UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| REYNOLDS CONSUMER PRODUCTS INC.,<br>Plaintiff,<br><br>v.<br><br>HANDI-FOIL CORPORATION,<br>Defendant. | Case No.: 1:13-cv-214 LO/TRJ |

PLAINTIFF REYNOLDS CONSUMER PRODUCTS INC.'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT REPORT OF DR. RAN KIVETZ

BRACEWELL & GIULIANI LLP

Britt Steckman
britt.steckman@bgllp.com
2000 K Street NW, Suite 500
Washington, D.C. 20006-1809
Telephone: 202.828.5800
Facsimile: 800.404.3970

OF COUNSEL:

Mark N. Mutterperl (*pro hac vice*)
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
Telephone: 212.508.6100
Facsimile: 800.404.3970

*Attorneys for Plaintiff Reynolds Consumer Products Inc.*

Dated: December 20, 2013

TABLE OF CONTENTS

PAGE(S)

I. SUMMARY ..... 1

II. STATEMENT OF FACTS ..... 2

A. The Two Generally Acceptable Survey Methodologies: *Squirt* and *Eveready* ..... 2

B. The Kivetz Survey ..... 3

ARGUMENTS AND AUTHORITIES ..... 7

III. LEGAL STANDARD ..... 7

A. Rule 702 and *Daubert* ..... 7

B. Rule 403 ..... 8

IV. DR. KIVETZ'S SURVEY FAILS TO FOLLOW ACCEPTED STANDARDS FOR PERFORMING SURVEYS AND MUST BE STRICKEN ..... 9

A. The Kivetz Survey Uses An Untested And Unaccepted Methodology ..... 9

B. The Kivetz Survey Fails to Replicate Marketplace Conditions ..... 16

V. CONCLUSION ..... 17

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Belk, Inc. v. Meyer Corp., U.S.*,
679 F.3d 146 (4th Cir. 2012) ....... 8

*Cooper v. Smith & Nephew, Inc.*,
259 F.3d 194 (4th Cir. 2001) ....... 9

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) ....... 8, 9, 14

*Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*,
628 F.2d 500 (5th Cir. 1980) ....... 7

*Hansen Beverage Co. v. Cytopsport, Inc.*,
2009 WL 5104260 (C.D. Cal. Nov. 10, 2009) ....... 13

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
2007 WL 2258688 (S.D.N.Y Aug. 6, 2007) ....... 13

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*,
Case No. 06 Civ. 550, 2007 U.S. Dist. LEXIS 57320 (S.D.N.Y. Aug. 6, 2007) ....... 16

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ....... 9

*Leelanau Wine Cellars, Ltd. V. Black & Red, Inc.*,
452 F. Supp. 2d 772 (W.D. Mich. 2006) ....... 16

*M. Kramer Mfg. Co., Inc. v. Andrews*,
783 F.2d 421 (4th Cir. 1986) ....... 11

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
472 F.3d 298 (6th Cir. 2006) ....... 15

*PBM Prods., LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir. 2011) ....... 8

*Richmond Med. Ctr. for Women v. Herring*,
527 F.3d 128 (4th Cir.2008) ....... 9

*Safe Auto ins. Co. v. State Auto. Mut. Ins. Co.*,
2009 WL 3150328 (S.D. Ohio Sept. 30, 2009) ....... 13, 14

*Simon & Schuster, Inc. v. Dove Audio, Inc.*,
970 F.Supp. 279 (S.D.N.Y.1997) ....... 13

*Simon Prop. Group L.P. v. MySimon, Inc.*,
104 F. Supp. 2d 1033 (S.D. Ind. 2000) .......... 13, 16

*Squirtco v. Seven-Up Co.*,
628 F.2d 1086 (8th Cir. 1980) .......... 2, 3, 10

*THIOP v. Walt Disney Comp.*,
690 F. Supp. 2d 218 (S.D.N.Y. 2010) .......... 13

*Union Carbide Corp. v. Ever-ready, Inc.*,
531 F.2d 366 (7th Cir. 1976) .......... 2, 9

*Westberry v. Gislaved Gummi AB*,
178 F.3d 257 (4th Cir. 1999) .......... 9

RULES

FED. R. EVID. 403 .......... 1, 9

FED. R. EVID. 702 .......... 1, 8, 9

OTHER AUTHORITIES

6 J. THOMAS MCCARTHY, *McCarthy on Trademarks and Unfair Competition (2013)* .......... 3, 7, 8, 10, 12

S. DIAMOND & J. SWANN, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* (2012) .......... 13, 14

Plaintiff Reynolds Consumer Products, Inc. ("Reynolds") moves to exclude the expert report of Dr. Ran Kivetz offered on behalf defendant Handi-Foil Corporation ("Handi-Foil") and respectfully shows as follows:

## I. SUMMARY

Handi-Foil hired an expert to conduct a reliable and admissible survey to assess the likelihood of confusion between Reynolds' federally registered trade dress and the trade dress used by Handi-Foil. However, Handi-Foil got more than it bargained for. Its expert, Dr. Kivetz, employed his expertise to create an unorthodox, not generally accepted survey design tailored to minimize the inevitable confusion between the strikingly similar packages in this case. Rather than use one of two generally accepted survey methodologies, Dr. Kivetz's Frankenstein-inspired survey put pieces of each methodology together to create a hybrid monster that was thoroughly untested and unreliable. His survey employs a fundamentally flawed methodology that renders his report unreliable as a matter of law.

The flaws in Dr. Kivetz's survey are more than mere technical deficiencies. Dr. Kivetz's survey takes wildly inconsistent approaches with respect to the method used to present products to survey respondents and the questions asked of the survey respondents, combining two approaches that even Dr. Kivetz acknowledges are "fundamentally different." Dr. Kivetz's unconventional survey methodology also fails to properly replicate market conditions as required. The result is that the data he used to reach his conclusions does not meet the standards set forth in Federal Rules of Evidence 702 and 403. There is virtually no authority supporting the hybrid survey method employed by Dr. Kivetz, which was manufactured for the sole purpose of this litigation.

The flaws in Dr. Kivetz's methodology, including his failure to replicate market conditions, did not follow accepted survey principles, and had a substantial impact on the clarity of the survey, the integrity of the underlying data, and the overall reliability of his expert report such that Dr. Kivetz's report and any testimony regarding the same should be excluded as unreliable as a matter of law.

## II. STATEMENT OF FACTS

### A. The Two Generally Acceptable Survey Methodologies: *Squirt* and *Eveready*

Decades of case law have approved two different (indeed, fundamentally different) survey methodologies: *Squirt* (so-called after the case *Squirtco v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980)), and *Eveready* (after *Union Carbide Corp. v. Ever-ready, Inc.*, 531 F.2d 366 (7th Cir. 1976)).

In an Eveready survey, respondents are shown the junior user's product or marketing materials (Handi-Foil in this case) and, without showing the respondent anything about the senior user (Reynolds in this case), the respondent is asked open-ended questions such as "Who do you think puts out this product?," with follow-up questions, such as "What makes you think so?" and "Name any other products put out by the same concern which puts out this product." The Eveready survey tests top of mind confusion by having the respondents freely associate the subject materials with a known senior user, without any additional stimuli to encourage or discourage the connection.

In a Squirt survey, respondents are shown a line-up of products or marketing materials, including materials bearing both the senior and junior user's marks, and asked whether the two products or services are put out by the same company, without mentioning either company by

name. *Id.*; *see also* 6 MCCARTHY at §§32:174 (discussing the Eveready design); 32:177 (discussing product line-up/Squirt designs). These questions test the key criteria – confusion between choices that are otherwise given equal weight in the presentation.

B. The Kivetz Survey

Dr. Kivetz was hired by Handi-Foil to prepare a survey in an attempt to estimate the amount of confusion between the registered trade dress used by Reynolds' aluminum roll products (*i.e.*, the senior user of the trade dress at issue) and the trade dress used by the accused Handi-Foil product (*i.e.*, the junior user of the trade dress at issue). **Ex. 1**, Expert Report of Dr. Ran Kivetz ("Kivetz Report") at 1. Dr. Kivetz administered his survey to approximately 400 respondents that were split into two primary groups: those who participated in the survey with the "test product" (the accused Handi-Foil product) and those who participated in the survey with the "control product" (a modified Handi-Foil product designed by Dr. Kivetz that he contends removes all of the trade dress elements at issue in this case). *Id.* at 22-23, 26-31. The use of a control is aimed at reducing "noise," whereby some responses that might be registered as an instance of confusion are obtained due to factors not attributable to confusion between the products at issue, such as guessing. *Id.* The instances of confusion registered by the surveys administered with the control product are subtracted from the instances of confusion registered by the surveys administered with the test product to arrive at a net estimate of confusion. *Id.* at 26-31.

Here, respondents in both the test and control groups were shown a two-shelf display with three aluminum foil products: (1) the test or control Handi-Foil product (**Exs. 2 and 3**, respectively); (2) a representative Reynolds aluminum foil product (**Ex. 4**); and (3) an aluminum

foil product manufactured by Ultra Foil, a non-party seller (**Ex. 5**). *Id.* at 22-23. Front facing images of the aluminum foil products used during Dr. Kivetz's survey are shown below:




**Ex. 2**, test Handi-Foil Product (i.e., the accused product).




**Ex. 3**, control Handi-Foil Product (i.e., the modified versions of the accused product).




**Ex. 4**, representative Reynolds product.




**Ex. 5**, third party Ultra Foil product.

As discussed above, this product array follows the sequential or so-called "Squirt" survey format.

However, Dr. Kivetz's interviewers did not ask the questions that are well-established and associated with a Squirt survey product line-up, but instead used a set of biased questions modified from the Eveready survey format.

In particular, when faced with the product line-up, the respondents were instructed as follows:

> Suppose you are going to a Dollar Tree store to buy aluminum foil. Let me show you now products you might see in the cooking, baking, or kitchen supplies section of the store. Please evaluate the products as you would normally do if you were thinking of buying aluminum foil. You may pick up any product if that is what you would normally do before deciding which one to buy. Take as much time as you would normally do when considering buying such a product. Just tell me when you are done.

**Ex. 1**, Kivetz Report at 23.

After a survey respondent viewed the three products, the interviewer removed the test or control Handi-Foil product and placed it on a table in front of the respondent, notably singling out the Handi-Foil product as distinct from the Reynolds and Ultra Foil products. *Id.* Next, while explicitly pointing at the test or control Handi-Foil product, thus singling out the Handi-Foil product for a second time, the interviewer instructed as follows:

> Suppose now that you are thinking of buying this product. Please evaluate it as you would normally do if you were thinking of buying it. You may pick it up if that is what you would normally do before deciding whether to buy such a product. Take as much time as you would normally do when considering buying such a product. Just tell me when you are done.

*Id.*

At this point, the Handi-Foil products have twice been singled out, and the respondents almost surely expended more time and focus than one would normally have engaged in when purchasing aluminum foil (a low cost, low investment purchasing decision).

After examining the test or control Handi-Foil product for a second time, the respondents were asked a series of questions. The Handi-Foil product, separated from the other two products, remained on the table in front of the respondents for the remainder of the interview. *Id.* The questions were as follows:

1a. Which company makes this product?

1b. What makes you say that? Anything else?

2a. Do you think that:

The company that makes this product does have a business affiliation or connection with another company or brand, or

The company that makes this product does not have a business affiliation or connection with another company or brand, or

You have no opinion about that

2b. [*If the respondent answered that the company that makes the test or control Handi-Foil product does have a business affiliation or connection with another company or brand*] Which other company or brand has a business affiliation or connection with the company that makes this product?

2c. What makes you say that [*inserting the name from question 2b.*] has a business affiliation or connection with the company that makes this product? Anything else?

3a. Do you think that:

The company that makes this product did receive permission or approval from another company or brand, or

The company that makes this product did not receive permission or approval from another company or brand, or

You have no opinion about that

> 3b. [*If the respondent answered that the company that makes the test or control Handi-Foil product did receive permission or approval from another company or brand*] From which other company or brand did the company that makes this product receive permission or approval?
>
> 3c. What makes you say that the company that makes this product received permission or approval from ([*inserting the name from question 3b.*]? Anything else?
>
> *Id.* at 24-26.

Of the 202 respondents in the test group, 75 provided answers indicating confusion, amounting to a confusion rate of *over 37%.*[1] *Id.* at 32. Of the 205 respondents in the control group, 89 provided answers indicating confusion, amounting to a confusion rate of 43%, rendering a net confusion rate of negative 6%. *Id.*[2] According to Dr. Kivetz, these results indicate there is no likelihood of confusion between the accused Handi-Foil product and the Reynolds product.

As discussed further below, there is nearly no support for combining the Eveready questions with the sequential/Squirt product array, and it is clear that Dr. Kivetz improperly combined these formats for the purpose of manufacturing a low estimate of confusion to support his client's position in litigation.

## ARGUMENTS AND AUTHORITIES

### III. LEGAL STANDARD

#### A. Rule 702 and *Daubert*

---

[1] To provide a sense of scale for how remarkably high this level of confusion is in the context of confusion surveys, survey results ***as low as 11%*** applicable to large pools of consumers support a finding of likely confusion. 6 J. THOMAS MCCARTHY, *McCarthy on Trademarks and Unfair Competition* (2013) ("McCarthy") § 32:185; *see also Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 506–07 (5th Cir. 1980) (finding a survey to be "strong evidence" where "15 percent of the individuals surveyed associated the Texon sign with Exxon," "23 percent . . . with gasoline, a gas station, or an oil company," and "seven percent. . . with defendants' corporation.").

[2] The fact that respondents allegedly indicated *more* confusion from an essentially all red box than the strikingly similar mostly blue box does not even pass the "red face test," and should have given Kivetz a strong clue that his survey was unreliable.

Pursuant to Federal Rule of Evidence Rule 702, expert testimony is admissible if it will assist the trier of fact and is (1) "based upon sufficient facts or data," (2) "the product of reliable principles and methods," and (3) "the principles and methods [have been applied] reliably to the facts of the case." Fed. R. Evid. 702. As the Supreme Court has explained, evidence is admissible under Rule 702 if "it rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 597 (1993). The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Id.* at 590.

Although mere technical deficiencies merely go to the weight—and not admissibility—of a confusion survey, there are occasions when the proffered methodology is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011); *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 163 (4th Cir. 2012). As Professor McCarthy has observed, "once a survey has passed the threshold criteria of having a proper foundation, being relevant, *and having been conducted according to accepted principles*" it can be admitted into evidence and any follow-on technical critiques are largely left for the trier of fact to weigh when assessing the persuasive value of the expert's testimony. 6 MCCARTHY §32:170 (emphasis added).

Here, Dr. Kivetz, as explained herein, failed to conduct his survey according to accepted principles to manufacture an artificially low level of confusion. Accordingly, his survey should be excluded.

B. Rule 403

Expert testimony may also be excluded under Federal Rule of Evidence Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury." Fed. R. Evid. 403. *Daubert* recognized that because expert testimony "can be both powerful and quite misleading because of the difficulty of evaluating it," the Court must "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Id.* at 595; *see also Richmond Med. Ctr. for Women v. Herring,* 527 F.3d 128, 134 n. 1 (4th Cir.2008) ("Under Federal Rule of Evidence Rule 702 expert testimony must be both relevant and reliable."). Thus, in applying Rule 403, the Court "exercises more control over experts than . . . lay witnesses." *Id.*; *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir. 1999)).

## IV. DR. KIVETZ'S SURVEY FAILS TO FOLLOW ACCEPTED STANDARDS FOR PERFORMING SURVEYS AND MUST BE STRICKEN

Although the decision in *Daubert* addressed expert testimony that relied on "scientific principles," in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), the Supreme Court made clear "*Daubert's* general holding – setting forth the trial judge's 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Thus, any expert testimony, including testimony regarding surveys, must meet the "standard of evidentiary reliability" established by Federal Rule of Evidence 702. *Id.* at 149 (quoting *Daubert*, 509 U.S. at 590).

### A. The Kivetz Survey Uses An Untested And Unaccepted Methodology

In his Report, Dr. Kivetz inaccurately suggests that his survey follows the Eveready survey format. **Ex. 1**, Kivetz Report at 24, 36; *see also Union Carbide Corp. v. Ever-ready, Inc.*, 531 F.2d 366, 381-82 (7th Cir. 1976). However, during his deposition, Dr. Kivetz conceded that he, in fact, used an unorthodox hybrid methodology he terms a "side-by-side Eveready" survey that conflates an Eveready survey approach with a Squirt survey approach. **Ex. 6**, Kivetz Dep. at

184:16-186:9; *see also Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4, 1091 (8th Cir. 1980). Dr. Kivetz's hybrid approach is untested, not generally accepted, and fails to follow well-accepted survey principles.

Kivetz readily admits that the two most commonly used and accepted methodologies for surveying potential confusion are the Eveready and Squirt survey designs. **Ex. 1**, Kivetz Report at 24, 36-37, 64-65; *see also* 6 MCCARTHY §32:173.50.

The methodology used in the Kivetz Survey notably fails to follow either the Eveready or Squirt format. Contrary to the standards followed in an Eveready survey, the Kivetz Survey erroneously exposed the respondents to information regarding Reynolds (the senior user). Further, Dr. Kivetz placed three products in front of the respondents and then conspicuously and intentionally isolated the Handi-Foil product by placing the Handi-Foil test and control product in front of the respondent. Indeed, the forced focus on a singular product (*i.e.*, the Handi-Foil test and Handi-Foil control product) is repeated twice by asking the respondent to view the product separately and then keeping the product in front of the respondent, isolated from the other products. Dr. Kivetz's format suggests to respondents that the isolated, inherently emphasized Handi-Foil product is distinct and will be asked about on its own. This process undermines the potential association respondents may have had with the senior product (*i.e.*, the Reynolds product) and is precisely why neither the Eveready nor Squirt format is performed in this manner.

Kivetz's method not only directed attention to the Handi-Foil product as a distinct product, it did so at the expense of the Reynolds product. Whereas an Eveready survey tests the recall of the respondent of the senior mark without any stimulus, Kivetz's hybrid method did

provide a stimulus of the senior mark – in the other direction. By pulling the Handi-Foil product out and keeping the Reynolds product in the background during the interview about the Handi-Foil product, his actions affirmatively *severed* any relationship between the product on the table and the ones in the background. In a classic Eveready survey, the open-ended questions give the respondent the ability to freely associate the junior product with whatever comes to mind. Here, Kivetz actively *discouraged* any such association by first presenting, then physically separating, the products.

Dr. Kivetz's questionnaire also departs from the Eveready format such that it improperly isolates and emphasizes the Handi-Foil product. Instead of asking the neutral "Who do you think puts out this product?" as is standard in an Eveready survey questionnaire, Dr. Kivetz asked at the outset "*Which company* makes this product?" As with the product array and repeated emphasis on and segregation of the Handi-Foil product, Dr. Kivetz's opening question implies that the product placed before the respondents (*i.e.*, the Handi-Foil product) is marketed and sold by a particular company that is distinct and unrelated to the other products that are a part of the survey.

The request for a particular company name, rather than the standard, more open-ended Eveready question, "who," also likely downplays the strength of the brand association. A consumer may know a particular brand as unique to a source, but trademark law does not require the consumer to know the *name* of the particular source, only to make the connection. *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 449 (4th Cir. 1986) ("The public need not be able to identify the name of the manufacturer that produces the product; it is enough if the public perceives that the product emanates from a single source"). By asking for a company name, Kivetz effectively cut off possible responses from respondents who may have known the

Reynolds product by its brand name, REYNOLDS WRAP, without knowing (or caring about) the name of the corporate entity behind the brand.

Moreover, in a Squirt survey, the respondents are presented with the product or marketing material of the senior user, the junior user and others, and then asked whether the respondent believes that the product/service of the senior user is put out by the same company as the product/service of the junior user. 6 MCCARTHY at §32:177. Such "comparative" questions are appropriate when the respondent is faced with an array of products so the survey can elicit the respondent's reactions to the multiple stimuli before them. Contrary to the standards followed in a Squirt survey, and rather than being asked the direct question of whether the products sold under the Handi-Foil trade dress were put out by the same company as the products sold under the Reynolds trade dress (as required by a Squirt survey), the respondents here were asked only questions concerning Handi-Foil. Thus, Dr. Kivetz's hybrid survey format fundamentally undermined the potential association the respondents may have had with the Reynolds product.

Even Dr. Kivetz struggled to explain why he chose the unorthodox hybrid Eveready/Squirt format. Although Dr. Kivetz attempted to brush aside his markedly unusual survey design as simply an "issue of semantics" and tried to couch it as better reflecting market conditions, in his Report Dr. Kivetz expressly admitted that the "Eveready survey format that uses questions that focus on just one mark/product/service is often fundamentally different from a sequential presentation of both marks at issue [i.e., the Squirt format]." *Compare* **Ex. 6**, Kivetz Dep. at 186:2-9 *with* **Ex. 1**, Kivetz Report at 38 (emphasis added). In fact, it is for this reason that courts (and experts) have long viewed the two methods as distinct and competing. *See Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 289–91 (S.D.N.Y.1997) (discussing the

"markedly" divergent results between a sequential/Squirt survey and an Eveready survey); *Simon Prop. Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033, 1041-43 (S.D. Ind. 2000) (discussing the different nature of sequential and Eveready survey formats); *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *8 (S.D.N.Y Aug. 6, 2007) (same); *Hansen Beverage Co. v. Cytopsport, Inc.*, 2009 WL 5104260, at *15 (C.D. Cal. Nov. 10, 2009) (same); *THIOP v. Walt Disney Comp.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010) (noting that confusion surveys are "contingent on the method used, and different methods often produce drastically different results"; discussing the marked difference between sequential array and Eveready survey formats). In contrast, in the decades since the Eveready and Squirt survey formats were first accepted, there has been almost no endorsement of the form of hybrid methodology proffered by Dr. Kivetz.

When asked whether a Court or authoritative body had endorsed his methodology, Kivetz could not identify a single case, only generally stating that he believed some case or cases may have accepted such a methodology. **Ex. 6**, Kivetz Dep 191:24-192:25. Indeed, the only support he could muster during his deposition was a single footnote in chapter of a book concerning confusion surveys *that he co-authored* (with a Dr. Itamar Simonson). **Ex. 7**, S. DIAMOND & J. SWANN, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* (2012) ("Swann") at 249, n. 25. Further, among the only—if not the only—case that appears to have accepted a substantially similar mixed-method survey is *Safe Auto ins. Co. v. State Auto. Mut. Ins. Co.*, 2009 WL 3150328, at *3 (S.D. Ohio Sept. 30, 2009). As an initial matter, the court in *Safe Auto* effectively devoted no analysis to the issue, merely stating without explanation that "[a]lthough the Court is suspicious of methodologies created for the purpose of litigation, the Court finds that Plaintiff has not shown the Simonson Survey's methodology to be so unreliable

that it should be excluded." *Id.* (citations and quotations omitted). Moreover, the survey expert in *Safe Auto* subject to the *Daubert* motion in that case was Dr. Itamar Simonson, the co-author of the above-cited publication that Dr. Kivetz claims supports his survey method. Dr. Kivetz and Dr. Simonson's self-serving publication is in no way a neutral peer review and does not provide any *indicia* of reliability concerning Dr. Kivetz's proffered methodology. Further, a decision in a case with different facts and circumstances from a district court in Ohio does not remotely establish that Dr. Kivetz's unorthodox methodology is reliable by *Daubert* standards.

Further, a leading trademark practitioner to whom Dr. Kivetz repeatedly points in his Report and deposition was skeptical that the "judicially unvetted" method of combining the formats, or "going both ways," would be given credence by the courts:

> Given the level of judicial suspicion generated by variants of traditional designs [Eveready and Squirt], and the often higher level of hostility to the Squirt format, I doubt that "going both ways" will come into vogue.

**Ex. 8**, SWANN at 54, 72; *see also, e.g.*, **Ex. 1**, Kivetz Report at 24, n.21-22; 36, n. 36-37; 37, n.41-44; 55, 61 (repeatedly referencing Mr. Swann); **Ex. 6**, Kivetz Dep. at 138:13-144:23; 154:17-25; 191:19-22 (same).[3]

Courts are rightfully "suspicious of methodologies created for the purpose of litigation, because expert witnesses are not necessarily unbiased scientists," *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 298, 408 (6th Cir. 2006), and Reynolds urges the Court to see Dr. Kivetz's survey for what it clearly is: an unreliable "one-off" creation that substantially deviates

[3] Although Mr. Swann casts doubt on the acceptability of "going both ways," his proffered version of combining the two survey methods is much less divergent from the standard formats than the survey method employed by Dr. Kivetz. The example of going both ways highlighted by Mr. Swann entails a sequential array, ***a Squirt questionnaire***, and then questions about the respondents' prior awareness of the senior user's mark. SWANN at 72.As noted, Dr. Kivetz fails to administer a Squirt questionnaire, likely because doing so would have resulted in a high level of confusion (due to the undeniable fact that the accused Handi-Foil product looks nearly identical to the representative Reynolds product).

from accepted confusion survey principles created solely for the purposes of this litigation. Dr. Kivetz's methodology finds almost no support in the courts and has not been subjected to any reliable peer review process in the context of trademark confusion surveys. Indeed, despite performing expert services for 17 cases in the last four years alone—and likely many more before that—the survey here is the only "side-by-side Eveready" survey Dr. Kivetz has ever conducted. **Ex. 6**, Kivetz Dep. at 44:23-45:20; 245:12-247:16. The only reason Dr. Kivetz would have designed a survey using a methodology lacking strong peer review support and wide judicial acceptance when two long-standing and well-established alternative methodologies exist is because he knew that the traditional Eveready and/or Squirt surveys would have resulted in a clear finding of confusion. This is not surprising, given the near identical nature of the trade dress used by the infringing Handi-Foil product when compared to Reynolds' aluminum foil products. Only a fundamentally flawed survey could have produced the nonsensical results that these two products:




are more confusingly similar than these two products:



B. The Kivetz Survey Fails to Replicate Marketplace Conditions

It is well settled that "a survey to test likelihood of confusion must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace." *Simon Prop.*, 104 F.Supp.2d at 1038. That is,

> Germaine survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions. . . . A survey's failure to approximate marketplace conditions can provide grounds for the survey's exclusion.

*Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, Case No. 06 Civ. 550, 2007 U.S. Dist. LEXIS 57320, *20 (S.D.N.Y. Aug. 6, 2007) (internal quotations and citations omitted); *see also Leelanau Wine Cellars, Ltd. V. Black & Red, Inc.*, 452 F. Supp. 2d 772, 783 (W.D. Mich. 2006) (noting that a survey that fails to adequately replicate market conditions is entitled to little if any weight); *aff'd* 502 F.3d 504, 518 (stating the district court "was also correct in concluding that the study failed to replicate actual market conditions.").

The Kivetz Survey does not show, or even attempt to show, the Handi-Foil product in the manner that it is seen in the marketplace. Rather, as set forth above, the Handi-Foil product was specifically pulled out and placed before the respondents and further highlighted (*i.e.*, pointed to) during the interview. This methodology blatantly and artificially highlights the accused product and separates it from the product it is accused of infringing. Further, given that aluminum foil is a low cost, low investment purchasing decision, the intensified focus placed on the single Handi-Foil test or control product fails to replicate purchasing habits for those in the market for aluminum foil. It would be a rare event that a consumer would study an aluminum foil product with the intensity mandated by Dr. Kivetz's survey. It is far more likely that an aluminum foil shopper would not even notice the name on the accused Handi-Foil product and might simply

assume that the accused product is identical to or affiliated with Reynolds' products due to the near identical nature of the packaging. Thus, in addition to his fundamentally flawed methodology, Dr. Kivetz's survey also fails to replicate marketplace conditions and must, therefore, be excluded.

## V. CONCLUSION

For the foregoing reasons, the Court should grant this motion to exclude Dr. Kivetz's report and testimony.

December 20, 2013

Respectfully submitted,

Britt Steckman
britt.steckman@bgllp.com
BRACEWELL & GIULIANI LLP
2000 K Street NW, Suite 500
Washington, D.C. 20006-1809
Telephone: 202.828.5800
Facsimile: 800.404.3970

OF COUNSEL:

Mark N. Mutterperl (*pro hac vice*)
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
Telephone: 212.508.6100
Facsimile: 800.404.3970

*Attorneys for Plaintiff Reynolds Consumer Products Inc.*

CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2013, the foregoing document was served via electronic mail to the following per the parties' agreement:

Brian N. Gross
D. Sean Trainor
Kirkland & Ellis L.L.P.
655 15th Street, NW
Suite 12
Washington, D.C. 20005
brian.gross@kirkland.com
dtrainor@kirkland.com

David Callahan
Ian J. Block
Robin A. McCue
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
dcallahan@kirkland.com
ian.block@kirkland.com
rmccue@kirkland.com

Mark N. Mutterperl