**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| REYNOLDS CONSUMER PRODUCTS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 1:13-cv-214 LO/TRJ |
| ) | |
| HANDI-FOIL CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT HANDI-FOIL CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION
TO EXCLUDE ANY TESTIMONY, ARGUMENT, OR EVIDENCE REGARDING
THE SURVEY, EXPERT REPORT, AND OPINIONS OF SARAH BUTLER**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................2

I.   THE ACCUSED PACKAGES ...............................................................................3

II.   MS. BUTLER'S SURVEY......................................................................................4

    A.   Universe Surveyed Versus Proper Universe of Consumers .....................4

    B.   How The Survey Was Conducted...............................................................5

    C.   The Questions Asked And Responses Given...............................................6

ARGUMENT .....................................................................................................................8

III.   *DAUBERT* REQUIRES THE COURT TO EXCLUDE EXPERT TESTIMONY
    THAT IS IRRELEVANT, UNRELIABLE, UNSUPPORTED, OR
    SPECULATIVE......................................................................................................8

IV.   MS. BUTLER'S SURVEY IS IRRELEVANT AND UNRELIABLE, AND
    SHOULD BE EXCLUDED...................................................................................10

    A.   Ms. Butler Surveyed The Wrong Universe, And Her Survey Is Irrelevant...........10

    B.   The Butler Survey Violated Market Conditions When It Used Products
        That Do Not Appear Together In The Market. .......................................13

    C.   Ms. Butler's Leading Questions Resulted In Unreliable Data That Cannot
        Support Her Opinions On Confusion......................................................15

    D.   The Butler Survey Failed To Use A Proper Control................................17

V.   THE BUTLER SURVEY IS INAPPLICABLE AND IRRELEVANT TO ANY
    PACKAGE OTHER THAN THE ONE TESTED, AND ANY OPINIONS AS TO
    UNTESTED PACKAGES ARE SPECULATIVE AND UNSUPPORTED....................21

CONCLUSION...............................................................................................................24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.,*
   402 F. Supp. 2d 1312 (D. Kan. 2005) ................................................................. 12

*Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City,*
   No. Civ.A. 01-1524, 2003 WL 24010950, at \*5 (W.D. Pa. Apr. 23, 2003) ............................ 11

*Cooper v. Smith & Nephew, Inc.,*
   259 F.3d 194 (4th Cir. 2001) ................................................................................ 9

*Cumberland Packing Corp. v. Monsanto Co.,*
   140 F. Supp. 2d 241 (E.D.N.Y. 2001) ................................................................. 17

*CytoSport, Inc. v. Vital Pharm., Inc.,*
   617 F. Supp. 2d. 1051 (E.D. Cal. 2012) ............................................................. 22

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ...................................................................................... 8, 9, 21

*Fancaster, Inc. v. Comcast Corp.,*
   832 F. Supp. 2d 380 (D.N.J. 2011) ................................................................... 14

*General Motors Corp. v. Lanard Toys, Inc.,*
   468 F.3d 405 (6th Cir. 2006) ............................................................................. 17

*Georgia-Pacific Consumer Prods. LP, v. Global Tissue Grp., Inc.,*
   Opposition No. 91184529 (T.T.A.B. 2011) ....................................................... 23

*Gov't Emps. Ins. Co. v. Google, Inc.,*
   No. 1:04CV507, 2005 WL 1903128 (E.D. Va. Aug. 8, 2005) ........................... 21

*Innovation Ventures, LLC v. N2G Distrib., Inc.,*
   No. 08-CV-10983, 2011 WL 6010206 (E.D. Mich. Nov. 30, 2011) ............... 16, 20

*J & J Snack Foods, Corp. v. Earthgrains Co.,*
   220 F. Supp. 2d 358 (D.N.J. 2002) ..................................................................... 9

*Johnson & Johnson-Merck Consumer Pharmas. Co. v. Rhone-Poulenc Rorer Pharmas., Inc.,*
   19 F.3d 125 (3rd Cir. 2008) ............................................................................... 15

*Kargo Global, Inc. v. Adv. Mag. Publishers, Inc.,*
   No. 06 Civ. 550(JFK); 2007 WL 2258688 (S.D.N.Y. 2007) ......................... 15, 16

**Page(s)**

*Kumho Tire Co. Ltd. v. Carmichael,*
  526 U.S. 137 (1999) ............................................................................. 8

*Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.,*
  No. 10 CIV. 1611 (PKC), 2012 WL 1022247 (S.D.N.Y. 2012) ............................. 11

*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................................. 12, 17, 20

*Millennium Labs., Inc. v. Ameritox, Ltd.,*
  924 F. Supp. 2d 594 (D. Md. 2013) ........................................................ 17

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.,*
  198 F. Supp. 2d 474 (S.D.N.Y. 2002) ...................................................... 15

*Native Am. Arts, Inc. v. Bud K World Wide Inc.,*
  No. 7:20-CV-124, 2012 WL 1833877 (M.D. Ga. May 18, 2012) ........................ 10

*Pamlab, L.L.C. and Metabolite Labs., Inc. v. Brookstone Pharmas, L.L.C.,*
  No. 2:09-cv-07434, Dkt. No. 201-6 (E.D. La. 2010) .................................... 23

*Simon Prop. Grp. L.P. v. mySimon, Inc.,*
  104 F. Supp. 2d 1033 (S.D. Ind. 2000) .................................................. 10

*Starter Corp. v. Converse, Inc.,*
  170 F.3d 286 (2d Cir. 1999) .............................................................. 9

*Sterling Drug. Inc. v. Bayer AG,*
  14 F.3d 733 (2d Cir.1994) ............................................................... 11

*The Learning Network, Inc. v. Discovery Commc'ns, Inc.,*
  153 F. Supp. 2d 785 (D. Md. 2001) ...................................................... 10

*THOIP v. Walt Disney Co.,*
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) .................................................. 15, 17, 21

*Time Warner Cable, Inc. v. DirectTV, Inc.,*
  No. 06 CIV 14245(LTS)(MHD), 2007 WL 1138879 (S.D.N.Y. Apr. 16, 2007) ............ 22

*Trouble v. Wet Seal,*
  179 F. Supp. 2d 291 (S.D.N.Y. 2001) .................................................... 15

*Tunnell v. Ford Motor Co.,*
  330 F. Supp. 2d 707 (W.D. Va. 2004) .................................................... 12

*Univ. of Kan. v. Sinks,*
  No. 06-2341-JAR, 2008 WL 755065 (D. Kan. 2008) ...................................... 11

**Page(s)**

*Water Pik Inc. v. Med-Sys, Inc.,*
No. 12-1065, 2013 WL 4046470 (10th Cir. Aug. 12, 2013) .................................................... 13

*WE Media, Inc. v. Cablevision Sys. Corp.,*
94 F. App'x 29 (2d Cir. 2004) ................................................................................................ 13

*WE Media, Inc. v. Gen. Elec. Co.,*
218 F. Supp. 2d 463 (S.D.N.Y. 2002) .................................................................................... 13

*Weight Watchers Int'l., Inc. v. Stouffer Corp.,*
744 F. Supp. 1259 (S.D.N.Y. 1990) ................................................................................. 12, 22

**Rules**

FED. R. EVID. 403 ......................................................................................................................... 9, 10

FED. R. EVID. 702 .................................................................................................................. 9, 10, 21

**Treatises**

J. Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, Trademark Rep., Vol. 92 (2002) ............................................................ 17

Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of* SQUIRT. 98 Trademark Rep. 739  (2008) ......................................................................................... 13, 15

McCarthy on Trademarks and Unfair Competition,
§ 32:159 (4th Ed. 2003) ............................................................................................... 10, 13, 15

S. Diamond, *Control Foundations: Rationales and Approaches*
Trademark & Deceptive Advertising Surveys: Law, Science and Design, ABA (2012) at 212-213.) .......................................................................................................................................... 18

S. Diamond, *Reference Guide on Survey Research*, Reference Manual on Survey Evidence, 229 (2d ed. 2000) ........................................................................................................... 10, 16, 20

## INTRODUCTION

Handi-Foil seeks to exclude all testimony, argument or evidence relating to the opinions and report of Ms. Sarah Butler, submitted on July 12, 2013.   If ever a survey were to be excluded, it should be this one.  Ms. Butler's survey—the first survey of this type she has *ever* conducted— is profoundly flawed, and meets neither the requirement of relevancy nor reliability under *Daubert*.  **First**, Ms. Butler's survey is flawed in the most basic way:  it tested the wrong universe.  For a survey to have any value, it must be directed to prospective purchasers of the accused package.   The package surveyed by Ms. Butler is sold exclusively in Dollar Tree stores—stores where every item sells for $1.  Ms. Butler, however, did not survey shoppers at Dollar Tree stores, but rather surveyed *anyone* who would consider purchasing aluminum foil, and so is materially over-inclusive.  This matters because the demographics of shoppers at Dollar Tree stores are distinct from the demographic make-up of Ms. Butler's survey.  Thus, her survey is irrelevant.

**Second**, Ms. Butler made no effort to replicate real-world market conditions—a necessary requirement for any consumer survey.  Ms. Butler surveyed packages of aluminum roll foil in a side-by-side manner even though that array of products would never be sold side-by-side all together in the marketplace.  If the products do not appear next to each other in stores, placing them together in front of survey respondents violates the real market conditions, an error courts frequently cite in rejecting surveys of this type.

**Third**, Ms. Butler used a meaningless control that violated the basic tenet of controls that she herself acknowledges:  Ms. Butler used an entirely different package—the CVS store brand aluminum foil—that did not retain *any* of the non-accused features of the Handi-Foil package (most notably the Handi-Foil brand name) but, yet contained numerous features that Reynolds

claims are infringing.   Even Ms. Butler herself admits that what she did is considered an "improper control."

Each of these flaws by themselves provides an independent basis to exclude Ms. Butler's testimony.   Taken together, they demonstrate that Ms. Butler's survey and opinion is so fatally flawed, and so deviates from accepted methodology, that the Court should exclude her report and opinions, and all testimony, evidence or argument relating to them.

***Finally***, Ms. Butler failed to survey all of the accused packages, looking only at the Dollar Tree package.   She did not expose a single respondent to any of the other four accused packages, nor did she address in her expert report the applicability of her survey of the Dollar Tree box to the other accused packages.   These packages are different in design and in color, but—most notably—in that the packages sold in grocery channels contain ***an express disclaimer disavowing any affiliation with Reynolds***.   Ms. Butler attempted to correct this profound void in her survey and report by baldly asserting at her deposition that the results of her survey can apply to other, different packages.   This opinion is nothing more than sheer speculation.   Ms. Butler could not—and cannot—account for how the disclaimer that is present on the accused grocery boxes would impact the survey results; in fact, her preparation in this case was so lacking that she had no idea the disclaimer existed until told so by counsel at her deposition.   If this survey is admitted, it should only be admitted for the limited purpose of allowing Ms. Butler to offer her stated opinions on the rate of confusion with respect to the specific Handi-Foil product used in the survey—any other conclusions from the survey are pure speculation.

## **BACKGROUND**

Reynolds filed this case against Handi-Foil in February 2013, claiming that the design of Handi-Foil's packaging was likely to cause confusion with the Reynolds Wrap package.   Before filing this case in February of 2013, Reynolds did not undertake any sort of consumer perception

study to determine if, in fact, its allegations of confusion were true or supportable. Instead, Reynolds waited until two weeks before the deadline for expert disclosure (six months after it filed suit) to retain an expert who—until this very case—had never before offered an opinion as a testifying expert with respect to any trade dress survey. It is, therefore, no surprise that Ms. Butler developed, implemented, and opined on a survey so flawed that it is rendered irrelevant to any issue and claim in this case.

## I.   THE ACCUSED PACKAGES

Reynolds has accused *five* different Handi-Foil packages of infringing its asserted trade dress. (Dkt. No. 56 ("2d Am. Compl.") ¶¶ 26-29.) Originally, Reynolds accused two packages: one that has been sold exclusively at Dollar Tree Stores—a chain of stores in which everything sells for $1 (or less)—since March 2012; and a prototype package displayed at a trade show that was never sold. (Dkt. No. 1 ("Original Compl." ¶¶ 21-26.) Several months into litigation, Reynolds sought to add additional packages, accusing three additional boxes: a design that was sold in grocery stores for a few months beginning in May 2012; a revised package design that is currently sold to grocery stores; and a package design for non-stick foil that is not commercially available. (Dkt. No. 34, ("1st Am. Compl.") ¶¶ 34-39; Ex. 1, June 11, 2013 Plaintiff's First Amended Responses to Defendant Handi-Foil Corporation's First Set of Interrogatories (Nos. 1-14) at No. 1.)[1]

Ms. Butler's survey tested only *one* accused package—the package sold exclusively at Dollar Tree. Ms. Butler did not survey any of the four other accused packages.

---

[1]   All references to exhibits to this Brief refer to the corresponding numbered exhibits to the Declaration of Ian J. Block in Support Of Its Motion to Exclude Any Testimony, Argument, or Evidence Regarding the Survey, Expert Report, And Opinions of Sarah Butler, filed concurrently herewith.

## II.    MS. BUTLER'S SURVEY

Reynolds retained Ms. Butler "to design research to determine whether Handi-Foil's use of aluminum foil packaging is confusingly similar to the packaging for Reynolds Wrap aluminum foil packaging." (*See* Ex. 2, 7/12/13 Sarah Butler Expert Report and Accompanying Exhibits D & E ("Butler Report) ¶ 7.)  Despite this being her first time serving as a testifying expert in a trade dress case (Ex. 3, 9/9/13 Sarah Butler Deposition ("Butler Dep.") 30:21-31:5), in a short two and a half weeks, Ms. Butler designed and performed a survey that is the basis for her report and opinions.  (Ex. 2, Butler Report ¶ 7; Ex. 3, Butler Dep. 59:18-63:7.)  While Ms. Butler claims the design of her research follows generally accepted principles for the design of a likelihood of confusion survey (Ex. 2, Butler Report ¶ 16), the universe selected failed to measure the proper consumers, the packages selected violated market place conditions, the questions asked were leading, and the control used was worthless.  Indeed, the design and execution are so flawed that they have rendered the survey irrelevant.

### A.    Universe Surveyed Versus Proper Universe of Consumers

Despite the fact that the package tested is ***available only to Dollar Tree*** customers, Ms. Butler identified the relevant population as being "men and women across the United States, over age 18, who are considering purchasing aluminum foil." (Ex. 2, Butler Report ¶ 17.)  In other words, Ms. Butler did not limit her survey to Dollar Tree shoppers.  Dollar Tree shoppers, however, are the only ones who would encounter the surveyed package in the marketplace, and the demographics of such consumers differ greatly from the universe surveyed by Ms. Butler.

Basing her survey demographics on what counsel told her, Ms. Butler used a demographic break-down of 80 percent female, 20 percent male. (*Id.*)   However, research conducted on behalf of Handi-Foil on the specific demographic breakdown of Dollar Tree customers shows that women make up 66% of customers and men 34%.  (Ex. 4, 8/12/13 Ran

Kivetz Expert Report Excluding Accompanying Exhibits ("Kivetz Report") ¶ 100.)  As a result, Ms. Butler's survey is underinclusive of men, and more importantly she has no way of knowing if even a single one of her survey respondents actually shops at Dollar Tree.  (Ex. 3, Butler Dep. 78:15-19.)  As a result, Ms. Butler is unable to say whether any of her survey respondents would ever encounter the Handi-Foil package surveyed.

### B.   How The Survey Was Conducted

Ms. Butler chose to do a line-up study—which features an "array" of products—with a two-room format.  (Ex. 2, Butler Report ¶¶ 20-22.)  Once qualified for the survey, respondents were told they were going to be asked questions about household products, and then were brought into a room where the Reynolds product was displayed alone on a shelf. (*Id.*) The Reynolds package used by Ms. Butler is the 30 square foot package that is available in grocery stores **but not at Dollar Tree stores**.  (Ex. 3, Butler Dep. 81:19-83:10.)  Once the respondent was finished looking at the Reynolds product, he or she was led into another room where an array of three different aluminum foil products was unveiled:  in the test group, the array included the Handi-Foil Dollar Tree package, Ultra Foil (a private label product available at Dollar Tree stores), and Shopper's Value (the store brand sold **only at SuperValu** chain of supermarkets); in the control group, the Handi-Foil Dollar Tree package was replaced with CVS's Total Home brand aluminum foil (the store brand available **only at CVS**).  (Ex. 2, Butler Report ¶¶ 24, 28-29; Ex. 3, Butler Dep. 84:3-22; 86:11-87:6.)[2]  Both test and control respondents were allowed to look at the products, and then were asked a series of questions about those products.

---

[2]  *See also* ShoperValu Labels Store Brand, http://www.supervalu-storebrands.com/sb_labels_shopvalu.asp (last visited Dec. 18, 2013); Durable Packaging International Home Page, http://www.durablepackaging.com/ (last visited Dec. 18, 2013); CVS.com Total Home Product Page, http://www.cvs.com/shop/product-detail/Total-Home-by-CVS-Heavy-Duty-Aluminum-Foil-50-Sq-Ft?skuId=692865 (last visited Dec. 18, 2013).

**C.     The Questions Asked And Responses Given.**

After reviewing the three-product line-up, respondents were asked the following, pertinent question:

> Q2:  "Do you think any of these products—the ones in front of you—are made or put out by the same company as the product you saw in the first room?
>
> 1. Yes, made or put out of the same company
> 2. No, not made or put out by the same company
> 3. Don't know

(Ex. 2, Butler Report at Ex. D, Foil Survey Questionnaire.)   The respondents who answered "Yes" to Q2 were asked the following close-ended "source confusion" question, Q3:

> Q3:  Which of these products do you think are made or put out by the same company?
>
> 1. Shopper's Value
> 2. Handi-Foil [test condition only]
> 3. Total Home [control condition only]
> 4. Ultra foil
> 5. Don't know

(*Id.*)   After Q3, respondents were asked in Q4 to explain their answers using an open-ended "What makes you say that?"   (*Id.*)   Then, respondents were asked another closed-ended filter question for the "affiliation confusion" question, Q5:

> Q5:  "Do you think any of these products—the ones in front of you—are affiliated or associated with the company that made or put out the product you saw in the first room?
>
> 1. Yes, are affiliated or associated
> 2. No, are not affiliated or associated
> 3. Don't know

(*Id.*)   Respondents who answered "Yes" were asked the following close-ended "source confusion" question, Q6:

Q6:  Which of these products do you think are affiliated or associated with the company that made or put out the product you saw in the first room?

1. Shopper's Value
2. Handi-Foil [test condition only]
3. Total Home [control condition only]
4. Ultra foil
5. Don't know

(*Id.*)  After Q6, respondents were asked in Q7 to explain their answer using an open-ended "What makes you say that?  (*Id.*)  Next, the respondents were asked another close-ended filter question for the "permission confusion" question, Q8:

Q8: "Do you think any of these products—the ones in front of you—received permission from the company that made or put out the product you saw in the first room?

1. Yes, received permission
2. No, did not receive permission
3. Don't know

(*Id.*)   Respondents who selected "Yes" were asked the following close-ended "permission confusion" question, Q9:

Q9: Which of these products do you think received permission from the company that made or put out the product you saw in the first room?

1. Shopper's Value
2. Handi-Foil [test condition only]
3. Total Home [control condition only]
4. Ultra foil
5. Don't know

(*Id.*)  For all of the questions, while the questionnaire listed a "Don't know" option, Ms. Butler ***specifically instructed the interviewers not to read*** that option.  (*Id.*)   In other words, in answering the questions, respondents were not given "Don't know" as an option.  Instead, Ms. Butler had them asked a multiple choice question with only "yes" and "no" as options.

7

Ms. Butler then undertook to calculate how many respondents were led to believe that there was either an affiliation between the parties, or that Reynolds was the source or had given Handi-Foil permission to put out its product.  Ms. Butler's method for such calculation was simple:  if the respondent said "Handi-Foil" then he or she was confused.  Period.  Ms. Butler did not take into account the reason for the response as explained in the verbatim responses (*i.e.*, the narrative answers to the open-ended questions), despite the fact that numerous people offered a reason other than the trade dress.[3]  (Ex. 3, Butler Dep. 114:9-118:5.)

## ARGUMENT

**III.   *DAUBERT* REQUIRES THE COURT TO EXCLUDE EXPERT TESTIMONY THAT IS IRRELEVANT, UNRELIABLE, UNSUPPORTED, OR SPECULATIVE.**

The Supreme Court has "assign[ed] to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  Likewise, Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge *will help the trier of fact* to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[3]   For example, Ms. Butler considered as confused people who stated their reason for believing the products are from, affiliated with or given permission by Reynolds included: "I just believe that they just don't make one product"; "it's the same company that makes the generic brand"; "the reason I think that is because they have to all get the aluminum all likely from the same place"; "because I don't think it would be part of the survey if it did not have permission." (*See* Ex. 3 Butler Dep. 117:14-121:3; 129:13-131:17.)

FED. R. EVID. 702 (emphasis added).  Under Rule 702, expert opinions are unreliable if they are formed from speculative, insufficient, or otherwise untrustworthy data.  *See* Rule 702 Advisory Committee notes ("The trial judge in all cases of proffered expert testimony must find it properly grounded, well-reasoned, and not speculative before it can be admitted."); FED. R. EVID. 403 (evidence may be excluded "if its probative value is substantially outweighed by a danger . . . unfair prejudice . . .").  Because expert testimony has the potential to be particularly misleading, courts must exercise greater control over experts than over lay witnesses and ensure all scientific testimony is relevant and reliable.  *Daubert*, 509 U.S. at 595; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

Moreover, Rule 403 requires the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger" of "unfair prejudice, confusion of the issues, or misleading the jury[.]"  FED. R. EVID. 403.  If a consumer survey is only marginally relevant, or if it is wholly irrelevant, to the key issues in a Lanham Act case the "survey may be kept from the jury's attention entirely."  *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (affirming district court's exclusion of survey under Rules 402, 403 and hearsay objections because it did not properly measure consumer confusion).  Most importantly, in order to be relevant, "the survey's design must fit the issue which is to be decided by the jury . . . lest the survey findings inject confusion or inappropriate definitions into evidence, confounding rather than assisting the jury."  *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 370 (D.N.J. 2002) (excluding survey under Rules 702 and 403).

Ms. Butler's survey used the wrong packages with the wrong group of people, and asked questions that created the desired outcome, and failed to control for any noise.  These flaws render her survey irrelevant in terms of measuring confusion and prejudicial to Handi-Foil, and

9

this Court should exclude it.  *See The Learning Network, Inc. v. Discovery Commc'ns, Inc.*, 153 F. Supp. 2d 785 (D. Md. 2001) (excluding a survey where the defects were "so great as to warrant exclusion rather than grist for the mill of cross-examination, rebuttal evidence, and jury evaluation;" excluded an exert report and testimony); *Native Am. Arts, Inc. v. Bud K World Wide Inc.*, No. 7:20-CV-124, 2012 WL 1833877, at *6 (M.D. Ga. May 18, 2012) ("[A] fundamentally flawed survey may be excluded under Rule 702 or 403; excluding expert survey, opinion testimony and reports."); *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1044 (S.D. Ind. 2000) ("The court need not and should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility.").

## IV. MS. BUTLER'S SURVEY IS IRRELEVANT AND UNRELIABLE, AND SHOULD BE EXCLUDED.

### A. Ms. Butler Surveyed The Wrong Universe, And Her Survey Is Irrelevant.

Ms. Butler's survey is irrelevant to any issue in this case because she violated a bedrock principle of survey design by surveying the wrong universe.  Because the only accused package surveyed is available exclusively at Dollar Tree, Ms. Butler ***should have*** surveyed, logically and legally, Dollar Tree customers.  Ms. Butler did not do that; instead, she surveyed prospective purchasers of *all* aluminum foil products, rendering the results of her survey unreliable and irrelevant.

"Identification of the proper universe is recognized uniformly as a key element in the development of a survey."  S. Diamond, *Reference Guide on Survey Research*, Reference Manual on Survey Evidence, 229, 239 n. 41 (2d ed. 2000); *see also* McCarthy on Trademarks and Unfair Competition, § 32:159 (4th Ed. 2003) (a universe "is that segment of the population whose perceptions and state of mind are irrelevant to the issues in the case.").  As is the case here, "[w]hen a senior user asserts that its mark has been unlawfully used by a defendant, the

relevant survey universe is the prospective purchasers of the defendant's products." *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10 CIV. 1611 (PKC), 2012 WL 1022247, at *23 (S.D.N.Y. 2012) (quoting *Sterling Drug. Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir. 1994)); *see also Univ. of Kan. v. Sinks*, No. 06-2341-JAR, 2008 WL 755065, at *3 (D. Kan. 2008) ("In a trademark infringement case such as this, where the plaintiff alleges that the defendant's mark causes consumers of the defendant's products to mistakenly believe that the defendant's products are from the same source as, or are connected with, the plaintiff's products, the proper universe is the potential purchasers of the defendant's, *i.e.*, the junior user's, products."); *Citizen Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, No. Civ.A. 01-1524, 2003 WL 24010950, at *5 (W.D. Pa. Apr. 23, 2003) (excluding a survey because it was "stripped of any significant probative value" due to an irrelevant and improper universe that did not include the consumers of the trademark).

Here, the only population who will ever encounter—and potentially purchase—the surveyed package are Dollar Tree customers; theirs are the only opinions relevant to this case. Accordingly, Ms. Butler's universe should have consisted of Dollar Tree customers that are prospective purchasers of aluminum foil.  Ms. Butler's survey universe, however, improperly included prospective purchasers of ***all*** aluminum foil, including those who have never been in a Dollar Tree Store and who have no intention of purchasing aluminum foil at Dollar Tree. Ms. Butler cannot say whether her survey includes a single consumer who shops at Dollar Tree, let alone represent a majority of her universe; she has no evidence of whether and to what extent that the people she surveyed shop in Dollar Tree.  (Ex. 3, Butler Dep. 78:9-19.)  Such an over-inclusive universe makes it impossible to know whether respondents are less likely to be aware of or to make relevant distinctions when viewing the products. *See Big Dog Motorcycles, L.L.C.*

*v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) (finding a survey universe was "improperly over-inclusive" because it encompassed all prospective purchasers of all t-shirts and caps rather than limiting it to consumers who are likely to by plaintiff's t-shirts and caps); *Weight Watchers Int'l., Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272-73 (S.D.N.Y. 1990) ("The ability to make relevant distinctions is crucial when what is being tested is likelihood of confusion."). Moreover, while Ms. Butler's survey universe was 80% female and 20% male, the *actual* breakdown of relevant purchasers or potential purchasers at Dollar Tree is 66% female and 34% male; when considering the proper universe, the Butler survey was under-inclusive of men. And there is no way to know how those differences would—or did—impact the results.[4]

Even Ms. Butler was forced to admit that where a survey does not have a proper universe it "may include or exclude the opinions of individuals that are relevant." (Ex. 3, Butler Dep. 52:3-7.) Yet, Ms. Butler did exactly that—used a universe that includes opinions of consumers who are irrelevant and excludes opinions of consumers who are relevant. (*Id.* at 78:9-19.) Allowing Ms. Butler to argue that her survey—and opinions based on that survey—are relevant when the universe she used is irrelevant would be extremely prejudicial to Handi-Foil because, in the case of a jury trial, jurors are less able to properly discredit an expert survey that suffers from profound technical flaws, such as an improper universe. *See, e.g.*, *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 562-63 (S.D.N.Y. 2007) (noting that a purported expert's opinion can carry special weight even when unwarranted, and thus, can be prejudicial); *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 711 (W.D. Va. 2004) (excluding a survey rather than letting the criticisms go to weight because when a survey is so fatally flawed,

---

[4]   That said, when Handi-Foil's expert conducted a proper survey—namely one that used the Dollar Tree package with Dollar Tree universe—the results were notably different, with a confusion rate of less than 1%. (Ex. 4, Kivetz Report ¶ 134.)

letting the jury hear it would unfairly prejudice the other party).  Because the Butler survey tested an entirely wrong population, and this Court therefore exclude it in its entirety.

### B.   The Butler Survey Violated Market Conditions When It Used Products That Do Not Appear Together In The Market.

In designing her survey, Ms. Butler used the *Squirt* approach, which tests "the likelihood of confusion between marks that are weak, but are ***simultaneously or sequentially accessible in the marketplace*** for comparison."  Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of* SQUIRT. 98 Trademark Rep. 739, 755 (2008) (emphasis added); McCarthy on Trademarks and Unfair Competition, § 32:173.50 (4th Ed. 2003) (the *Squirt* format is used when marks appear "simultaneously or sequentially" in the marketplace).  In other words, a *Squirt* survey should only put products in a side-by-side manner when—and only when—they appear that way in the real world.  *See Water Pik Inc. v. Med-Sys, Inc.*, No. 12-1065, 2013 WL 4046470, at *7 (10th Cir. Aug. 12, 2013) ("But a side-by-side comparison ordinarily is not the proper method of determining likelihood of confusion.  The marks 'must be compared in light of what occurs in the marketplace, not in the courtroom." (citation omitted)).  It is critical— axiomatic—that a survey must "compare the impressions the marks have on potential customers ***under marketplace conditions.***"  *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (emphasis added) *aff'd sub nom. WE Media, Inc. v. Cablevision Sys. Corp.*, 94 F. App'x 29 (2d Cir. 2004); *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:163 (4th ed. 2012) (a survey is only useful where it "mirror[s] the situation in which the ordinary person would encounter the trademark").  Here, Ms. Butler violated marketplace conditions in two respects.

***First***, the Handi-Foil package used in the Butler Survey only appears in Dollar Tree Stores, a fact that Ms. Butler was not aware of when she designed and implemented her survey.

(Ex. 3, Butler Dep. 64:14-65:10.)  The Reynolds package that Ms. Butler showed to respondents, on the other hand, is *never* sold in Dollar Tree stores and instead sells in various other retail stores.  In fact, the Reynolds package surveyed is ***larger in quantity*** than the surveyed Dollar Tree package—a fact that could significantly impact purchasing decisions (as well as any take-away beliefs about sponsorship, affiliation or permission) by shoppers at bargain retail stores like Dollar Tree, but for which Ms. Butler's survey cannot account.  Because these two products are never sold side-by-side, the Butler survey failed to replicate marketplace conditions.

*Second*, the other products used in the display are private label products—*i.e.*, ***store brands***—that are sold separately and exclusively in the sponsoring store.  A shopper at CVS is not going to encounter Supervalu's store brand (or vice versa), and ***neither*** of these is available at Dollar Tree.  (Ex. 3, Butler Dep. 84:8-87:6.)  In other words, the packages used in the Butler Survey are not sold side-by-side, a fact that Ms. Butler admits is true:

> Q:  [] No consumer would ever come across the [H]andi-[F]oil product you surveyed in the same place as they would come across either the Shoppers Value [Supervalu] or the Total Home [CVS] products, correct?
>
> . . .
>
> A:  As currently on the market, that is my understanding, yes.
>
> ***
> Q:  Okay. So we know -- we know that consumers aren't seeing many of these products side by side, right?
>
> A:  Well, the precise products, no . . . .

(*Id.* 88:7-13; 103:4-7.)  In short, Ms. Butler's survey used a side-by-side method that is only appropriate when the products are, in fact, sold side-by-side in the market, and therefore her survey is not a proper measure of likelihood of confusion and is thus properly excluded.  *See Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 405 (D.N.J. 2011) ("[T]he results of a

14

survey that does not adequately simulate how a consumer would encounter a trademark are neither reliable nor probative."); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010) (excluding survey that, *inter alia*, did not replicate market conditions); *Trouble v. Wet Seal,* 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) (excluding survey and related testimony where expert did not use stimuli that replicated market conditions because "a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions.").

> C.     **Ms. Butler's Leading Questions Resulted In Unreliable Data That Cannot Support Her Opinions On Confusion.**

As an initial matter, the *Squirt* method used by Ms. Butler has been highly criticized by courts and experts alike because it uses closed-ended questions and makes the consumers "artificially aware" of the other party's trademark. *Kargo Global, Inc. v. Adv. Mag. Publishers, Inc.*, No. 06 Civ. 550(JFK); 2007 WL 2258688, at *8 (S.D.N.Y. 2007) (discussing how back-to-back display of parties products in a survey is a "major flaw"); *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) (finding a survey that used the *Squirt* method unreliable because it did not replicate marketplace conditions); *see also* Swann, 98 Trademark Rep. at 740 ("Because a Squirt test uses closed-ended questions, it has been historically criticized by pundits and the courts.").  Although Ms. Butler is aware of the potential problems posed with leading questions, and perhaps because she had only two weeks to design and execute a survey, she nonetheless adopted those leading questions for her survey.

A survey that relies on leading questions is unreliable because such questions are "inherently suggestive and invite guessing by those who did not get any clear message at all." *Johnson & Johnson-Merck Consumer Pharmas. Co. v. Rhone-Poulenc Rorer Pharmas., Inc.*, 19 F.3d 125, 134 (3d Cir. 2008) (finding a survey did not prove consumers were confused because the survey included leading questions and was flawed).  In fact, Ms. Butler admits that one of the

15

reasons a survey should avoid asking leading questions is to ensure demand effects (*i.e.*, "responses in a survey which are generated or are artifacts of the survey [] design or the survey process itself") do not occur.  (Ex. 3, Butler Dep. 79:13-25; 56:8-17.)

As described earlier, the respondents in the Butler Survey were read the survey questions and given answer options.  For example, instead of asking the open-ended "Who puts this product out?" to determine source confusion, Ms. Butler asked "Do you think any of these products—the ones in front of you—are made or put out by the same company as the product you saw in the first room?  Yes, made or put out by the same company; No, not made or put out by same company."  (Ex. 2, Butler Report, Ex. D, Foil Survey Questionnaire Q.2.)   These types of leading questions used by Ms. Butler, especially when done in the *Squirt* format, suggest "to respondents, at least implicitly, that they should believe there is at least some sort of relationship between different items." *See Kargo Global,* 2007 WL 2258688, at *9.

Moreover, while "Don't know" is listed as an answer option for the interviewers to circle, Ms. Butler affirmatively instructed the interviewers ***not*** to read this option out loud.  (Ex. 2, Butler Report Ex. D.)  Instead, the respondents were read only two choices—yes or no.  The failure to include a "Don't know" option only exacerbates that.  S. Diamond, *Reference Guide on Survey Research*, Reference Manual on Survey Evidence 359, 390 (3d ed. 2011) (discussing the importance of including a "no opinion" or "don't know" option to decrease guessing, reducing demand for an answer that encourages the "hazard of a guess just to comply"). Ms. Butler's questions improperly led consumers and failed to provide complete answer choices, generating responses that are a function of the questions and not of the accused package.  Thus, the results are not reliable or relevant to the issue of likelihood of confusion.  *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-CV-10983, 2011 WL 6010206, at *4 (E.D. Mich. Nov. 30, 2011)

(finding the fact that a survey included a Don't know option but did not inform the participants of the survey of the option "contributes to a flawed and unreliable foundation for the survey results" and excluded the survey).

### D.   The Butler Survey Failed To Use A Proper Control.

Because "to prove actual confusion, the confusion must stem from the mark in question," it is a fundamental principle that a survey to test the likelihood of confusion must include a proper control.  *Malletier*, 525 F. Supp. 2d at 596 (quoting *General Motors Corp. v. Lanard Toys, Inc.* 468 F.3d 405, 414 (6th Cir. 2006)).  "Proper controls approximate 'background noise,' or confusion unrelated to similarities in protectable elements of the trade dress."  *Cumberland Packing Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241, 250 (E.D.N.Y. 2001); *see also* J. Jacoby, *Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys*, Trademark Rep., Vol. 92, at 890 n. 2 (2002) ("It is helpful to think of a control as a comparison used to rule out plausible alternative explanations for the observed effect."). Without a proper control, "it is nearly impossible to determine how much reported confusion is attributable to the survey participants' preexisting beliefs or other background 'noise' created when, for example, a participant misunderstands the survey questions or responds to them inarticulately."  *Millennium Labs., Inc. v. Ameritox, Ltd.*, 924 F. Supp. 2d 594, 601 (D. Md. 2013) (excluding a survey, primarily because of an absence of proper controls); *see also THOIP*, 690 F. Supp. 2d at 240 ("Without a proper 'control', there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology.")  Here, the control used by Ms. Butler is improper because it both retained too many infringing elements of the asserted Reynolds' trade dress and yet failed to retain any of the non-infringing elements of the Handi-Foil test package.

*First*, as Ms. Butler admitted, an appropriate control should not include elements of the claimed trade dress:

> Q: . . . In creating a good control you do not want it to have any or at least not many of the claimed elements of the trade dress that's at issue in this case; is that right?
>
> A: The control should be as close to the infringing product at issue *without including those infringing elements*.
>
> Q: Okay. So you try to make it look like the allegedly infringing product and then you take away the elements that are alleged to be part of the trade dress; is that right?
>
> A: I would want to be careful with the idea that you try to make it look like. Because you may select a control that's an existing control or an existing product that you are not in fact creating.
>
> Q: Okay. So you're going to try to select a control that has as few of the elements of the allegedly protected trade dress as possible; is that right?
>
> A: Well, *I don't think it should include any of the elements of the allegedly infringing trade dress*.
>
> Q: Why? And why is that?
>
> A: Because if it includes elements of the allegedly infringing trade dress in the control, you don't know what proportion of respondents are responding to the allegedly infringing elements and what portion of the control respondents are reacting to something else about the control.
>
> Q: Okay. And does that make it an improper control or a less useful control?
>
> A: That's correct.

(Ex. 3, Butler Dep. 19:11-20:16 (emphasis added)); *see also* S. Diamond, *Control Foundations: Rationales and Approaches*, Trademark & Deceptive Advertising Surveys: Law, Science and Design, ABA (2012) at 212-213.)  Ms. Butler knowingly ignored that basic principle in selecting the control in her survey; she conceded that the control she selected contained ***numerous***

elements of the accused trade dress, including a shade of blue; shade of red; name on the front of

the box in blue section; same color scheme on the ends of the box; instructions as to "press to

lock"; and graphics indicating how to wrap food, line pans, and cover bowls.  (Ex. 3, Butler Dep.

at 21:4-24:23.)  The fact that Ms. Butler's control included numerous of the trade dress elements

is evident:



At the same time, and incredibly, Ms. Butler criticizes the survey done by Handi-Foil, arguing

that the control in that survey "contains too many of the infringing elements to be a useful

control."  (Ex. 3, Butler Dep. 18:16-19:17; *see also* 150:7-18; 159:24-160:15.)  To be sure, here

is the control used in Handi-Foil's survey:



(Ex. 4, Kivetz Report Ex. G.2.)  As this image shows, in terms of removing the asserted trade

dress elements, Ms. Butler's position on her control being appropriate and the above red box

being infringing are demonstrably disproven.

**Second**, adding to the problem, the control Ms. Butler used also failed to retain any ***non-***

***infringing*** features of the Handi-Foil package. "[I]n designing a control group study, the expert

should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible." S. Diamond, *Reference Guide on Survey Research*, Reference Manual on Scientific Evidence 229, 258 (2d ed. 2000); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 596 (S.D.N.Y. 2007) ("A control product is one that is a non-infringing product which is similar to the products at issue." (citation omitted)). Here, a key non-infringing element of the Handi-Foil package is the use of the Handi-Foil name itself—a registered mark and a source identifier for Handi-Foil—but that was not retained on the Butler survey control package. Instead, the Total Home box has very different written source indicia, *i.e.*, "CVS pharmacy" and "Total Home." And the Total Home package differs from Handi-Foil's product package in numerous other ways, including the fact that Total Home is a store brand, while Handi-Foil is a national brand, and the fact that the Handi-Foil package surveyed was 25 square feet while Total Home package was 75 square feet. (Ex. 2, Butler Report Ex. E.) These significant differences between the test package and the control package render Ms. Butler's control meaningless. *See Innovation Ventures, LLC* 2011 WL 6010206, at *5 (finding an inadequate control because of obvious differences between the colors of the label and how the wording appeared on the product).

Ms. Butler's control failed to remove the infringing elements while at the same time failed to retain non-infringing elements of the test package. In short, her control is worthless. The failure of using a proper control warrants exclusion of the Butler Survey and any opinions Ms. Butler plans on stating about the Butler Survey.[5] *Gov't Emps. Ins. Co. v. Google, Inc.*,

---

[5]  Indeed, Ms. Butler repeatedly relied on her control as a means for "fixing" other flaws in her survey. For example, Ms. Butler failed to rotate the order of packages or answer choices, which research has found can result in skewed results, yet Ms. Butler says that she—unlike most other survey professionals—does not need to rotate the products or answers because the control "fixes" that. (Ex. 3, Butler Dep. 107:2-109:11). Similarly, in calculating the

No. 1:04CV507, 2005 WL 1903128, at * 5 (E.D. Va. Aug. 8, 2005) (finding a survey did not produce evidence that the alleged infringing word caused confusion because of an improper control); *see also THOIP*, 690 F. Supp. 2d at 240-41 (S.D.N.Y. 2010) (excluding survey where among other things control underestimated noise).

## V. THE BUTLER SURVEY IS INAPPLICABLE AND IRRELEVANT TO ANY PACKAGE OTHER THAN THE ONE TESTED, AND ANY OPINIONS AS TO UNTESTED PACKAGES ARE SPECULATIVE AND UNSUPPORTED.

Even if it were not riddled with fatal flaws, Ms. Butler's survey has no bearing on any of the other accused packages. If this Court chooses to not exclude Ms. Butler's survey completely, then it should be let in with the limiting instruction that it only applies to the package that was actually tested. Ms. Butler should not be permitted to offer any opinions or testimony as to any likelihood of confusion on the packages not surveyed, or offer any opinions that the survey she did can be extrapolated to the other accused packages. Any such "opinions" or testimony would be nothing but speculation on Ms. Butler's part, and not proper under *Daubert* or Rule 702.

Here, it is undisputed that Ms. Butler surveyed **only** the package sold exclusively in Dollar Tree stores; she admits she did not survey the accused packages sold into the grocery channel. In fact, at the time of her deposition (taken months after her report was submitted), she had ***never even seen*** the actual accused grocery packages. (Ex. 3, Butler Dep. 70:3-23.) Despite this, Ms. Butler nonetheless opines that she thinks if she *had* actually surveyed the other accused packages (that she had not even seen at the time of her deposition), the results would be "similar" and that the results are "broadly" applicable to the accused packages sold in grocery. (Ex. 3,

---

confusion rate, Ms. Butler admits she ignored the "reasons" that respondents identified for their answers (and counted them nonetheless even if their stated answer showed they were not confused by the trade dress elements but rather for some other reason), stating that the purpose of a control is to clean those things up. (*Id.* 116:1-25.) As a result, exclusion is further warranted.

Butler Dep. at 70:24-71:6.)  Despite her best guess that the results would be "similar," Ms. Butler cannot measure the degree of similarity between the rates of confusion on the surveyed package, nor can she say what the confusion rate may have been on the other accused packages.  (Ex. 3, Butler Dep. 39:4-20.)  Simply put, Ms. Butler has no scientific basis for her opinion that the results of her survey are applicable or can be extrapolated to packages not actually surveyed.

Moreover, a key distinction between the package that Ms. Butler tested and the non-surveyed, accused packages is that the packages not surveyed contain a disclaimer that is not included in the Handi-Foil package that Ms. Butler used for her survey.   (Ex. 3, Butler Dep. 183:20-186:13.)  That disclaimer clearly and expressly states:  "Reynolds Wrap® is the registered trademark of Reynolds Consumer Products Company.  ***This product is neither manufactured nor made*** under the authorization of Reynolds Consumer Products Company." (Ex. 5 (photograph of box) (emphasis added).)  Ms. Butler did not survey how that disclaimer would impact the results, nor could she offer any viable opinions on that.  And disclaimers do, in fact, make a difference in how consumers view claims and thus a survey based on a package that does not include the disclaimer is not relevant to that package.  *Weight Watchers Int'l., Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1276 (S.D.N.Y. 1990) ("Disclaimers that emphasize the source of a product often can reduce or eliminate consumer confusion, and have been used by courts as remedies in trademark cases."); *see also CytoSport, Inc. v. Vital Pharm., Inc.* 617 F. Supp. 2d. 1051, 1066-67 (E.D. Cal. 2012) (adding a disclaimer to a label made a difference as to whether or not a statement on the label was false); *Time Warner Cable, Inc. v. DirectTV, Inc.*, No. 06 CIV 14245(LTS)(MHD), 2007 WL 1138879, at *4 (S.D.N.Y. Apr. 16, 2007) (finding that a disclaimer effects the meaning of an advertisement).  Here, Ms. Butler has not seen the disclaimer and admits she has "no way of knowing how significant [the disclaimer] potentially

22

is." (Ex. 3, Butler Dep. 184:7-185:4.)  Worse, Ms. Butler was not even aware of the existence of the disclaimer until it was pointed out to her in her deposition, two months after her survey was complete.  (*Id.* at 182:25-185:20.)  Thus, Ms. Butler should not be allowed to extrapolate the findings of her survey from the Dollar Tree package to the other accused packages that clearly disclaim relevant information.

Notably, Ms. Butler herself has recognized the problem of doing what she purports to do here, roundly criticizing other experts for testing only one accused product in trademark or advertising cases and stating that that the results are limited to *only* that product.  (*See* Ex. 6, Report of Sarah Butler in *Georgia-Pacific Consumer Prods. LP, v. Global Tissue Grp., Inc.*, Opposition No. 91184529 (T.T.A.B. 2011) (opining that a survey's results "to the extent they are reliable at all can only be said to provide information for the word "Quilted" in the bath tissue market" and cannot be applied to non-tested products); Ex. 7, Expert Report of Sarah Butler in *Pamlab, L.L.C. and Metabolite Labs., Inc. v. Brookstone Pharmas, L.L.C.*, Case No. 2:09-cv-07434, Dkt. No. 201-6 at 41 (E.D. La. 2010) (opining that the survey done on pharmacists cannot be extrapolated and applied to wholesalers and that the survey was flawed because it "only tests the impact of one type of information, package inserts, on one population—pharmacists.  Any results from these surveys can therefore only be applied to the supposed impact of the package inserts on pharmacists' substitution decisions."); *see also* Ex. 3, Butler Dep. 194:2-18.).)  Further, Ms. Butler has argued that an expert "cannot be used to infer or estimate the impact of other marketing or product materials with pharmacists and also cannot be used to infer the impact of package inserts or other marketing products materials with other relevant populations" because neither the survey is limited to the population and product it tests.  (Ex. 7 at 42.)

As Ms. Butler herself has argued, if the survey is admitted, it should only be admitted for the limited purpose of demonstrating confusion existed with the specific Handi-Foil product used in the survey—any other conclusions from the survey are pure speculation.

### CONCLUSION

Based on the foregoing, Handi-Foil respectfully requests that the Court exclude all testimony, argument, or evidence relating to the survey, opinions, and report of Ms. Sarah Butler.

Dated: December 20, 2013                    Respectfully Submitted,

By: */s/ Brian N. Gross*
    D. Sean Trainor (Va. Bar No. 43260)
    dtrainor@kirkland.com
    Brian N. Gross (Va. Bar No. 76795)
    brian.gross@kirkland.com
    KIRKLAND & ELLIS LLP
    655 Fifteenth Street, N.W.
    Washington, D.C. 20005
    Telephone: (202) 879-5000
    Facsimile: (202) 879-5200

    David K. Callahan, P.C. (admitted *pro hac vice*)
    dcallahan@kirkland.com
    Robin A. McCue (admitted *pro hac vice*)
    rmccue@kirkland.com
    Jordan M. Heinz (admitted *pro hac vice*)
    jordan.heinz@kirkland.com
    Ian J. Block (admitted *pro hac vice*)
    ian.block@kirkland.com
    KIRKLAND & ELLIS LLP
    300 North LaSalle
    Chicago, Illinois 60654
    Telephone: (312) 862-2000
    Facsimile: (312) 862-2200

    *Counsel for Defendant*
    *Handi-Foil Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December, 2013, pursuant to the Court's approval and the parties' agreement, I served via electronic e-mail the foregoing document to the following:

Britt Cass Steckman (Va. Bar No. 80966)
britt.steckman@bgllp.com
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 828-5831

Mark N. Mutterperl
mark.mutterperl@bgllp.com
Jessica S. Parise
jessica.parise@bgllp.com
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020
Telephone: (212) 638-6468

/s/ Ian J. Block
Ian J. Block (admitted *pro hac vice*)
ian.block@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200