UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

REYNOLDS CONSUMER PRODUCTS INC.,

Plaintiff,

-v-

HANDI-FOIL CORPORATION,

Defendant.

Case No.: 1:13-CV-214 LO/TRJ

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN FURTHER
SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BRACEWELL & GIULIANI LLP

Britt Steckman
britt.steckman@bgllp.com
2000 K Street NW, Suite 500
Washington, D.C. 20006-1809
Telephone: 202.828.5800
Facsimile: 800.404.3970

OF COUNSEL:

Mark N. Mutterperl (*pro hac vice*)
Mark.mutterperl@bgllp.com
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
Telephone: 212.508.6100
Facsimile: 800.404.3970
*Attorneys for Plaintiff Reynolds Consumer
Products Inc.*

Dated: December 31, 2013

## TABLE OF CONTENTS

Page

STATEMENT OF UNDISPUTED FACTS ....................................................................2

RESPONSE TO HF'S LISTING OF ALLEGEDLY UNDISPUTED FACTS............................2

ARGUMENT ..........................................................................................................11

I.   HF'S COUNTERCLAIM FOR CANCELLATION OF REYNOLDS' REGISTERED
     TRADE DRESS FAILS AS A MATTER OF LAW. .......................................................11

     A.  The PTO Approved The Refreshed Trade Dress As Essentially The Same As The
         Registered Designs......................................................................................13

     B.  HF Ignores Evidence That The Commercial Impression Of The REYNOLDS WRAP
         Trade Dress Continued With Its "Refreshes" ...............................................14

II.  HF FAILS TO ARTICULATE ANY BASIS ENTITLING IT TO SUMMARY
     JUDGMENT ON REYNOLDS' FALSE ADVERTISING CLAIM.................................17

     A.  HF's One-On-One Statements Are Actionable Commercial Advertising ..................18

     B.  HF's Claims Are Literally False Or, At The Very Least, Misleading ........................21

         1.   HF's Statements Are Literally False..................................................22

              a.   "Compare To" Claim ..............................................................24ge

              b.   "Equivalence" Claim ...............................................................25

              c.   "New" Product Claim ..............................................................26

         2.   Alternatively, HF's Statements Are Likely to Mislead .....................27

     C.  The Evidence Establishes That HF's Claims Are Material .........................................28

CONCLUSION.........................................................................................................30

## TABLE OF AUTHORITIES

Page(s)

CASES

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
  725 F.2d 1350 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 821 (1984)........................................15

*Am. Home Products Corp. v. Johnson & Johnson*,
  577 F.2d 160 (2d Cir. 1978)...............................................................................................27

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................................16, 17

*AvePoint, Inc. v. Power Tools, Inc.*,
  Civ. No. 13-CV-00035, 2013 WL 5963034 (W.D. Va. Nov. 7, 2013)...................................19

*Axcan Scandipharm Inc. v. Ethex Corp.*,
  585 F. Supp. 2d 1067 (D. Minn. 2007)................................................................................24

*Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*,
  875 F. Supp. 2d 511 (D. Md. 2012)......................................................................................29

*Beech-nut Packing Co. v. P Lorillard Co.*,
  299 F. 834 (D.N.J. 1924), *aff'd,* 7 F.2d 967 (3d Cir. 1925)..................................................14

*C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*,
  131 F.3d 430 (4th Cir. 1997) ...............................................................................22, 23, 24, 27

*Cartier, Inc. v. Deziner Wholesale, L.L.C.*,
  98 Civ. 4947, 2000 WL 347171 (S.D.N.Y. Apr. 3, 2000)......................................................28

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
  284 F.3d 302 (1st Cir. 2002).................................................................................................30

*Dreyfus Fund, Inc. v. Royal Bank of Can.*,
  525 F. Supp. 1108 (S.D.N.Y. 1981)......................................................................................14

*Emergency One, Inc. v. Am. FireEagle Ltd.*,
  228 F.3d 531 (4th Cir. 2000)................................................................................................12

*George & Co. LLC v. Imagination Entm't Ltd.*,
  575 F.3d 383 (4th Cir. 2009) .........................................................................................12, 14

*In re Who? Vision Sys. Inc.*,
  57 U.S.P.Q.2d 1211, 2000 WL 33147118 (T.T.A.B. 2000)...................................................12

*Labware, Inc. v. Thermo Labsystems, Inc.*,
  No. 04-2545, 2005 WL 1541028 (E.D. Pa. June 28, 2005)...................................................29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...................................................................................12

*Merck Eprova AG v. Brookstone Pharm., LLC*,
    920 F. Supp.2d 404 (S.D.N.Y. 2013)....................................................30

*Neuros Co. v. KTurbo, Inc.*,
    698 F.3d 514 (7th Cir. 2012) ................................................................19

*Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.*,
    501 F. Supp. 2d 431 (M.D.N.C. 2002) .................................................28

*One Indus. v. Jim O'Neal*,
    578 F.3d 1154 (9th Cir. 2009) ........................................................12, 15

*Paris Glove of Canada, Ltd. v. SBC/Sporto Corp.*,
    84 U.S.P.Q.2d 1856, 2007 WL 2422997 (T.T.A.B. 2007).....................14

*PBM Prods., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ..........................................................22, 29

*PBM Prods. v. Mead Johnson Nutrition Co.*,
    09-CV-269, 2009 WL 5090862 (E.D. Va. Dec. 24, 2009), *aff'd sub nom., PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011).......................................22

*Rexall Sundown, Inc. v. Perrigo Co.*,
    651 F.Supp.2d 9 (E.D.N.Y. 2009) ..................................................24, 30

*Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow*,
    93 F.3d 511 (8th Cir. 1996) ............................................................26, 28

*Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
    902 F.2d 222 (3d Cir. 1990)..................................................................29

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
    978 F.2d 947 (7th Cir. 1992) ................................................................14

*Seven-Up Co. v. Coca-Cola Co.*,
    86 F.3d 1379 (5th Cir. 1996)................................................................20

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ..............................................................22

*Tao of Systems Integration, Inc. v. Analytical Servs. & Materials, Inc.*,
    299 F. Supp.2d 565 (E.D. Va. 2004) ....................................................19

*Veryfine Prods., Inc. v. Colon Bros., Inc.*,
    799 F. Supp. 240 (D.P.R. 1992)............................................................14

*X-IT Prods., L.L.C. v. Walter Kidde Portable Equip., Inc.*,
   155 F. Supp. 2d 577 (E.D. Va. 2001) ......................................................................................29

STATUTES

15 U.S.C. § 1058.................................................................................................................13

15 U.S.C. § 1125(a)(1).......................................................................................................18

REGULATIONS

37 C.F.R. § 2.51 ..................................................................................................................13

OTHER AUTHORITIES

3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 17:28
   (4th ed. 2013) ("McCarthy").........................................................................................12, 14

Webster's II New College Dictionary 381 (1999 ed.) ...................................................26

Plaintiff Reynolds Consumer Products Inc. ("Reynolds") respectfully submits this memorandum of law in opposition to defendant Handi-Foil Corporation's ("HF") motion for partial summary judgment ("HF's Br.") (i) for cancellation of two of Reynolds' federal trademark registrations based on abandonment; and (ii) against Reynolds on its claim of false advertising.  For the reasons set forth below, HF's motion should be denied in its entirety.

HF has failed to move for summary judgment on the core issues in this case: HF's infringement and dilution of Reynolds' famous trademark.  Instead, HF diverts attention from its own wrongful conduct by arguing for summary judgment on claims where it has *no facts to support its position*.  *First*, HF alleges trademark abandonment based upon the single fact that Reynolds' trade dress has changed over the decades.  That fact is undisputed.  But, the law requires the change to be substantial enough that the refreshed package has a different commercial impression.  On this point, HF offers nothing in support.  *Second*, HF defends Reynolds' false advertising claim by ignoring the overwhelming evidence that its advertising campaign was based on demonstrably false claims.  Instead, HF engages in sophistry, arguing that its direct statements to the relevant market (made to a "*great many of its customers*") are not "advertising" or "promotion."  Those arguments are not just disingenuous, they are legally wrong.

HF's approach to its summary judgment motion is telling.  When it has no facts to support its case, it argues immaterial matters that have nothing to do with the law.  And when the facts are harmful to its case, it simply denies that those facts matter.  But the legal and factual context matter, and the context provided by Reynolds below establishes that HF's motion should be denied.

STATEMENT OF UNDISPUTED FACTS

The facts and evidence showing why HF is not entitled to partial summary judgment are set forth in (i) Reynolds' Counterstatement of Material Facts in Opposition to HF's Motion for Partial Summary Judgment (the "Counter SUF") contained herein and in (ii) Reynolds' Statement of Undisputed Facts in Support of its own Motion for Partial Summary Judgment ("SUF") contained within Reynolds' Memorandum of Law in Support of its Motion for Partial Summary Judgment, dated December 20, 2013 ("Reynolds' Br.).

RESPONSE TO HF'S LISTING OF ALLEGEDLY UNDISPUTED FACTS

As shown below, many of the facts alleged by HF to be "undisputed" find no support in any competent evidence or are controverted by unrebutted evidence.[1]  In disputing those alleged facts, Reynolds does not acknowledge the existence of a triable issue that would preclude the granting of Reynolds' contemporaneous motion for partial summary judgment.

1.  Admitted.

2.  Denied to the extent HF implies that the commercial impression of the REYNOLDS WRAP® aluminum foil packaging has changed over the years.  The undisputed facts show that it has not.  (SUF ¶¶ 35-65); Reynolds' Motion at 19-25)).  Reynolds admits that the packaging for its REYNOLDS WRAP aluminum foil has been "refreshed" and modernized since it was first introduced in 1947.  (SUF ¶¶ 35-37, 48, 51, 62).

3.  Admitted.

---

[1]  The facts and evidence supporting Reynolds' opposition are set forth in (i) Reynolds' Counterstatement of Material Facts in Opposition to HF's Motion for Partial Summary Judgment (the "Counter SUF") contained herein and in (ii) Reynolds' Statement of Undisputed Facts in Support of its own Motion for Partial Summary Judgment  ("SUF") contained within Reynolds' Memorandum of Law in Support of its Motion for Partial Summary Judgment, dated December 20, 2013 ("Reynolds' Br.).  References ("Counter SUF ¶ __") and to ("SUF ¶ __") are to the enumerated paragraph and the exhibits cited therein.

4.   Admitted.   Reynolds directs the Court to Reynolds' SUF ¶¶ 9-34 for a complete recitation of the history of amendments and specimens submitted to the United States Patent and Trademark Office ("PTO").

5.   Admitted to the extent and for the reasons stated in Counter SUF ¶ 4.

6.   Admitted.

7.   Denied to the extent and for the reasons stated in Counter SUF ¶ 2.  Reynolds admits that the identified dates indicate the approximate year each identified package was first available for sale on the market.  (*See* SUF ¶ 34).

8.   Reynolds incorporates its response to Counter SUF ¶ 2.  Reynolds further states that when a package is "refreshed" inventory of the old version of its packaging is drawn down and replaced with the "refreshed" package.  (HF's Ex. 1; Ex. 31 (Mickle Dep.) 61:3-8). [2]

9.   Reynolds incorporates its response to Counter SUF ¶ 8.

10. Reynolds incorporates its response to Counter SUF ¶ 8.

11. Reynolds incorporates its response to Counter SUF ¶ 8.  Reynolds further states that since 1958, Reynolds has used the same Pantone colors for its blue, pink and silver colors that are the key elements of its trade dress.  (SUF ¶ 13).

12. Admitted.

13. Reynolds incorporates its response to Counter SUF ¶ 8.

14. Denied.   HF misrepresents the cited testimony.   The full testimony reveals that, although Reynolds' employees were able to identify differences between the REYNOLDS

---

[2] References to HF Ex. ___ are to the exhibits attached to the December 20, 2013, Declaration or Ian Block submitted in connection with HF's Motion for Partial Summary Judgment. References to Ex. ____ are to the exhibits attached to the December 31, 2013 Declaration of Mark N. Mutterperl in Opposition to HF's Motion for Partial Summary Judgment and in Further Support of Reynolds' Motion for Partial Summary Judgment.

WRAP® aluminum foil packages, consumers were not.  (Ex. 31 (Mickle Dep.) 103:20-104:1; 104:6-11; 142:3-12; SUF ¶¶ 37, 46).   HF also ignores independent survey research that shows more than 80% of the 1800 surveyed consumers were not able distinguish between the boxes and did not notice a change in package between the 1992 and 2002 packages.  (Ex. 31 (Mickle Dep.) 142:3-12; SUF ¶ 61).

15. Denied.   The evidence shows that the "refresh" of the REYNOLDS WRAP packaging first introduced in 2008 was merely to the proportions of the graphics.  (SUF ¶ 34; Reynolds' Motion at 3, fn.3).  The "billboard of the packaging became much smaller, and therefore required a revision to the graphics so that we could adapt the trade dress to the new requirements of the smaller package."  (HF Ex. 1, Ex. 31(Mickle Dep.) 38:9-21).  With the exception of a few limited changes (relocating the "Foil Made In USA" statement and revising the banner under REYNOLDS WRAP to read "Trusted Since 1947"), the graphics remained virtually identical to its 2002 package, just smaller.   In other words, the packaging was miniaturized, but the key elements, blue, pink and silver divider remained the same. (SUF ¶¶ 13, 34).

16. Denied to the extent HF implies that REYNOLDS is limited to only those statements specifically identified despite the fact that Reynolds responded to both this Court's August 28, 2013 Order and HF's Interrogatory No. 17 merely by way of example.  Admitted that Reynolds provided, by way of example, certain HF statements constituting false advertising in its (1) August 30, 2013 response to the Court's August 28, 2013 Order and in its (2) response to HF's Interrogatory No. 17. (HF Ex. 9, 10).  These examples represent a small fraction of the total evidence, which overwhelmingly illustrates that HF made these and similar false statements to customers as part of HF's sales and marketing strategy to effectively compete with Reynolds in

the aluminum foil roll market.  HF's own interrogatory responses state that "at least" 25 of the 80 potential nationwide grocery chains and bulk retailer customers received the allegedly false statements.   (Ex.32 (HF Interrogatory Response No. 17 and 19)).   In addition, deposition testimony reveals that HF intentionally made these false claims to almost every customer HF approached as part of its "sales blitz" effort.  *See* (Ex. 33 (Alderete Dep.) 118:25-119:7; 77:19-80:10 ("Every presentation I would make, I would -- I would say that our product is comparable to Reynolds.")); Ex. 34 (Laney Dep.) 41:23-42:19; 42:25-43:13; 60:8-15; 61:5-10; 67:21-68:21; 75:17-76:4; 81:12-83:20 (explaining the selling point "instructions" HF provided to its sales agents for use during pitches); Ex. 35 (Oesterreicher Dep.) 18:17-19:3; 19:15-19; 19:23-25; 54:24-62:7 (noting use of presentations and sales sheets); Ex. 36 (Salzstein Dep.) 96:14-21) (confirming that use of "all-out sales blitz") (*see also,* Ex. 37 (Sarnoff Dep. I) 141:5-20; 142:22-143:14; 159:4-161:9; 162:16-24; Exs. 38-45; HF Exs. 11-15).

17. Reynolds incorporates its response to Counter SUF ¶ 16.  Reynolds further states that countless other false advertising statements were widely disseminated to aluminum foil roll customers via email and in-person meetings, as well as at trade shows, including, among others:

- August 2012 email from Jim Oesterreicher to SearsHC representative stating that "I can save you big Dollars on Reynolds quality in a great looking package."  (Ex. 46)

- February 2013 emails from Diane Krawczyk to Robert Bush attaching a Hand-Foil catalogue sheet for SuperValu stating "Reynolds Equivalent Gauge and Strength."  (Ex. 47)

- March 2013 email from Karen Laney to Spartan Stores representative stating that "Hand-Foil aluminum foil is equivalent in gauge and strength to Reynolds's wrap [sic] with pricing and margins that will be exciting to both Spartan and your members, as well as the Spartan shopper."  (Ex. 48)

- March 2013 emails from Casey Snow to Harris Teeter representative stating that HF is "getting a lot of business because of the price vs Reynolds, with the same quality."  (Ex. 49)

- April 2013 email from Casey Snow to SuperValu grocery stores representative indicating that a letter had "been emailed [by HF] to all of the [SuperValu] divisions" stating that "Handi-Foil introduced a new line of aluminum rolled foil that competes against Reynolds

wrap foil with the same gage of metal and quality, but 30% cheaper in cost of goods." (Ex. 50).

- April 2013 email from Karen Laney to Meijer representative attaching independent test results performed on HF roll foil and stating "[a]s you will see from this information our product is the same quality as Reynolds." (Ex. 51).

-  April 2013 email from Karen Laney to Meijer representative stating that "[o]ur items are of the exact quality of Reynolds brand roll foil." (Same chain as conversation by HF but later in thread – (HF Ex. 18).

-  April 2013 email from Karen Laney to Jim Oesterreicher recounting meeting with Spartan Stores representative: "I shared while we are not looking to be a third brand, at this time don't expect to take over all the Reynolds SKU's but believe we can replace 1, 2 or 3 items." (Ex. 52).

- April 2013 email from David Alderete to Times Supermarket representative stating that "we are the same quality as Reynolds but as you can see, at a much lower cost." (Ex. 44).

- May 2013 email from Casey Snow to SuperValu representative attaching "some backup on our quality vs Reynolds from a 3rd party testing." (Ex. 53).

- August 2012 email from Jim Oesterreicher to David Sarnoff requesting a "one page sell sheet . . . on the rolls" with instructions to include, *inter alia*, "Reynold's Equivalent Gauge and Strength" and "Compare to Reynold's Wrap on the Box." (Ex. 54).

- October 2013 email from David Alderete to Nugget Market representative attaching a Hand-Foil catalogue sheet for stating "Reynolds Equivalent Gauge and Strength." (Ex. 42).

18. Admitted.

19. Denied.  Admitted, however, that, in 2011, HF received reports from Specialized Technology Resources ("STR"), (Ex. 34 (Laney Dep.) 88:17-89:16; Ex. 33 (Alderete Dep.) 67:8-20;  69:17-70:5;  79:9-80:10;  81:3-16;  108:20-109:4;  128:19-129:9), purporting to compare certain aspects of HF aluminum foil roll to REYNOLDS WRAP.  (Ex.55; HF Ex. 20).  These reports were commissioned at the request of a prospective grocery chain customer that HF solicited with its claims of "equivalent strength and gauge" and "comparability to" REYNOLDS WRAP.  (Ex. 37 (Sarnoff Dep. I) 40:11-41:25; 43:6-45:19; 46:8-49:16; Ex. 35 (Oesterreicher Dep.) 22:2-25:18; Ex.55)  The reports purport to show that, according to STR, the tested HF foil

had the same gauge as the tested REYNOLDS WRAP aluminum foil and summarily conclude that the HF foil was "comparable" to REYNOLDS WRAP aluminum foil based on other superficial metrics, such as product size and use of a serrated edge cutter, the reports show, however, that HF roll foil had a substantially weaker tensile strength than Reynolds. (Ex.55; HF Ex. 20-21). The report also instructs HF not to use the results of the study or the conclusions therein to support advertising or marketing claims. (Ex.55; HF Ex. 20-21) ("This report is rendered on the condition that it is not to be reproduced wholly or in part for advertising or other purposes over our signature or in connection with our name without special permission in writing.")

Crucially, the 2011 reports reach conclusions on comparability that are diametrically opposed to testing prepared by two separate independent laboratories in 2002 and 2003 that compared the *exact same* HF roll foil. (Ex. 37 (Sarnoff Dep.) 156:16-157:10) (admitting that HF's so-called "new" foil was the same foil HF had sold for over 10 years); *id*. 144:7-20 (admitting that only the box was new); *id*. 125:12-22 (same); *id.* 191:17-24 (claiming that allegation that product was only recently introduced was just "semantics" while acknowledging that HF only "had just introduced . . . new boxes") (*see also,* Ex. 37 (Sarnoff Dep. I) 36:7-19; Ex. 35 (Oesterreicher Dep.) 22:9-12 (testifying prior HF packaging did not contain "comparable to"); Ex. 56 at HANDI 00012939 and Ex. 57 (Pre-2011 HF Packaging containing no "comparable to" statement*); Exs. 51, 55, 58-60). The 2002 test, performed by GTI Laboratories at HF's request, concluded that HF's aluminum foil roll was "not comparable" to REYNOLDS WRAP aluminum foil due to its inferior gauge, tensile strength and bursting strength. (Ex. 56) (comparing seven foils and concluding that HF was not comparable to REYNOLDS WRAP aluminum foil due, in part, to its "significantly lower tensile strength resulting in its lower performance during impact

testing"). Similarly, another test performed in 2003 by Western Family Foods, Inc. at HF's request determined that HF standard and heavy-duty aluminum roll foil products were substantially weaker than REYNOLDS WRAP aluminum foil and expressly concluded that the HF product was "[n]ot comparable to the national brand, Reynolds." (Ex.58) (finding that HF's standard foil roll "is 4% weaker in the machine direction and 35% weaker in the cross direction when compared to the national brand, Reynolds" and that HF's heavy duty foil "is 50 percent weaker in both the machine and cross direction when compared to the national brand, Reynolds"); (*see* Ex. 37 (Sarnoff Dep.) 49:6-16 (observing difference in gauges between products). HF's "genera; practice" was to send the 2011 test results to its potential customers. (Ex. 32 (HF Interrogatory Response No. 17)).

20. Denied.  HF testified that tensile strength is a factor considered by prospective customers when determining the quality of an aluminum foil roll product.  (Ex. 37 (Sarnoff Dep.) 32:14-20; 78:5-80:16).  Moreover, the customer-requested tests include the tensile strength metric.  (Exs. 56, 58; HF Ex. 20).  On the other hand, REYNOLDS WRAP aluminum foil is the *only* national brand of aluminum foil rolls; stores do not request specifications for REYNOLDS WRAP® aluminum foil. (Ex. 61 (Lane Dep.) 65:12-66:7, 65:10-11 ("It's really about strength.")).  Whether prospective buyers of REYNOLDS WRAP aluminum foil request tensile strength measurements is irrelevant to the analysis of whether HF's aluminum foil roll products, with quantifiably lower tensile strength, were falsely advertised as "equivalent in. . . strength" to REYNOLDS WRAP aluminum foil.  Moreover, the evidence shows that prospective store buyers of HF's aluminum foil roll products considered tensile strength to be relevant to their purchasing decisions.  (Ex. 37 (Sarnoff Dep.) 32:14-20, 78:5-80:16; Ex. 33 (Alderete Dep.)

118:25-119:7; Exs. 49, 51-53; 65-67 (HF email with customers providing testing and strength information)).

21. Admit that HF launched its aluminum pan bakeware business in approximately 1984, and began selling HANDI-FOIL brand aluminum roll foil in or around 2000, but deny any suggestion that HF failed to market and sell its HF-branded aluminum roll foil to the retail customer market and deny HF's contention that it "essentially abandoned its HANDI-FOIL brand roll foil business." To the contrary, HF sold aluminum roll foil from approximately 2000 to 2011, albeit with limited success.  (Ex. 62 (Perkins Dep.) 46:19-25; 48:2-55:14; Ex. 56; Ex. 63 (HF sales 2002-July 2013); Ex. 37 (Sarnoff Dep.) 34:11-35:10, 156:16-157:10).

22. Denied to the extent HF suggests that it did not have sales of aluminum foil roll product each year between 2001 and 2013.  ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████  (Ex. 63 (HF sales 2002-July 2013); Ex. 62 (Perkins Dep.) 46:19-25; 48:2-55:14). Also admit these sales were driven by a business opportunity created by Dollar Tree, when it approached HF to create a national brad equivalent foil roll product, but deny that HF actually developed a new HF brand roll foil product to supply to Dollar Tree.  HF made no attempt to source a new, national  brand equivalent foil roll product.  Rather, as noted above, HF merely created a new box to contain its old, inferior roll foil.  The aluminum foil HF sells today is the same foil HF has sold for a decade.   (Ex. 37(Sarnoff Dep.) 51:4-53:4; 53:19-54:9; 125:12-22; 144:7-20; 156:16-157:10; 191:17-24 ;  Ex. 36 (Salzstein Dep.) 33:16-34:22; 45:17-47:8; Ex.56 at HANDI 00012939 and Ex. 57 (Pre-2011 HF Packaging)).  Admit that in early 2012, HF developed yet another new box, which bore striking similarity to the new Dollar Tree box that also would contain the old, inferior

roll foil to market and sell to the broader retail market.  (Ex.1, ¶¶13-16; 18-19; 21-23 (Stipulated Facts)).  Admit that documents produced by HF that purport to represent all consumer foil roll sales from 2000 to 2013 do not show consumer roll foils sale to Meijer, SaveMart, Spartan Foods, SuperValu or Times Supermarket between 2000 and 2012.   Admit that in 2012, HF engaged in a "sales blitz" to market and promote its aluminum foil roll product in packaging that infringes and dilutes REYNOLDS WRAP aluminum foil and did so by making false statements that its product was "equivalent in gauge and strength" or comparable to REYNOLDS WRAP aluminum foil.  (HF Ex. 9; Ex. 64 at 1 (statement by HF's marketing manager that "we are embarking on an all-out sales blitz"); Ex. 36 (Salzstein Dep.) 96:14-21).

23. Denied.  The evidence shows that HF sold aluminum foil roll product prior to 2012. (Ex.63 (HF sales 2002-July 2013)).  Admitted that, prior to 2012, HF had limited success with its marketing and sale efforts to the retail customer market for aluminum foil roll per the cited testimony of Reynolds' deponents, but deny that HF's limited sales were due to supply issues rather than its inferior quality product.  Deny that there is evidence in the record to support HF's statement.  Admit that HF's self-serving declaration states that "Handi-Foil did not actively market or sell HANDI-FOIL brand aluminum foil to the national grocery market or supermarket chain level because Handi-Foil did not have the ability to supply roll foil in any large quantity." [3]

24. The evidence shows that the retail customer market for aluminum foil roll are buyers for grocery stores, hardware stores, dollar stores, mass merchant stores and distributors, who resell the product to consumers. (Ex. 35 (Oesterreicher Dep.) 18:17-19:3; 85:4-86:12; Ex. 37 (Sarnoff Dep. I) 27:23-28:21; Ex. 32 (HF Responses to 2nd Set of Interrogatories at 17 and 19)).  Purchasing decisions are made based on input provided by the sellers.  (Ex. 61(Lane Dep.)

---

[3] Reynolds objects to the Declaration of Peter Perkins submitted with its Motion for Partial Summary Judgment to the extent it identifies alleged facts not produced by HF in discovery.

223:10-224:3) (noting "commonly accepted practice" to provide buyers, who have responsibility for numerous products beyond aluminum foil roll, with "category management advice" and that "retailers rely on [sellers] as the category experts to aid them in making strategic decisions about the category").

## ARGUMENT

I.  HF'S COUNTERCLAIM FOR CANCELLATION OF REYNOLDS' REGISTERED TRADE DRESS FAILS AS A MATTER OF LAW.

HF's position is narrow; it claims Reynolds' abandoned its federally registered trade dress because it changed "from a straight-line divider between the blue and pink sections to a curved 'tri-arch' element . . . ." (HF Br. at 13). Reynolds does not deny it made that change, and if all HF had to do were point to a change in packaging, it would undoubtedly prevail. However, HF has to do much more. It must prove that the minor change – empirically proven to be imperceptible to consumers – was so drastic that the new box had a different commercial impression from the old box. HF presents no such evidence.

In its opening summary judgment motion on the same issue, Reynolds demonstrated that:

- This is a classic case of refreshing iconic trade dress that does not give rise to abandonment (*see, e.g.,* Reynolds' Br. at 19-21);

- The United States Patent and Trademark Office ("PTO") determined – on three separate occasions – that Reynolds' "refresh" was not a material alternation giving rise to a different commercial impression than the registered trade dress (Reynolds' Br. at 22-24); and

- A 1999 consumer study revealed that more than 80% of consumers did not recognize a difference between the REYNOLDS WRAP® aluminum foil package with diagonally straight lines and one with diagonally curved lines. (Reynolds' Br. at 21-22).

HF's cross motion for summary judgment (filed simultaneously with Reynolds' motion) provides no evidence or arguments that militate against Reynolds' showing. Instead, HF would have the Court ignore the PTO's findings and undisputed consumer study evidence on the basis of HF's legally insufficient and irrelevant argument that any packaging change constitutes

abandonment of registered trade dress.  (HF Br. at 13-19).  The facts and law amply demonstrate the contrary:  Reynolds' registrations of its iconic trade dress *have not been* abandoned, especially since "[m]odernization of a logo, trademark style or trade dress which retains the commercial impression of the previous version does not result in any abandonment or loss of priority in the mark."  3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 17:28 (4th ed. 2013) ("McCarthy"); (Reynolds Br. at 19-21).

The burden to prove abandonment is squarely on HF.  *Emergency One, Inc. v. Am. FireEagle Ltd.*, 228 F.3d 531, 537-38 (4th Cir. 2000); *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 401 (4th Cir. 2009).  HF has not, and cannot, point to "specific facts" to support its claim of abandonment, and instead impermissibly relies upon "conclusory allegations" and attorney argument. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

HF's brief unsuccessfully attempts to marshal case law to match the facts of this case. Every one of the cases HF cites, regardless of the facts, confirms the universally accepted test on the issue of "refreshed" trade dress, including the Fourth Circuit:  Do the two designs create a "continuing commercial impression?"  *George.*, 575 F.3d at 402.[4]  Here, HF presents no evidence in relation to that test and what evidence does exist supports Reynolds' own motion for summary judgment on this issue.

---

[4] *See, e.g.,* HF Br. at 13 (citing *In re Who? Vision Sys. Inc.*, 57 U.S.P.Q.2d 1211, 2000 WL 33147118, at *17 (T.T.A.B. 2000) (to qualify as a non-material alternation, the "modified mark must contain what is the essence of the original mark, and the new form must create the impression of being essentially the same. . . . That is the new and old forms of the mark must create essentially the same commercial impression.")); *id.* at 17-18 (citing *One Indus. v. Jim O'Neal*, 578 F.3d 1154, 1156 (9th Cir. 2009) (reiterating the familiar standard that, in order to avoid abandonment in this context, "[t]he marks must create *same, continuing commercial impression*, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked.") (emphasis in original)).

A.     The PTO Approved The Refreshed Trade Dress As Essentially The Same As The
       Registered Designs

The PTO has determined that, despite HF's attempt to describe it as a "key change," the refresh from diagonally straight lines to diagonally curved lines was not material, constituted "essentially the same" design, and maintained the same continuing commercial impression. TMEP § 1604.13; (Reynolds' Br. at 22-24).[5]   Despite making a misplaced reference to a "substantially exact" standard, (HF Br. at 13-14), HF acknowledges that the correct standard in the abandonment context is "continuing commercial impression."  (HF Br. at 16-17).[6]  The PTO will accept a specimen if it is essentially the same as the registered trade dress.  15 U.S.C. § 1058; TMEP § 1604.13.  HF does not dispute that law.  The PTO accepted the specimen of the refreshed trade dress with diagonally curved lines in place of the registered diagonally straight lines.  (Reynolds' Br. at 22-24).  HF does not dispute that fact.  With both the law and the facts undisputed, and in Reynolds' favor, HF's motion must be denied and Reynolds' must be granted.

---

[5] By accepting Reynolds' (i) 1997 amendment to its registrations – from a drawing of the trade dress with blue on the left, pink on the right, separated by one silver diagonal line and a white parallelogram, to a drawing consisting, from left to right, of blue, silver diagonally straight lines, then pink – and (ii) 2002 specimens with diagonally curved lines as continued use of the registered drawing showing diagonally straight lines, the PTO determined that the 2002 REYNOLDS WRAP trade dress was "essentially the same as the mark that appears in the registration" and represented a "continuing commercial impression."  15 U.S.C. § 1058;  TMEP § 1604.13 (internal citations omitted); Reynolds' Br. at 22-24.  In other words, the PTO has determined that Reynolds package with diagonally curved silver lines is "essentially the same" as the registered trade dress.

[6] *See, e.g.,* HF Br. at 13-14 (quoting 37 C.F.R. § 2.51 that "the drawing of the mark must be a substantially exact representation of the mark as used on or in connection with the goods and/or services.").  Here, the Court need not compare the trade dress in use at the time Reynolds' applied to register its trade dress with the applied-for drawing.  Instead, the Court must compare the trade dress used today with the drawing as registered to determine what the PTO has already determined – that the marks are "essentially the same" and therefore the "commercial impression" of the "refreshed" trade dress is "the same" as the registered trade dress.

B.      HF Ignores Evidence That The Commercial Impression Of The REYNOLDS
        WRAP Trade Dress Continued With Its "Refreshes"

While the Fourth Circuit has characterized it as a "rare instance[]" that a later use will be

legally indistinguishable from a prior use, *George*, 575 F.3d at 402, all of the evidence in this

case demonstrates that this is that "rare instance."[7]   Indeed, Reynolds' "minor refreshes" are

precisely the modernizations that trademark law protects.  *See, e.g., Beech-nut Packing Co. v. P*

*Lorillard Co.*, 299 F. 834 (D.N.J. 1924), *aff'd*, 7 F.2d 967 (3d Cir. 1925) ("To hold that the

rightful owners of an established trade-name may not redecorate or reornament, or, to use a

somewhat inelegant phrase, polish it up, would be, in our opinion, unreasonable"); *Paris Glove*

*of Canada, Ltd. v. SBC/Sporto Corp.*, 84 U.S.P.Q.2d 1856, 2007 WL 2422997 (T.T.A.B. 2007)

(no abandonment); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir.

1992) (finding no abandonment even where plaintiff and its predecessors had not used, for over

30 years, the entire slogan that was the subject of the relevant registration because the "key

element" of the registered mark remained in use); *Veryfine Prods., Inc. v. Colon Bros., Inc.*, 799

F. Supp. 240, 255 (D.P.R. 1992) (no abandonment); *Dreyfus Fund, Inc. v. Royal Bank of Can.*,

525 F. Supp. 1108, 1115 (S.D.N.Y. 1981); McCarthy § 17:26 (collecting cases) (trademark will

not be deemed abandoned based on minor modifications or refreshments as long as the

modifications are "done in such a way that the continuing common element of the mark retains

its impact and symbolizes a continuing commercial impression").

---

[7] While *George* arguably took a narrow approach to the issue of "continuing impression," the
facts of that case made the decision to find abandonment easy.   In that case, the plaintiff
attempted to argue that its current mark, "LCR," made the same continuing impression as a
mark, LEFT CENTER RIGHT, that it had ceased using at least 15 years earlier.   The scope of
the difference between packages at issue in this case is not even comparable, and the evidence of
the PTO's determination of a continuing commercial impression and consumer study (not
presented in that case) confirms it.  Reynolds' Br. at 21-24.

HF's reliance on *One Industries v. Jim O'Neal*, 578 F.3d 1154 (9th Cir. 2009), is inapt. In *One Industries*, the Court reiterated the familiar standard that, in order to avoid abandonment, "[t]he marks must create the *same, continuing commercial impression*, and the later mark should not materially differ from or alter the character of the mark attempted to be tacked." *Id.* at 1160 (internal quotation marks omitted).  The Ninth Circuit recognized *One Industries* was a "close case," but, given the nature of the mark – a stylized "O" – the court was not inclined "to grant [defendant] a virtual monopoly on the use of the letter "O" on motorcycle helmets." *Id.* at 1165.[8]

*One Industries* lacked any facts similar to the PTO determination and consumer research that HF must overcome here.  *First*, as described above, the PTO's expert determination on this issue is highly persuasive; the PTO is entrusted to ensure the integrity of the trademark system and is presumed to have done its job.  *See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 821 (1984) (PTO is owed "deference that is due to a qualified government agency presumed to have properly done its job"). *Second*, as addressed in detail in Reynolds' brief, (SUF ¶ 46-62; Reynolds' Br. 21-22), the minor "refresh" was imperceptible to more than 80% of 1,800 survey respondents in research conducted independent of this litigation.  (SUF ¶¶ 477-62; Counter SUF ¶ 14).

HF misleadingly cites the testimony of Reynolds' former Group Director of Marketing and Advertising, claiming that he admits that the changes are "noticeable and distinguishable."

---

[8] The Ninth Circuit decision was not unanimous.  Judge Graber dissented in part with respect to the finding that defendant was not permitted to tack, especially given the pre-discovery phase of the litigation.  *One Indus.*, 578 F.3d at 1166-67 ("[T]he majority itself concedes that this is a 'close case' [and] [t]he conclusory statement [that the defendant only used one mark that had been slightly altered over the years], unsupported by any evidence in the record . . . is not enough to decide the highly fact-dependent question of tacking as a matter of law.")  Here, discovery is complete and the evidence undisputedly shows that Reynolds is entitled to tack back because the commercial impression of its trade dress has not changed.  *See generally*, Reynolds' Br.

(HF Br. at 18).   HF, however, failed to disclose the key testimony, which makes clear that, although there are subtle differences, those differences were not perceptible to consumers:

Q: Is it fair to say, then, that the 1973 and the 2002 boxes are distinguishable?

A: They are distinguishable to me because I'm very, very close to this [refresh] project, and so I know what the objectives were and what we did to arrive at where we were in 2002.  To a consumer, no.

* * * * * *

Q: You're saying that – if I heard you right, you said that a consumer would not distinguish between the 1973 and the 2002 box.  Is that correct?

A: I'm saying that as they moved along, the consumers did not perceive that there was a major change in the way this product looked.

* * * * * *

Q: So somebody told you, then, that consumers didn't perceive a difference between the arc [called the tri-archs] and the wave in the 1992 package.

A: That was my take away from what was said and presented in the research, that the risk was small.  Consumers – consumers did not perceive a difference [between the 1997 and 2002 packaging].  They didn't say that 2 of them did and 20 of them didn't.  They said consumers did not perceive a difference based on this [PRS] research.  That's what I'm sharing with you.

(Counter SUF ¶ 14; Ex. 31, Mickle Dep. 103:20-104:1, 104:9-11, 142:3-12).

Despite HF's efforts to put words in Mr. Mickle's mouth, the record is clear that Mr. Mickle testified that, while *he* could distinguish the refresh changes between boxes because of his job responsibilities related to the packaging and trade dress, *consumers could not*.

* * * * * *

HF's only available argument – other than that Reynolds' evidence is flawed – is to say to the Court:  "Put yourself in the position of the jury and look for yourself at the two designs." That argument too is wholly misplaced on summary judgment.   On summary judgment, the Court *may not* evaluate the credibility of Reynolds' evidence, nor displace the jury.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Given that the test is *not* a packaging change, but the *perception of the packaging change*, it is clear that summary judgment *is* appropriate – but to Reynolds.  HF's evidence consists entirely of its bald claim that the package changed.  That is not the test, and therefore cannot raise a genuine issue of material fact.  *Id.* at 248 (a fact is material only if it affects the outcome of the case).  Reynolds' evidence establishes that the package change maintained the same commercial impression both to consumers and the PTO.  That is the test, and it is the only evidence on the ledger.  HF's motion should be denied, and Reynolds' motion should be granted.[9]

II.   **HF FAILS TO ARTICULATE ANY BASIS ENTITLING IT TO SUMMARY JUDGMENT ON REYNOLDS' FALSE ADVERTISING CLAIM**

HF's response to Reynolds' false advertising claim is stunningly disingenuous.  HF does not defend any of its false advertising by arguing its statements were proper.  Instead, it makes the following arguments to avoid its clear violation of the Lanham Act:  (1) *The Lanham Act only applies to large scale anonymous advertising to the public, and our intentionally false (or misleading) statements were made one-on-one.*  HF conveniently avoids telling the Court either that courts have routinely held that one-on-one sales meetings are actionable promotional activities under the Lanham Act or that such one-on-one meetings are the primary promotional activities that HF performs.  The law does not permit companies to escape liability for false advertising because of the method by which they choose to spread false statements.  Notably, HF does not even attempt to justify its one-on-one false statements.  (2) *Our statements were so intentionally ambiguous that it is impossible for them to be "literally false."*  HF ignores that its

---

[9] Because HF's motion for partial summary judgment concerning cancelation of the trademark registrations based on abandonment should be denied, it follows that  HF's request to dismiss the registered trademark infringement claim should also be denied.

claims are precisely the type of claims, based on objective testing, that are routinely found to be literally false and constitute false advertising regardless of any alleged "ambiguity."  HF also fails to mention that its intentional ambiguity made the claims totally misleading, and misleading statements are just as actionable as claims that are literally false.  Tellingly, HF presents no arguments on that second means of proving false advertising.  (3) *Even if we lied, it was immaterial because no one cared*.  That argument is baseless.  HF's actionable claims boil down to "equivalent in gauge and strength" and "comparable" to REYNOLDS WRAP aluminum foil, just at a lower price.  These were not just prominent in substantially all of HF's sales communications – they were the only claims HF actually made.  And HF made them repeatedly.  Why would HF feature such claims so prominently and so repetitively if they were so meaningless?

Accordingly, HF fails to present any basis upon which it is entitled to judgment as a matter of law, and its motion for summary judgment on Reynolds' false advertising claim should be denied.

A.      HF's One-On-One Statements Are Actionable Commercial Advertising

HF asserts, as a threshold legal issue, that a subset of eight alleged false statements are non-actionable under § 1125(a)(1)(B) of the Lanham Act because statements made in one-on-one communications are not "sufficiently disseminated" to constitute "commercial advertising or promotion" under the statute.  (HF Br. at 23.)  HF's argument misstates the law and mischaracterizes the facts in a transparent effort to exclude eight of the most egregious examples of false and misleading statements that HF repeated to the relevant marketplace.

False advertising under the Lanham Act is actionable against any "commercial advertising *or* promotion."  15 U.S.C. § 1125(a)(1) (emphasis added).  Courts have consistently recognized that one-to-one promotion, although not classical "advertising," is actionable.  *See*

*Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 521-22 (7th Cir. 2012) (noting that "all seven other federal courts of appeals to have considered the issue" agree that person-to-person communication may be actionable).  The touchstone of "commercial advertising or promotion" is whether the material was disseminated "sufficiently to the relevant purchasing public." *Tao of Systems Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp.2d 565, 572-73 (E.D. Va. 2004); *see AvePoint, Inc. v. Power Tools, Inc.*, Civ. No. 13-CV-00035, 2013 WL 5963034, at *16 (W.D. Va. Nov. 7, 2013).  Where the relevant market is limited, the level of dissemination can be low.  *Neuros*, 698 F.3d at 523 ("There is no basis for limiting the Lanham Act to advertising or promotion directed to the *general* public, and the case law does not do that."); *Tao*, 299 F. Supp. 2d at 573 ("In various scenarios, courts have found that communications to a very limited number of consumers can reach the required level of dissemination to constitute commercial advertising or promotion.").

Here, according to HF's own admission, the "relevant purchasing public" is limited to "approximately 80 national retail chains," a substantial number of whom received the false statements.  (HF Br. at 9, ¶ 18; Counter SUF  ¶ 16).  Marketing the HF aluminum foil roll product to the approximately 80 retail store buyers HF actively solicits constitutes the sum total of the advertising necessary to get HF's product on the shelf.  HF concedes that the false statements were disseminated to "at least" 25 of the roughly 80 total potential customers. (Counter SUF  ¶ 16).  In other words, at least roughly one third of HF's potential customers were exposed to HF's false statements during its self-described "sales-blitz." (Counter SUF  ¶ 16; Ex. 64 at 1 (HF's marketing manager stating "we are embarking on an all-out sales blitz").  That

level of dissemination is clearly sufficient under the Lanham Act.[10] *See Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996) (finding false advertising based on statements to 11 out of 76 potential bottlers).

Moreover, HF sales representatives testified that they were instructed to pitch HF as "comparable to" Reynolds and had "equivalent strength and gauge" and did so in nearly every one-on-one pitch. (Counter SUF ¶¶ 16-17). HF and its team of sales representatives presented prospective retail purchasers with emails attaching glossy sell sheets or PowerPoint presentations, all of which contained the false statements and which were prepared by HF and approved by its top management. (Counter SUF ¶¶ 16-17, 19). Those materials announced the introduction of a "new" HF aluminum roll foil product that was "equivalent" to Reynolds Wrap in "strength and gauge," as well as included comparative test reports prepared in 2011 by a company called STR that purport to show certain similarities between Reynolds' and HF's roll foil. (Counter SUF ¶¶ 16-17). HF readily admits the widespread distribution of the STR reports and the false claims the STR reports were intended to support:

> In connection with the sale or offer for sale of Handi-Foil brand aluminum roll foil, it is the *general practice* of Handi-Foil's sales executive David Sarnoff to have and utilize the 2011 STR testing reports in meetings with retailers and retail customers. In addition, Handi-Foil provided 2011 test reports to its independent sales representatives, and *understands that many of the sales representatives have used or may utilize these reports in connection with the sale or offer for sale of Handi-Foil aluminum roll foil with their customers and retailers*. . . . Handi-Foil believes that *a great many of its customers have seen or discussed* the 2011 test reports with Handi-Foil or one of its representatives.

(Counter SUF ¶ 19; Ex. 32 (HF Interrogatory Response No. 17). Given this evidence, HF's attempt to limit its false advertising claims to just 11 statements, and then summarily dismiss

---

[10] The number of potential customers exposed to the false statements is likely higher, given the evidence summarized below concerning HF's "general practices" and the instructions its sales representatives received – and conveyed to customers – regarding the false statements. (Counter SUF ¶ 16).

eight of those statements with an overly narrow and selective reading of Reynolds' interrogatory responses – in contradiction of its own admissions – is disingenuous, at best.[11]  Any suggestion of a legitimate dispute about whether HF's false statements were sufficiently disseminated under the Lanham Act is equally disingenuous.

Taking the evidence in a light most favorable to Reynolds, as the Court must on HF's motion for summary judgment, a reasonable fact finder is likely to conclude that HF's statements were disseminated widely enough to the relevant purchasing public to constitute advertising or promotion within the very market that HF claims is relevant.[12]  At a minimum, this raises genuine issues of fact rendering summary judgment inappropriate.

B.    HF's Claims Are Literally False Or, At The Very Least, Misleading

HF identifies just three statements that it argues are neither literally false nor misleading as a matter of law.  Two of these statements appear in HF's widely distributed sell sheets and claim to be (1) "Introducing" the market to an allegedly new HF aluminum roll foil product that (2) is "Reynolds Equivalent Gauge and Strength."  The third statement, "Compare to Reynolds Wrap," appears on the front of the hundreds of thousands of HF boxes that bear Reynolds' distinctive trade dress and HF's widely distributed sell sheets.  HF's argument plays on semantics rather than realities and seeks to distract from the literal falsity and rampant confusion

---

[11] Aside from listing examples such as catalog sheets and emails, Reynolds' response to the Court Order expressly stated that HF pursued a "sales blitz" strategy: (1) "[t]hrough other written and oral advertisements and promotional communications," (2) by "repeatedly email[ing] and otherwise communicat[ing] literally false "test results to prospective customers (e.g., Savemart, Big Lots, Meijer, SuperValu) as purported support for its claims," and (3) by "include[ing] detailed oral and written presentations that urged customers to replace many REYNOLDS WRAP products on store shelves with Handi-Foil products in the REYNOLDS look-alike boxes."  (HF Ex. 9 (Plaintiff Reynolds Consumer Products Inc.'s Response to Order Dated August 28, 2013).

[12] HF fails to address the veracity of the 8 statements it summarily dismissed.  Thus, to the extent the Court finds the statements were sufficiently disseminated, issue of fact remain with respect to Reynolds' false advertising claims.  For that reason alone, HF's motion should be denied.

evident when HF's false advertising campaign is viewed in full context. This context establishes that HF's desire to parse its false advertising campaign into just three, separate and allegedly "ambiguous" statements should be rejected and its motion for partial summary judgment denied. Moreover, HF's own argument disputing Reynolds interpretation of the various statements shows a genuine conflict between the plain and obvious meaning in the full context of HF's "sales blitz" and HF's preferred, innocuous interpretation, such that summary judgment is not appropriate. *PBM Prods. v. Mead Johnson Nutrition Co.*, 09-CV-269, 2009 WL 5090862, at *4-5 (E.D. Va. Dec. 24, 2009), *aff'd sub nom., PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111 (4th Cir. 2011) (holding that "whether the claims are literally or impliedly false or true, or somewhere in between, involves material factual disputes that cannot be resolved on summary judgment"); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997) (reversing grant of summary judgment for defendant because "there are several ways in which a jury could reasonably conclude" defendant's advertisements "when read as a whole, contain literally false statements within the meaning of § 43(a)").

### 1.   HF's Statements Are Literally False

Falsity may be established in one of two ways. "[T]he contested statement or representation must be either [(1)] false on its face or, [(2)] although literally true, likely to mislead and to confuse consumers given the merchandising context." *C.B. Fleet Co., Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997). A statement that is literally false on its face may be either explicitly false, or conveyed by implication when considering the statement within its full context. *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011). Literal falsity is a violation of the Lanham Act *without* evidence of consumer confusion. *Id.* In cases in which the statement asserts a basis in, or support by, validating tests, literal falsity is established simply by showing the test does not

support the claim.  *C.B. Fleet*, 131 F.3d at 435-36 ("The relevant question for determining the required proof is whether the advertisement made an assertion of test-validation to the consumer public.").[13]

Here, the evidence shows not only that many of the accused statements were conveyed to HF's relevant consuming public as a "tests-based" claim, but also that those claims were unsupported by testing; in fact, the test data contradicted the claims.  A 2002 third-party test commissioned by HF found that HF's aluminum foil roll was inferior in both tensile strength and bursting strength to REYNOLDS WRAP and concluded it was not comparable to REYNOLDS WRAP.  (Counter SUF ¶ 19; Ex. 56).  Another test commissioned by a customer in 2003, at HF's expense, found that HF's branded standard and heavy-duty consumer aluminum roll foil products were substantially weaker than REYNOLDS WRAP and expressly concluded that the HF product was "Not comparable to the national brand, Reynolds."  (Counter SUF ¶ 19; Ex. 58).

Even though HF had conclusive testing establishing HF's product is not comparable to REYNOLDS WRAP, when Dollar Tree approached HF in 2011 to supply it with a "National Brand Equivalent" ("NBE") product, HF made no attempt to source a new, comparable roll foil product for Dollar Tree.  (Counter SUF ¶ 22).  Instead, HF just created a new box but used the same, inferior foil that it had been selling to retail customers, albeit with limited success, since 2001.  *Id.*  In other words, the aluminum foil roll product HF sells today is the *same* foil it has been selling for more than a decade.  (Counter SUF ¶ 22).

---

[13] In *C.B. Fleet*, the defendant did not make an express "tests validate" claim, and the district court concluded that the plaintiff could not prevail merely by showing lack of support in testing. The Fourth Circuit, under a clearly erroneous standard of review, did not upset that holding. *C.B. Fleet*, 131 F.3d at 436.  However, the Fourth Circuit did suppose that the claim could be found to be "test-based," even though not explicitly claimed that way.  *Id.* ("If it is later revealed, through discovery or otherwise, that the claim was test-based, the claimant may obviously challenge the test's reliability in attempting to prove false the advertised fact.").

While the claims at issue, "Compare to REYNOLDS WRAP®" and "Equivalent Gauge and Strength to REYNOLDS WRAP®," did not *expressly* cite test validation, HF's policy was to provide test data during, and cite test data in, the person-to-person communications and sales meetings related to these products.  (Counter SUF ¶¶ 16-17, 19).  It was HF's "*general practice . . .* to have and utilize the 2011 STR testing reports in meetings with retailers and retail customers" and "*many of the sales representatives have used or may utilize these reports*" when communicating with HF potential customers.  (Counter SUF ¶ 19).  Thus, there can be no question that, in the context of the promotion, those claims were viewed by the relevant purchasing public – and HF – as test-based claims.  And, each of those claims at issue is literally false.

a.      "Compare To" Claim

Despite the laboratory testing establishing that HF's aluminum foil roll product was *not* comparable to REYNOLDS WRAP®, HF marketed its product – the same product today as it was when first introduced more than a decade ago – as a National Brand Equivalent and "comparable" to REYNOLDS WRAP aluminum foil.  (Counter SUF ¶ 19-22).

Numerous courts have held that advertisements inviting consumers to 'compare' one product to another are actionable when placed in context.  *Axcan Scandipharm Inc. v. Ethex Corp.*, 585 F. Supp. 2d 1067, 1082 (D. Minn. 2007) (stating that "compare to" language suggests that a product's performance has in fact been tested and verified).  "When an advertising claim of favorable fact either expressly or impliedly asserts that the fact is testor study-validated, the fact of the validation becomes an integral and critical part of the claim."  *C.B. Fleet*, 131 F.3d at 435; *see Rexall Sundown, Inc. v. Perrigo Co.*, 651 F.Supp.2d 9 (E.D.N.Y. 2009) (determining that, consistent with other courts, "'[c]ompare to' statements, depending on their wording and context,

may convey more than a general invitation to compare and, instead, convey a specific assertion of measurable fact, such as the same ingredients or efficacy.").

Here, HF explicitly advised its potential customers that its "compare to" claim was supported by independent laboratory tests. (Counter SUF ¶ 17).   But, those tests did no such thing.  The 2002 and 2003 tests prove that HF's "compare to" claims are literally false.  HF's reliance on a 2011 report commissioned by Defendant that concluded, based on a number of superficial measures relating primarily to the size of the products, that HF was "comparable" to the REYNOLDS WRAP products is misplaced.[14]   (Counter SUF ¶ 19).  Even the 2011 report showed that HF standard roll foil was substantially weaker than REYNOLDS WRAP.  (HF Ex. 20; Counter SUF ¶ 19).  As such, HF's "Compare To" claim is literally false on its face.

b.       "Equivalence" Claim

HF also advertised that the HF product was "equivalent in gauge and strength" to REYNOLDS WRAP.  HF tries to muddle the issue by asserting that Reynolds misinterprets the equivalency statement, and since the statement is subject to interpretation it cannot be literally false.  (HF Br. at 25).  However, the facts demonstrate that HF itself interpreted the word "equivalent" and the phrase "compare to" in the exact same manner.  (Counter SUF ¶ 17).  These series of examples, all made to numerous customers, prove the disingenuous nature of HF's bald assertion that Reynolds cannot identify any instances where HF equated "equivalence" and "compare to" in order to convey (and invite customers to determine) that HF's product, which it knew to be inferior, had "identical or similar effects" and "correspond[ed] or [was] practically

---

[14]   A comparison of the three reports illustrates the superficiality of the 2011 report compared to the precise laboratory testing contained in the 2002 and 2003 reports.  Considering the same roll foil was tested in each, the fact that the 2011 report omits numerous metrics and comes to a different conclusion after HF was attempting to aggressively re-brand itself as a national brand equivalent as part of its "sales blitz" renders the report inherently suspect.  (Compare Exs. 55, 56 and 58).

equal in effect" to REYNOLDS WRAP.  (HF Br. at 25 (quoting Webster's II New College Dictionary 381 (1999 ed.)).  Indeed, the weakness of HF's argument is visible in its attempt to disclaim responsibility for the clear meaning conveyed by its sales representative to a customer:

> I am very confident to tell you without reservation that our product has been tested by a 3rd party and the results were conclusive that we have the same comparable quality as Reynolds – in fact, we clearly state this on our packaging "COMPARE TO REYNOLDS WRAP FOIL."

(HF Ex. 15).[15]  Moreover, at least one customer expressly rejected HF's claims of comparability. (Ex. 49).  However, countless other customers – sophisticated or not – were duped into believing HF's false claims, which it regularly buttressed with its 2011 report to add credibility to its claims and suggest lab-tested support for its claims.  The simple fact that HF went from an insignificant market participant to an $11 million brand that desires to and is replacing Reynolds more than adequately establishes customers are influenced by HF's false advertising campaign. (Counter SUF ¶ 16-17, 22).  By promoting to consumers that HF is "equivalent" to Reynolds, HF represented that its product has certain qualities, namely those of Reynolds, which it in fact does not have.  *See, e.g.*, *Rhone-Poulenc Rorer Pharm., Inc. v. Marion Merrell Dow*, 93 F.3d 511, 516 (8th Cir. 1996) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 14 (7th Cir. 1992)).

c.      "New" Product Claim

Although not a test-based claim, HF's claim that its aluminum foil roll product in its infringing packaging was "new" to the grocery store channel is also literally false.  Although the product was *the exact same product HF had marketed nearly ten years earlier*, Counter SUF ¶ 19, HF now claims the product was "new" because it was "new" to the grocery channel.  (HF Br. at 28-29).  HF's belated attempt to define the "market" as the grocery channel market is belied

---

[15] That same sales representative, in addition to others, testified that they were supplied with scripts, presentations, and sell sheets by HF and instructed on how to sell HF's product to existing Reynolds customers.  (Counter SUF ¶ 16).

by its own unambiguous statements. *Id.* HF defined the relevant market when it told its potential customers that it was "now entering the *roll foil market*." (HF Ex. 12). Because the evidence in the record shows that HF had been manufacturing and selling aluminum roll foil for approximately a decade *before* it made those statements, the "introduction" to the roll foil market was a false marketing strategy to generate interest during its "sales blitz."

Consequently, there can be no doubt that HF's claims that it was "introducing" a new product are literally false. Given the above, summary judgment should be denied.

2.     Alternatively, HF's Statements Are Likely to Mislead

Even if this Court finds that HF's "Equivalent To," Compare To," and "New" statements are not literally false, the above evidence more than establishes that the statements are likely to mislead consumers. Accordingly, summary judgment is not warranted for this alternative reason.

Curiously, HF defends itself by emphasizing, rather than running from, the ambiguous nature of the claims. However, HF's attempt to take refuge behind some asserted "ambiguity" would impermissibly allow HF to profit from its purposely inartful claims. The Lanham Act prohibits such subterfuge. *See Am. Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978) ("Were it otherwise, clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed."). Thus, claims that may be literally true or ambiguous, but nevertheless implicitly convey a false impression, are misleading in context, or are likely to deceive consumers, violate the Lanham Act. *See C.B. Fleet*, 131 F.3d at 434.

Critically, HF fails to acknowledge that proof that statements are *likely* to deceive is sufficient. HF asserts that its equivalence statement is literally true because it merely states that HF's gauge and strength are *similar* to those of Reynolds. Likewise, HF asserts that simply

inviting customers to "compare" the two products cannot be literally false and therefore requires hard evidence that consumers were actually mislead.  Finally, HF argues that claiming its product is a new introduction to the market is literally true and that Reynolds must produce evidence of actual confusion.  Even if HF's assertions were literally true, the evidence at the very least demonstrates that these statements convey the unmistakable message that HF has created a new foil product that now has the same gauge and strength as Reynolds – and that independent tests support its claims.  *See, e.g.*, *Rhone-Poulenc*, 93 F.3d at 516; *Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc*., 501 F. Supp. 2d 431 (M.D.N.C. 2002) ("by referencing a particular competing product . . . Plaintiff's invitation to 'compare' does not qualify as a vague claim of superiority"); *Cartier, Inc. v. Deziner Wholesale, L.L.C.*, 98 Civ. 4947, 2000 WL 347171, at *4 (S.D.N.Y. Apr. 3, 2000) (denying summary judgment where label on product suggested that customers compare prices, quality and style with plaintiff's product).

Each of these statements, in context, establishes HF's intent to mislead the market.  The extrinsic evidence cited above more than adequately establishes the deceptive message that consumers not only are likely to take from the advertisement, but have taken (and only in rare instances rejected) from the false advertisements.  *See McNeil Lab*, 501 F. Supp. 517.

Accordingly, even if the claims are not literally false on their face or by implication, the statements are certainly likely to mislead and summary judgment is inappropriate.

C.    The Evidence Establishes That HF's Claims Are Material

Incredibly, HF has taken the position that HF's equivalence and related claims were not material to the purchasing decision of sophisticated, professional retail buyers.  (HF Br. at 29-30).  HF's position begs the question: If HF did not believe its potential customers would be influenced by its claims, why make them?  HF relies primarily on the bald assertion that professional buyers familiar with HF's reputation for quality in the aluminum baking pan

business translates directly to its aluminum roll foil products.  (HF Br. at 30).  Therefore, such

buyers are "unlikely to be deceived by a single line in an email or a catalogue sheet."  (*Id.*)

HF's arguments are wholly unpersuasive, and offer no evidence in substantiation.  This is

not surprising given that the materiality standard is so easily met here.  *First*, materiality is

presumed where, as here, the statements are literally false.  *X-IT Prods., L.L.C. v. Walter Kidde*

*Portable Equip., Inc.*, 155 F. Supp. 2d 577, 630 (E.D. Va. 2001) ("[T]he Court assumes in such

circumstances that the statements actually misled consumers.").  *Second*, a statement is material

if it is likely to influence a purchasing decision.  *PBM*, 639 F.3d at 126.  In other words, "[a]

statement is material if it describes a product or service as having a characteristic that most

consumers would find appealing."  *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs.*

*LLC*, 875 F. Supp. 2d 511, 529-30 (D. Md. 2012) (collecting cases from within the Fourth

Circuit).  Moreover, "[m]ateriality is generally a question of fact for the jury."  *Id.* at 529.

The record is replete with evidence that establishes HF influenced the purchasing

decisions of these "sophisticated" buyers.  The evidence shows that HF's sales force used the

false claims as a primary selling tool.  HF's sales pitch consisted of (i) comparison to

REYNOLDS WRAP, (ii) claims of equivalence to REYNOLDS WRAP in gauge and strength

and (iii) the value those benefits at a lower price.  As Kenard Lane, Reynolds' Vice President for

Marketing, Cooking Brands, testified, "it is really about strength."  (Counter SUF ¶ 20).[16]

---

[16] HF mistakenly asserts that its statements cannot be material because its consumers are
"sophisticated [] buyers."  (HF Br. at 30).  As the cases cited by HF demonstrate, a consumer's
level of sophistication is merely a factor that may be considered in determining whether a false
or misleading statement is material.  (Id. (citing *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*,
902 F.2d 222, 229-30 (3d Cir. 1990), and *Labware, Inc. v. Thermo Labsystems, Inc.*, No. 04-
2545, 2005 WL 1541028, at *1-11 (E.D. Pa. June 28, 2005)).  While a consumer's level of
sophistication may decrease the likelihood that HF's representations affected consumer behavior,
it certainly is not dispositive on the issue.  Further, the evidence shows that HF's "sophisticated"

HF's decision to advertise these messages reveals that HF believed that its strength and comparison claims were characteristics of its product likely to influence consumers' purchasing decisions. *See Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp.2d 404, 423 (S.D.N.Y. 2013); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 (1st Cir. 2002) ("[D]efendants' aggressive marketing strategy highlighting the 'cashmere' nature of the blazers [indicated] that defendants themselves believed cashmere to be an inherent and important characteristic of the blazers.").  The fact that HF's customers *specifically asked* for a product comparable to REYNOLDS WRAP fully supports the materiality of those claims. (Counter SUF ¶ 22).

Further, statements comparing one product to another have not only been deemed material when conveying a message of "equivalence as to the competing products formulation and/or efficacy," but also "by the manner in which [the statements] are conveyed on the package." *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F.Supp.2d 9, 30 (E.D.N.Y. 2009) ( "both the nature and location of the Compare To Statements are sufficient to raise a disputed issue of material fact as to . . . material[ity]").

Because a rational trier of fact could conclude HF's statements relate to characteristics that buyers of aluminum foil seek, summary judgment in not warranted on the issue of materiality.

<u>CONCLUSION</u>

For the foregoing reasons, and those stated in Reynolds' Motion For Partial Summary Judgment, the Court should deny HF's Motion For Partial Summary Judgment and grant plaintiff's Motion For Partial Summary Judgment.

---

buyers did consider HF's statements important enough to influence their purchasing decisions. (Counter SUF ¶¶ 17, 20).

BRACEWELL & GIULIANI LLP


/Britt Steckman/
Britt Steckman
britt.steckman@bgllp.com
2000 K Street NW, Suite 500
Washington, D.C. 20006-1809
Telephone: 202.828.5800
Facsimile: 800.404.3970

OF COUNSEL:

Mark N. Mutterperl (*pro hac vice*)
mark.mutterperl@bgllp.com
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
Telephone: 212.508.6100
Facsimile: 800.404.3970
*Attorneys for Plaintiff Reynolds Consumer Products Inc.*

Dated: December 31, 2013

CERTIFICATE OF SERVICE

The undersigned counsel for plaintiff Reynolds Consumer Products, Inc. hereby certifies that on December 31, 2013, the above and foregoing was sent via electronic mail pursuant to an agreement between the parties:

Brian N. Gross
D. Sean Trainor
Kirkland & Ellis LLP
655 15th Street, NW
Suite 12
Washington, D.C. 20005
brian.gross@kirkland.com
dtrainor@kirkland.com

David Callahan
Ian J. Block
Robin A. McCue
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
dcallahan@kirkland.com
ian.block@kirkland.com
rmccue@kirkland.com

/Mark N. Mutterperl/
Mark N. Mutterperl