**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| REYNOLDS CONSUMER PRODUCTS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No.: 1:13-cv-214 LO/TRJ |
| | ) |
| HANDI-FOIL CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT HANDI-FOIL CORPORATION'S OPPOSITION
TO PLAINTIFF REYNOLDS CONSUMER PRODUCTS INC.'S
<u>MOTION TO EXCLUDE THE EXPERT REPORT OF DR. RAN KIVETZ</u>**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iii

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND .................................................................................................. 2

        A.      Dr. Kivetz's Credentials Speak For Themselves. ................................... 2

        B.      Dr. Kivetz's Survey Design Is Sound. .................................................... 3

                1.      The product and universe surveyed. ........................................... 4

                2.      The side-by-side comparison. ...................................................... 5

                3.      The questions asked. .................................................................... 6

                4.      The results show there is no likelihood of confusion. ................ 8

III.    DR. KIVETZ'S LIKELIHOOD OF CONFUSION SURVEY SURPASSES THE
        REQUIREMENTS OF *DAUBERT*. ..................................................................... 8

IV.     DR. KIVETZ'S METHODOLOGY IS SOUND AND RELIABLE. ............... 9

        A.      The Purpose Of A Likelihood Of Confusion Survey Is To Replicate
                Marketplace Conditions So That It Is A Reliable Approximation Of How
                The Larger Population Would React. ........................................................ 9

        B.      The *Eveready* And The *Squirt* Methodology Are Options, But They Are
                Not The Only Absolute Choices In Designing A Survey. ...................... 11

                1.      Courts have criticized both the *Eveready* and *Squirt* survey formats
                        for their limitations. .................................................................. 12

                2.      Even within Eveready and Squirt methods, there are numerous
                        ways to design a survey. ............................................................ 14

        C.      Dr. Kivetz's Thoughtful Methodology Best Replicates Marketplace
                Conditions. ............................................................................................. 15

        D.      Reynolds' Representations To This Court That Dr. Kivetz Created This
                Methodology For Purposes Of Litigation Are Demonstrably False. ...... 18

V.      CONCLUSION .................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiro LLC v. House of Cheatham, Inc.*,
   No. 12 Civ. 5775, 2013 WL 2181088 (S.D.N.Y. May 17, 2013) ............................................ 13

*Big O Tires, Inc. v. Bigfoot 4X4, Inc.*,
   167 F. Supp. 2d 1216 (D. Colo. 2001) ................................................................................... 14

*Cumberland Packaging Corp. v. Monsanto Co.*,
   32 F. Supp. 2d 561 (E.D.N.Y. 1999) ..................................................................................... 17

*E & J Gallo Winery v. Proximo Spirits, Inc.*,
   No. 1:10-cv-00411, 2011 WL 5922090, (E.D. Cal. Nov. 28, 2011) ................................. 13, 16

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*,
   628 F. 2d 500 (5th Cir. 1980) ............................................................................................... 12

*Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*,
   2010 WL 3075318 (N.D. Ga. Aug. 4, 2010) ......................................................................... 12

*James Burrough Ltd. v. Sign of Beefeater, Inc.*,
   540 F.2d 266 (7th Cir. 1976) ................................................................................................ 12

*Johnson & Johnson v. Actavis Grp. HF*,
   2008 WL 228061 (S.D.N.Y. Jan. 25, 2008) ................................................................. 18, 20, 21

*Kargo Global v. Adv. Magazine Publishers, Inc.*,
   No. 06 Civ. 550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ............................................ 13

*Kumho Tire Co. Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................................................ 9

*M. Kramer Mfg. Co., Inc. v. Andrews*,
   783 F.2d 421 (4th Cir. 1986) ................................................................................................ 18

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
   472 F.3d 398 (6th Cir. 2006) ................................................................................................ 22

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
   198 F. Supp. 2d 474 (S.D.N.Y. 2002) ................................................................................... 14

*PBM Prods., LLC v. Mead Johnson & Co.*,
   639 F.3d 111 (4th Cir. 2011) .................................................................................................. 9

*Safe Auto Ins. Co. v. State Auto. Mut. Ins. Co.*,
   2009 WL 3150328 (S.D. Ohio Sept. 30, 2009) ............................................................. 20, 21, 22

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
   978 F. 2d 947 (7th Cir. 1992) ............................................................................................... 12

**Page(s)**

*Simon Prop. Grp. L.P. v. mySimon, Inc.*,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ............................................................ 10, 11

*Squirtco v. Seven-Up Co.*,
    628 F.2d 1086 (8th Cir. 1980) ......................................................................... 13, 14

*Steak Umm Co., LLC v. Steak 'Em Up, Inc.*,
    868 F. Supp. 2d 415 (E.D. Pa. 2012) ...................................................................... 8

*THOIP v. Walt Disney Co.*,
    690 F. Supp. 2d 218 (S.D.N.Y. 2010) ............................................................... 14, 18

*THOIP v. Walt Disney Co.*,
    788 F. Supp. 2d 168 (S.D.N.Y. 2011) ................................................................... 13

*Trouble v. Wet Seal, Inc.*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001) .................................................................. 10

*Union Carbide Corp. v. Ever-Ready, Inc.*,
    531 F.2d 366 (7th Cir. 1976) ............................................................................... 13

*Water Pik, Inc. v. Med-Sys., Inc.*,
    2012 WL 27598 (D. Colo. Jan. 5, 2012) .............................................................. 17

*WE Media, Inc. v. Cablevision Sys. Corp.*,
    94 F. App'x 29 (2d Cir. 2004) ............................................................................. 10

*WE Media, Inc. v. Gen. Elec. Co.*,
    218 F. Supp. 2d 463 (S.D.N.Y. 2002) .................................................................... 9

*Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*,
    2006 WL 62846 (W.D. Mich. Jan. 10, 2006) ....................................................... 14

**Other Authorities**

Hal Poret, *A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies
    for Trademark Surveys*,
    100 TRADEMARK REP. 756 (2010) ....................................................................... 14

Itamar Simonson, *The Effect of Survey Method On Likelihood of Confusion Estimates:
    Conceptual Analysis And Empirical Test*,
    83 TRADEMARK REP. 364 (1993) ......................................................................... 12

Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of* SQUIRT,
    98 TRADEMARK REP. 739 (2008) ......................................................................... 13

**Rules**

FED. R. EVID. 403 .................................................................................................... 9

FED. R. EVID. 702 .................................................................................................... 9

**Treatises**

§6.01[1] INTELLECTUAL PROPERTY TRADEMARK SURVEYS (Phyllis J. Welter) (1999) ............... 18

**Page(s)**

§6.01[3] INTELLECTUAL PROPERTY TRADEMARK SURVEYS (Phyllis J. Welter) (1999)................ 11

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:163 (4th ed. 2013) ............. 9, 18

*Manual on Complex Litigation*,
  Federal Judicial Center (4th ed. 2004) ...................................................................................... 4

S. Diamond & J. Swann, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE,
  AND DESIGN, *Demand Effects in Likelihood of Confusion Surveys: The Importance of
  Marketplace Conditions* (I. Simonson & R. Kivetz) (2012) ..................................................... 19

S. Diamond and J. Swann, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE,
  AND DESIGN, *Likelihood of Confusion* (J. Swann) (2012) ........................................................ 23

S. Diamond, *Reference Guide on Survey Research*,
  REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2000).................................................... 4

S. Diamond, *Reference Guide on Survey Research*,
  REFERENCE MANUAL ON SURVEY EVIDENCE (3d ed. 2011) ....................................................... 7

## I.        INTRODUCTION

Dr. Ran Kivetz—a highly regarded, tenured professor of marketing at Columbia University—designed a well-thought-out survey to determine whether the accused Handi-Foil package was likely to confuse consumers into believing it came from, or was sponsored by, Reynolds.  The results are telling:  *no one is confused* as to the source of the Handi-Foil package; consumers do not believe there is an affiliation with Reynolds or that the Handi-Foil package is sponsored or allowed by Reynolds.  These results are consistent with the fact that Handi-Foil has sold nearly *twenty million* boxes of the allegedly infringing designs *without a single reported instance of consumer confusion*.

Reynolds now seeks to exclude Dr. Kivetz's survey because, Reynolds argues, he did not adopt one of the two methods Reynolds deems to be the *only* ways to properly conduct a survey. Dr. Kivetz did not blindly use a fill-in-the-blank survey form; he considered and analyzed the real-world marketplace conditions, researched the products and retailers at issue, conducted a separate survey to determine the proper demographic breakdown of the proper universe of respondents, and only then—after spending nearly two weeks researching the products and market—developed a survey methodology that best replicated marketplace conditions and asked questions in a nonleading manner.  Reynolds' motion lacks any evidence to support its position that there is a problem with Dr. Kivetz's methodology.  With no evidence, Reynolds tries to discredit Dr. Kivetz's methodology through a series of misstatements and misrepresentations.

*First*, Reynolds claims that there are only two ways to properly conduct a likelihood of confusion survey:  the so-called *Squirt* and *Eveready* methodologies.  This is not true.  While the *Eveready* and *Squirt* designs may be the two more popular methods, there are variations even among those methodologies that have been accepted by experts and courts, including the one Dr. Kivetz chose.  Indeed, Reynolds' own survey expert used a modified (albeit highly flawed)

*Squirt*-inspired survey; Dr. Kivetz did a modified *Eveready* survey that better replicated marketplace conditions.

**Second**, Reynolds claims (several times) that Dr. Kivetz developed this methodology for purposes of this litigation. This is also incorrect, and Reynolds knows it, having admitted that Dr. Kivetz co-wrote a chapter in a scholarly treatise describing this methodology **two years before** this litigation. (Reynolds' Brief at 13.)

**Third**, Reynolds incredibly claims that no expert has ever used this type of methodology before (save for a single case Reynolds misconstrues), and that no court has ever accepted this type of side-by-side *Eveready* survey. In fact, in a case **five years ago**, Reynolds' own counsel faced a nearly identical side-by-side *Eveready* survey conducted by a different, well-regarded survey expert, Dr. Itamar Simonson. Notably, in that previous case, Reynolds' counsel did not seek to exclude Dr. Simonson's survey based on it being a "Frankenstein" survey. More notably, the court in that case **credited** Dr. Simonson's survey as evidence of the lack of confusion in the marketplace. Simply put, Reynolds' counsel knows that this type of methodology has been previously used and accepted by courts in the past.

Dr. Kivetz is a highly qualified survey expert who did not just blindly adopt a method but rather developed a survey that best replicated marketplace conditions and questioned the proper universe of respondents in a nonleading manner. His methodology is sound, and satisfies every requirement of *Daubert*.

## II.      BACKGROUND

### A.      Dr. Kivetz's Credentials Speak For Themselves.

Dr. Kivetz is a chaired, tenured professor of marketing at Columbia University Business School with nearly twenty-one years of education, training, and experience in the area of survey design and methodology. (*See* Ex. 1, 8/12/13 Expert Report of Dr. Ran Kivetz ("Kivetz Report")

¶¶ 2-8, Ex. A.)[1] Dr. Kivetz received both his Ph.D. and Masters from Stanford University.  (*Id*.)

Dr. Kivetz has published over twenty-three scholarly articles about marketing research and his

research has been covered extensively in the media.  (*Id*. Ex. A.)   One of his more recent

publications includes a chapter in a scholarly treatise published by the American Bar

Association, "Demand Effects in Likelihood of Confusion Surveys."  (*Id*.)  Dr. Kivetz has given

fifty-nine conference presentations about marketing research.  (*Id*.)

In addition, Dr. Kivetz has received countless honors and awards for his publications and

academic contributions in the marketing research profession, including being rated as the third

most prolific scholar by the leading marketing journals for the past twenty-four years. (*Id*.)

Further, Dr. Kivetz serves on the editorial boards of six leading journals and, over the course of

his career, has conducted, supervised, and evaluated over 1,000 marketing research surveys,

including several in the context of litigation.  (*Id*. ¶ 8.)  Specifically, Dr. Kivetz has served as an

expert witness and consultant in legal cases in the areas of intellectual property, trademark and

trade dress infringement, deceptive advertising, market surveys, buyer behavior, consumer

perception, class actions, marketing and branding strategy, retailing, promotions, other marketing

issues, patents, and employment disputes.  (*Id*. Exs. A, B.)  In the cases Dr. Kivetz has served as

an expert witness and submitted a survey, ***no court has ever excluded one of his surveys or***

***expert reports***.  Reynolds does not challenge Dr. Kivetz's qualifications.

### B.    Dr. Kivetz's Survey Design Is Sound.

Dr. Kivetz designed and conducted a survey to "estimate the likelihood that the accused

trade dress of Defendant's Handi-Foil Product . . . confuses consumers into believing that the

---

[1]    All references to exhibits in this Opposition refer to the corresponding numbered exhibits to
the Declaration of Ian J. Block in Support Of Handi-Foil Corporation's Opposition to
Plaintiff Reynolds Consumer Products Inc.'s Motion to Exclude the Expert Report of Dr.
Ran Kivetz, filed concurrently herewith.

company that makes Handi-Foil Product:  (a) is Reynolds; (b) has a connection with Reynolds; and/or (c) received permission from Reynolds."  (Ex. 1, Kivetz Report ¶ 12.)  In other words, the purpose of the survey was to determine if a likelihood of confusion exists between the accused Handi-Foil package design (the same package surveyed by Ms. Sarah Butler on behalf of Reynolds) and Reynolds' asserted trade dress.

The Federal Judicial Center's Manual for Complex Litigation provides guidelines for properly designing and conducting a litigation survey.  *Manual on Complex Litigation*, Federal Judicial Center, at 103 (4th ed. 2004); *see also* S. Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. 2000), at 232-35 (establishing guidelines adopted in *Manual on Complex Litigation* "to assist judges in identifying, narrowing, and addressing issues bearing on the adequacy of surveys either offered as evidence or proposed as a method for developing information.").  Dr. Kivetz specifically adopted these principles: "The survey was designed and conducted based on scientific methodologies . . . *including . . . the Manual for Complex Litigation*."  (Ex. 1, Kivetz Report ¶ 28 (emphasis added); *see also* Ex. 2, table detailing how Dr. Kivetz's methodology follows these guidelines.)

### 1.    *The product and universe surveyed.*

Dr. Kivetz designed a survey testing the same package Reynolds surveyed—a Handi-Foil package that is sold exclusively at Dollar Tree stores (stores that sell all items for $1 or less). Unlike Reynolds' expert, however, who critically failed to account for the fact that only Dollar Tree customers would encounter the accused surveyed package, Dr. Kivetz limited his survey to Dollar Tree shoppers who are likely to purchase aluminum foil in the next six months.  (*See* Ex. 1, Kivetz Report, Ex. D (survey screener questionnaire).)  To ensure that his survey universe properly represented Dollar Tree customers, Dr. Kivetz conducted an omnibus survey that established the demographic breakdown of Dollar Tree shoppers.  (Ex. 1, Kivetz Report ¶¶ 33-

35.)  Dr. Kivetz then specifically screened for shoppers at Dollar Tree stores to ensure that the respondents in his survey would actually encounter the accused package, as required by sound survey principles.  (*Id.*)

### 2.  *The side-by-side comparison.*

In accordance with well-established standards, Dr. Kivetz designed his survey to approximate marketplace conditions.  (Ex. 1, Kivetz Report ¶ 21.)  To accomplish this, he researched the actual market to understand how and where the products at issue (and specifically the accused Handi-Foil package) are sold.  Dr. Kivetz talked directly with Handi-Foil's Dollar Tree account executive and with Handi-Foil's CFO, and visited numerous Dollar Tree stores.  (*Id*. n.5; Ex. 3, 9/12/13 Deposition of Ran Kivetz ("Kivetz Dep.") 73:14-78:6.)[2]  Dr. Kivetz determined that the accused Handi-Foil package—sold exclusively at Dollar Tree stores—was sold side-by-side with Reynolds' Wrap brand aluminum foil in the 18 sq. ft. size, as well as Ultra Foil brand aluminum foil in the 40 sq. ft. size.  In other words, ***in the real world***, the junior user (*i.e.*, Handi-Foil) and the senior user (*i.e.*, Reynolds) are sold side-by-side on the shelf, along with a third product. (Ex. 1, Kivetz Report ¶ 21.)  To replicate this, Dr. Kivetz showed "respondents a two-shelf display with the three aluminum foil products that consumers typically encounter in the marketplace at Dollar Tree chain Stores:  (a) the Defendant's 'handi-foil ALUMINUM FOIL 25 SQ. FT.' product; (2) the Plaintiff's 'Reynolds Wrap ALUMINUM FOIL 18 SQ. FT.' product; and (3) the 'ULTRA FOIL Aluminum Foil 40 SQ. FT.' product."  (*Id.*

---

[2]  Reynolds' survey expert, Sarah Butler, spoke to no one (save for counsel) and did not visit any stores to learn or understand the marketplace conditions, which explains why she ***did not know*** that the package she tested was a Dollar Tree exclusive while the universe she surveyed was the (wildly over-inclusive) larger population of ***anyone*** who would consider purchasing aluminum foil.

¶¶ 13, 21.)  Reynolds does not deny that these three products were in fact sold side-by-side at Dollar Tree.

While viewing the display that Dollar Tree shoppers would encounter in the market, respondents were instructed to "evaluate the products as you would ***normally*** do if you were thinking of buying aluminum foil" and to "[t]ake as much time as you would ***normally*** do when considering buying such a product."  (Ex. 1, Kivetz Report ¶ 41 (emphasis added).)  Once respondents finished examining the products as they normally would, the interviewer placed the Handi-Foil Product on the table in front of respondents.  (*Id.* ¶ 42.)  Respondents were instructed:

> Suppose now that you are thinking of buying this product.  Please evaluate it as you would ***normally do*** if you were thinking of buying it.  You may pick it up if that is what you would ***normally do*** before deciding whether to buy such a product.  Take as much time as you would ***normally do*** when considering buying such a product.  Just tell me when you are done.

(*Id.* (emphasis added).)  The Handi-Foil package was left on the table for the remainder of the interview questions.  (*Id.*)

### 3.     *The questions asked.*

In order to determine whether there was any confusion, Dr. Kivetz developed a series of nonleading questions based on the *Eveready* methodology.   Dr. Kivetz asked respondents a series of open-ended questions, methodically inquiring into what company consumers thought made the Handi-Foil product sold at Dollar Tree stores.  (Ex. 1, Kivetz Report, Exhibit F.)  First, Dr. Kivetz asked Questions 1, 2, and 3 that sought to see whether "consumers would be confused into believing that a company that makes the Handi-Foil product:  (a) is Reynolds; (b) has a connection with Reynolds; and/or (c) receives permission from Reynolds."  (*Id.* ¶ 44.)  The first open-ended questions asked were:

Q. 1A:  Which company makes the product?

Q. 1B:  What makes you say that?  Anything else?

(*Id.* ¶ 45, Exhibit F.)  Dr. Kivetz next asked a filter question examining whether respondents thought that the company that makes the product they just examined has a business affiliation or connection with another company:

> Q. 2(a):  Now, I am going to read to you a question that has three answer choices. Please allow me to read the entire question before answering.  After I am done, if you like me to repeat the question, just ask me.  Do you think that . . .
>
>> The company that makes this product <u>does have</u> a business affiliation or connection with another company or brand, or
>>
>> The company that makes this product <u>does not have</u> a business affiliation or connection with another company or brand, or
>>
>> You have no opinion about that.

(*Id.* ¶ 46, Exhibit F (emphasis in original).)  Unlike Ms. Butler's survey, Dr. Kivetz followed accepted principles by offering a "no opinion" option, as well as rotating the order of the responses to avoid order bias.  *See* S. Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 390, 396 (3d ed. 2011) (discussing the importance of including a "no opinion" option to decrease guessing, reducing demand for an answer that encourages the "hazard of a guess just to comply" and noting that a "survey should be rotated" "to control for order effects").  Those respondents who said the company that makes this product ***does have*** a business affiliation or connection with another company or brand were asked:

> Q. 2(b):  Which other company or brand has a business affiliation or connection with the company that makes this product?

(*Id.* ¶ 47, Exhibit F.)  The answers were recorded verbatim.  (*Id.*)  The respondents that gave an answer were asked an open-ended question to explain what made them give their answer to question 2(b).  (*Id.*)  The same questions were asked in regards to "whether respondents thought

7

that the company that make the product they examined . . . received permission of approval from another company or brand."  (*Id.* ¶¶ 48-49, Exhibit F.)

As shown above, Dr. Kivetz asked nonleading questions to solicit responses.  Further, Dr. Kivetz instructed respondents they should not guess and instead should answer with a "don't know."  (*Id.* ¶ 43, Exhibit F ("Also, for each of my questions, if you don't know or don't have an answer, please don't guess.  Just tell me you 'don't know' or 'don't have an answer' and we'll go on to the next question.").)[3]

### 4.     *The results show there is no likelihood of confusion.*

The results of Dr. Kivetz's survey conclusively explain why there has not been a single report of ***actual*** consumer confusion in the tens of millions of Handi-Foil packages sold.  (Ex. 1, Kivetz Report ¶¶ 14, 67.)  Specifically, the Kivetz survey showed that "the confusion estimates in the test and control group are statistically indistinguishable."  (*Id.* at ¶¶ 23, 63); *see also Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 434-35, n.11 (E.D. Pa. 2012) ("When the 'percentage of confusion' survey result dips below 10%, it can become evidence that indicates there is no likelihood of confusion." (citing string of cases at n.11)).  In short, the survey shows consumers are no more confused by the accused Handi-Foil package than by a noninfringing, all-red package.

### III.     DR. KIVETZ'S LIKELIHOOD OF CONFUSION SURVEY SURPASSES THE REQUIREMENTS OF *DAUBERT*.

Handi-Foil and Reynolds do not disagree about what *Daubert* requires.   *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (Supreme Court "assign[ed] to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is

---

[3]   Sarah Butler, Reynolds' expert, did the opposite of Dr. Kivetz and specifically instructed her interviewers ***not*** to read the "don't know" option.  (Ex. 4, 7/12/13 Sarah Butler Expert Report at Exhibit D.)

relevant to the task at hand"); *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); FED. R. EVID. 403, 702.[4] Rather, Handi-Foil and Reynolds disagree on the application of the law and what type of survey best replicates marketplace conditions.  Reynolds argues that this Court should exclude Dr. Kivetz's survey because he:  (1) used an untested and unaccepted methodology, and (2) failed to replicate marketplace conditions.  Neither argument has merit:  Dr. Kivetz's methodology is tested and accepted, and his survey replicated marketplace conditions.  But even if Reynolds' arguments on Dr. Kivetz's methodology were true, unlike in the case of Reynolds' expert Ms. Butler (who surveyed the wrong universe; showed products side-by-side that never appear so in the marketplace; used a control that, by her own admission, violated the principles of a proper control; and asked leading questions that required respondents to guess), this is not the "rare" case requiring this Court to exclude the survey.  *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (finding situations to exclude survey "will be rare").

## IV.　　DR. KIVETZ'S METHODOLOGY IS SOUND AND RELIABLE.

### A.　The Purpose Of A Likelihood Of Confusion Survey Is To Replicate Marketplace Conditions So That It Is A Reliable Approximation Of How The Larger Population Would React.

It is axiomatic that "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."  Ex. 5, 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:163 (4th ed. 2013); *see also WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (emphasis added) *aff'd sub nom. WE Media, Inc. v. Cablevision Sys. Corp.*, 94 F. App'x 29 (2d

---

[4]　For an in-depth discussion of what *Daubert* requires, see Handi-Foil's Brief in Support of its Motion to Exclude any Testimony, Argument, or Evidence regarding the Survey, Expert Report, and Opinions of Sarah Butler at 8-10.

Cir. 2004) (a survey must "compare the impressions that marks have on potential customers under marketplace conditions"); *Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001) ("Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at minimum, tests for confusion by roughly simulating marketplace conditions."). "At bottom, however, a survey to test likelihood of confusion ***must attempt to replicate the thought processes of consumers encountering the disputed mark or marks as they would in the marketplace***." *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1038 (S.D. Ind. 2000) (citing a string of cases discussing importance of marketplace conditions) (emphasis added). In other words, the survey must examine consumers who will actually encounter the product (the proper universe) and present the product the way those consumers actually encounter it (replicating marketplace conditions).

Dr. Kivetz did just that, designing a survey that replicated marketplace realities based on the specific facts and circumstances surrounding the sale of the accused product. Dr. Kivetz's methodology is a reliable measure of how the larger population would react because, unlike Ms. Butler's survey, Dr. Kivetz only surveyed those consumers who would actually encounter the accused package (*i.e.*, Dollar Tree customers) and replicated how consumers would encounter the accused package in the marketplace. Because the products at issue appeared side-by-side on the Dollar Tree shelves, Dr. Kivetz determined that it would not be appropriate in this case to simply show respondents one product. Instead, Dr. Kivetz showed an array of aluminum roll foil products that were, in fact, sold side-by-side on the shelf in a Dollar Tree store. But, to avoid the leading—and highly criticized—nature of the "traditional" *Squirt*-type questions, Dr. Kivetz drafted open-ended, nonleading questions that are more traditionally found in an *Eveready*-type survey. Notably, Reynolds' expert adopted an array of products as well (albeit a

flawed array given that the products shown in Reynolds' survey are never actually all sold together), so Reynolds cannot complain about the use of an array.  Reynolds is left to merely argue that Dr. Kivetz must adopt form questions that have been criticized by courts (and experts) for years.

### B.       The *Eveready* And The *Squirt* Methodology Are Options, But They Are Not The Only Absolute Choices In Designing A Survey.

In an effort to convince this Court to exclude Dr. Kivetz's survey, Reynolds argues that an expert must adopt one of only two available methodologies.  No authority supports this "two surveys fit all" argument where the only choices are *Eveready* or *Squirt*—nor is there only one way to do an *Eveready* or a *Squirt* survey.  If that were the case, experts would be unnecessary because litigants could use a fill-in-the-blank survey form.  To the contrary, survey methodology must be flexible to allow a survey to get as close to marketplace conditions as possible.  *See Simon Prop. Grp.*, 104 F. Supp. 2d at 1038 ("No survey model is suitable for every case.").

A leading treatise on trademark surveys describes a variety of different types of possible survey methods that exist—including more than the *Eveready* (monadic) and *Squirt* (side-by-side comparison)—noting that choosing the one that best represents the realistic marketplace is the most important:

> As one would suspect, the monadic situation is not always realistic, because there is rarely only one product in a store.  Yet side-by-side comparison surveys, while seemingly reflective of marketplace realism, place more focus on the trademark than does the actual marketplace. . . . Where the monadic setting has been deemed inappropriate, but alternatives to the side-by-side comparison are sought, the survey expert might design a setting in which a display of several items is used.  Another option is to show one trademark, then carry out some intervening activity, show a second trademark, and then proceed to the appropriate question or questions.  A sequential survey without intervening activity can also be used.

Ex. 6, §6.01[3] INTELLECTUAL PROPERTY TRADEMARK SURVEYS (Phyllis J. Welter) (1999).

Notably, Welter references at least *four* different types of survey methods.  *Id.*

11

In fact, courts accept a wide variety of survey methods to determine likelihood of confusion. *See, e.g.*, *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F. 2d 947, 960 (7th Cir. 1992) (error to reject a survey that showed a likelihood of confusion with consumers who were shown a label of the test product known as "Thirst-Aid" and thought it was produced by Gatorade but consumers were not shown  a "Gatorade" mark or label); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F. 2d 500, 507 (5th Cir. 1980) (recognizing survey design where respondents are briefly shown the junior mark and asked for the first things that come to mind, referred to as a "word association" survey); *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 277-78 (7th Cir. 1976) (considering a survey that showed respondents an announcement in a face-to-face interview and then asked open ended questions and finding it reliable); *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, No. 1:08-CV-2376, 2010 WL 3075318, at *7 (N.D. Ga. Aug. 4, 2010) (considering an "array" survey format that "simulate[] what happens when a consumer sees" the plaintiff's product and the allegedly infringer product in the context of a display); *see also* Ex. 7, Itamar Simonson, *The Effect of Survey Method On Likelihood of Confusion Estimates:  Conceptual Analysis And Empirical Test*, 83 TRADEMARK REP. 364, 367 (1993) (discussing at least four different techniques for likelihood of confusion surveys, including the *Exxon*, *Eveready*, *Squirt*, and a simulated choice test methodologies.)  In short, Reynolds is simply wrong in its underlying assertion that no surveys other than an *Eveready* or *Squirt* are acceptable.

### 1.    *Courts have criticized both the* **Eveready** *and* **Squirt** *survey formats for their limitations.*

The reason courts allow a variety of survey types is because of the observed problems with the *Eveready* and *Squirt* surveys.  While the *Eveready* survey methodology—which shows consumers only the accused mark and nothing else—has been referred to as the "gold standard,"

(Ex. 8, Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of* SQUIRT, 98 TRADEMARK REP. 739, 739 (2008); *see also Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385-88 (7th Cir. 1976)), it is not appropriate in all cases.  Courts have criticized this approach where the senior mark was not highly accessible because it causes an internal search of memory that is "hostile to the general run of marks.  For weak marks an Eveready format will consistently produce negligible estimates of likelihood of confusion."  *Akiro LLC v. House of Cheatham, Inc.*, No. 12 Civ. 5775, 2013 WL 2181088, at *11 (S.D.N.Y. May 17, 2013).

In 1980, to overcome the shortcomings of the *Eveready* format, the Eighth Circuit adopted a new survey format, known as *Squirt*, which placed products side-by-side.  *See Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1089, 1091, 1092 n.4 (8th Cir. 1980).  Courts have, however, also criticized the *Squirt* format, including criticisms of the use of close-ended questions.  *See E & J Gallo Winery v. Proximo Spirits, Inc.*, No. 1:10-cv-00411, 2011 WL 5922090, at *4-5 (E.D. Cal. Nov. 28, 2011) (expert did not need to use *Squirt* method because of the flaws including close-ended questions); *see also* Swann, 98 TRADEMARK REP. 740 ("Because a Squirt test uses closed-ended questions, it has been historically criticized by pundits and the courts.").  Another limitation of a *Squirt* survey is that it may "explicitly lead[] respondents to consideration of the association between two marks, a question that might not have occurred to them in a normal purchase situation."  Simonson, 83 TRADEMARK REP. at 371; *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 170, 183 (S.D.N.Y. 2011) (finding a *Squirt* survey created a demand effect, *i.e.*, led consumers to consider an association they would not normally make); *see also Kargo Global v. Adv. Magazine Publishers, Inc.*, No. 06 Civ. 550, 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007) (discussing a *Squirt* like survey and questions that created "'demand

effects' by suggesting the existence of a connection between the products that the respondents would not have made on their own").

### 2.   *Even within* **Eveready** *and* **Squirt** *methods, there are numerous ways to design a survey.*

Because both the *Eveready* and *Squirt* method have their flaws, as pointed out above, different variations of each are used by experts, and considered by courts.  For example, "[t]he modern Squirt survey includes a number of variations on a survey endorsed by the Eighth Circuit in *Squirt Co v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980) .  Ex. 9, Hal Poret, *A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys*, 100 TRADEMARK REP. 756, 774, n.49 (2010); *see also Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1225 (D. Colo. 2001) (accepting a survey that "followed a modified version of the '*Squirt'* survey format").  Indeed, while Reynolds argues "two surveys fit all," its own expert performed a variation of the *Squirt* methodology, using a "two-room" approach that was more leading, unnecessarily highlighting the Reynolds product and ***violating*** market conditions by showing the products ***sequentially*** when they are sold side-by-side.  *See e.g.*, *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 222-23, 240 (S.D.N.Y. 2010) (survey unreliable because its method used a two room format); *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) (criticizing a two-room *Squirt* format survey because it highlighted products in the first room and did not replicate marketing conditions).  Similarly, the *Eveready* methodology has also been accepted in numerous, different variations.  *See, e.g.*, *THOIP*, 690 F. Supp. 2d at 235-42  (two different experts performed varied *Eveready* survey formats; court agreed with the survey that closest represented marketplace conditions); *Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *8 (W.D. Mich. Jan. 10, 2006) (denying motion to exclude survey that was close to an *Eveready* format

but "[did] not precisely follow the survey format utilized by Union Carbide's expert in *Ever-Ready*").  The bottom line is, to be methodologically sound, a survey need not heedlessly adopt a form method.  Rather, it should instead be well thought out and representative of marketplace conditions, like Dr. Kivetz's survey.

### C.    Dr. Kivetz's Thoughtful Methodology Best Replicates Marketplace Conditions.

During his deposition, Dr. Kivetz testified in detail about his survey methodology, noting that he considered different methods and their limitations and took the best of two widely accepted methods to create one that best conformed to the marketplace conditions:

> This is what you might call -- what we call in the publication, that we publish a side-by-side Ever-Ready.  Without going into the issue of semantics, the questions are the Ever-Ready questions.  The focus of inquiry, meaning the questions about the respondent product, about which the respondent is answering questions, is only the junior users product or package or mark, as is in the Ever-Ready Survey format.  The difference to which you are alluding is that here, to better reflect marketplace conditions and to allow for a more conservative test, that is a test that actually *favors* the side of the *plaintiff* and not the defendant. . . .  But most importantly and critically to better reflect marketplace conditions I exposed them before asking the questions and during the interview to the other marks that they would see in the marketplace, which are the Reynolds Wrap -- the specific Reynolds Wrap product and specific Ultra-Foil product that they would have seen in the Dollar -- in the Dollar Tree store.

(Ex. 3, Kivetz Dep. 184:24-186:3 (emphasis added); *see also id.* at 181:9-21; 183:20-184:11; Ex. 1, Kivetz Report ¶ 44.)  Notably, as Dr. Kivetz points out above, the methodology of his survey benefits **_Reynolds_** because it exposes respondents to Reynolds, allowing for easier "recollection" of the name.  (Ex. 3, Kivetz Dep. 184:24-186:3.)

Specifically, Dr. Kivetz designed his survey to replicate the actual marketplace conditions of the Dollar Tree stores—something Reynolds' expert entirely failed to do.  Dr. Kivetz researched the marketplace conditions and designed an *Eveready*-inspired survey that not only represents those conditions but also followed the well-established scientific methodologies

for surveys.  (*See id.* 108:20-24; 135:8-139:7 (discussing the differences between Dr. Kivetz's survey and Ms. Butler's survey).)   As Dr. Kivetz testified, he made this decision because "knowing what I knew about the marketplace conditions, having visited stores, having spoke with executives, having read the pleadings and so on in the case, I could not do [a straight Ever-Ready survey]." (*Id.* 280:19-25.)   In designing his survey, Dr. Kivetz's "number one criteria" was to "reflect as much as possible the marketplace, in the Dollar Tree store." (*Id.* 187:15-18.)[5]

Dr. Kivetz recognized that the *Eveready* and the *Squirt* formats are sometimes appropriate.   (Ex. 1, Kivetz Report ¶¶ 71-73 (recognizing both the *Eveready* and *Squirt* methods); *see also E & J Gallo Winery*, 2011 WL 5922090, at *4-5 (discussing the different situations when an *Eveready* format is typically used compared with the *Squirt* format).   But importantly, the format that is the most appropriate is the one that does the best job replicating marketplace conditions.   (Ex. 3, Kivetz Dep. 186:19-25, 189:8-18 ("[T]he most important criteria, the criteria that I followed was to get the best estimate, the most accurate, valid and reliable and scientifically valid and reliable estimate from a sample of the likelihood of confusion among a population of consumers in the actual marketplace."); Ex. 1, Kivetz Report ¶ 76 ("The suitable survey method and the determination of whether a survey creates severe demand effects and biased results, relative to what is likely to occur in reality, are highly dependent on the pertinent marketplace conditions.").

Because of that, Dr. Kivetz decided it was best to use a side-by-side array, allowing consumers to view the products as they do in the stores (more similar to a *Squirt* method) but ask nonleading open-ended questions that come from the *Eveready* methodology.  (Ex. 3, Kivetz

---

[5]   In the last paragraph of its Motion to Exclude Dr. Kivetz, Reynolds half-heartedly complains that Dr. Kivetz's survey did not replicate marketplace conditions, but fails to include one citation to either case law or facts supporting its arguments.  (Reynolds' Brief at 16.)

Dep. 273:13-23; 277:4-25.) Additionally, Dr. Kivetz not only selected products that are actually sold side-by-side in Dollar Tree Stores, but he also ensured that respondents were potential Dollar Tree customers. (*Id.* 100:18-101:4; 102:23-104:22 ("My survey was among buyers, people consumers who go to the Dollar Tree chain stores. With products sold at the Dollar Tree chain stores."). Dr. Kivetz then took into consideration the fact that displays may vary slightly on a store-by-store basis, which is one of the reasons why he rotated the display. (*Id.* 168:15-169:14.) This is a contrast to what Ms. Butler did in her survey, where she used products that are **never** sold in Dollar Tree Stores, and failed to rotate products or displays. (Ex. 10, Butler Dep. 64:14-65:10, 84:8-87:6, 103:4-7; Ex. 3, Kivetz Dep. 169:18-170:11.)

Reynolds argues that Dr. Kivetz's survey does not represent the marketplace because "the Handi-Foil product was specifically pulled out and placed before the respondents and further highlighted (*i.e.*, pointed to) during the interview." (Reynolds' Brief at 16.) Contrary to Reynolds argument, this reinforces the argument that Dr. Kivetz's survey represented marketplace conditions because shoppers often **do** pick up and examine products. *See Water Pik, Inc. v. Med-Sys., Inc.*, No. 10-cv-01221, 2012 WL 27598, at *7 (D. Colo. Jan. 5, 2012) (argument that a survey was flawed "because it permitted the respondents to handle the merchandise is unconvincing because the survey accurately accounted for marketplace conditions under which consumers encounter the [products]"); *see also Cumberland Packaging Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 578 (E.D.N.Y. 1999) (holding "[i]n an actual market situation, the product would not disappear from the consumers eye just as he or she is about to make a purchase"). In addition, before respondents were asked questions about the Handi-Foil product, respondents were instructed not to "touch or handle the product while answering the questions." (Ex. 1, Kivetz Report ¶ 43.)

17

Finally, contrary to Reynolds' unsupported assertion, Dr. Kivetz's questionnaire was not flawed when asking "which company" makes the product rather than a "who do you think puts out the product" as Reynolds argues.[6]  (Reynolds' Brief at 11.)  The questions Dr. Kivetz asked have been used in surveys courts have considered in the past.  *See e.g.*, *THOIP*, 690 F. Supp. 2d 241 (noting that a survey's use of the word "company" in an *Eveready* survey format is not unusual);  *Johnson & Johnson v. Actavis Grp. HF*, No. 06 Civ. 8209, 2008 WL 228061, at *6 (S.D.N.Y. Jan. 25, 2008) (considering a survey that asked questions in an *Eveready* including "Which company puts out or makes this product?"); Ex. 11, 9/7/2007 Rebuttal Expert Report of Dr. Itamar Simonson in *Johnson & Johnson v. Actavis Grp. HF,* No. 06 Civ. 8209 (S.D.N.Y. 2008)  ("I. Simonson Report") at 14 (using the question "Which company puts out or makes this product?"); Ex. 12, 6 McCarthy on Trademarks and Unfair Competition § 32:175 (4th ed. 2013) (discussing the standard format questions in a survey includes "What company do you think makes this product?"); Ex. 6, § 6.01[1] INTELLECTUAL PROPERTY TRADEMARK SURVEYS (Phyllis J. Welter) (1999) (noting that for monadic surveys, the typical questions are "who or what company").

### D.    Reynolds' Representations To This Court That Dr. Kivetz Created This Methodology For Purposes Of Litigation Are Demonstrably False.

Despite the fact that there is no one way to conduct a proper survey, and that Dr. Kivetz's methodology best represents actual marketplace conditions, Reynolds nonetheless argues that this Court should exclude his survey because (1) he created this method solely for purposes of

---

[6]    Reynolds' arguments that Dr. Kivetz's question "Which company makes this product" is flawed are meritless as demonstrated by the lack of any relevant citation to support its arguments.  The only case Reynolds cites to, *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 449 (4th Cir. 1986), does not address a survey but makes general findings of law about trade dress.

litigation, (2) this method has not been used by other experts or accepted by courts, and (3) this method has not been accepted by others in the field.  All of these arguments are baseless—as Reynolds well knows.

*First*, Reynolds misrepresents to this Court that Dr. Kivetz created this methodology "for the sole purpose of this litigation." (Reynolds' Brief at 1.)  Reynolds' own brief notes that a year before this case, Dr. Kivetz published a chapter in a scholarly treatise advocating for the very side-by-side *Eveready* format he used here.  Indeed, recognizing the limitations inherent in both the *Eveready* and *Squirt* methods (as noted by many courts over the years), in 2011, Dr. Kivetz, along with another well-regarded survey expert, Dr. Itamar Simonson, wrote about this survey method and, in 2012, Dr. Kivetz's writing—where a side-by-side *Eveready* methodology was discussed—was included as a chapter in a treatise authored and edited by Dr. Shari Diamond and Jerre Swann.  *See* Ex. 14, S. Diamond & J. Swann, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN, *Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions* (I. Simonson & R. Kivetz) (2012), at 243-59 (noting that "courts have come to recognize potential problems that affect the reliability of surveys' methodology and findings").  In other words, Dr. Kivetz wrote about and published a scholarly piece on the very methodology he employed in this case in 2012—approximately a full ***year*** prior to Reynolds even filed this lawsuit.  *See id.* at 249 n.25 ("Such a methodology, which might be called 'side-by-side display using Eveready questions' or simply 'side-by-side Eveready,' maintains the marketplace reality without asking potentially leading questions."); *see also* Ex. 3, Kivetz Dep. 34:14-25.[7]

---

[7]   It is irrelevant that Dr. Kivetz used his survey method for the first time in this case.  Prior to this case, Dr. Kivetz did not have any product or market that necessitated this type of design. (Ex. 3, Kivetz Dep. 184:24-186:3.)  Again, this demonstrates that Dr. Kivetz reviews each

**Second**, as counsel for Reynolds is well aware, other experts have employed, and others courts have accepted, the methodology used by Dr. Kivetz in this case.  Indeed, despite arguing that *Safe Auto Insurance v. State Automobile Mutual Insurance*, No. 2:07-cv-1121, 2009 WL 3150328 (S.D. Ohio Sept. 30, 2009), may be the *only* "case that appears to have accepted a substantially similar mixed-method survey" (Reynolds' Brief at 13), in *Johnson & Johnson v. Actavis Group HF*, No. 06 Civ. 8209, 2008 WL 228061 (S.D.N.Y. Jan. 25, 2008), Reynolds' current counsel were counsel of record for the plaintiff, Johnson & Johnson, and the defendant's expert in that case conducted a side-by-side *Eveready* survey nearly identical to the methodology Dr. Kivetz employed in this case.

Specifically, the defendants in *Johnson & Johnson* retained Dr. Itamar Simonson to perform a survey on "the likelihood of confusion between Neosporin and store brands (or private labels) of antibiotic ointment and cream products."  (Ex. 11, I. Simonson Report.)  In his report, Dr. Simonson describes his methodology, making it clear that he performed a **nearly identical** survey to the one Dr. Kivetz performed.  In it, respondents were shown "Neosporin and corresponding CVS products *side-by-side*, just as they are seen by consumers in the marketplace" **and** were asked "*Eveready* survey question[s]".  (*Id.* ¶¶ 30, 40 (emphasis added).) Compare Dr. Itamar Simonson's report with Dr. Kivetz's report:  "Respondents in all conditions were first shown a two-shelf display with the three aluminum foil products that consumers typically encounter in the marketplace at Dollar Tree" and the "questions followed the standard *Eveready* survey questions."  (Ex. 1, Kivetz Report ¶¶ 40, 44.)  Notably, despite counsel's

---

situation on a case-by-case basis and then determines what survey best fits the marketplace conditions of the facts at hand.  Here, as Dr. Kivetz first discussed in 2012 and as Dr. Itamar Simonson used in 2007, this type of survey, a "side-by-side *Eveready*," is useful when the question presented is one of forward confusion and the products appear side-by-side in the marketplace.  *See* Ex. 14 at 249 n.25.

criticisms of the Simonson survey, it does not appear that counsel sought to exclude Mr. Simonson's survey in the *Johnson & Johnson* case as some freak "Frankenstein" creation.

Moreover, in that case, in determining whether confusion was likely, the *Johnson & Johnson* court **acknowledged** that Dr. Simonson's survey showed a lack of likelihood of confusion. *See Johnson & Johnson*, 2008 WL 228061 at *6 ("In contrast, Actavis has offered substantial expert evidence that no confusion exists. . . . Actavis also presents four surveys conducted by its own expert, Dr. Itamar Simonson, to measure the likelihood of consumer confusion between the CVS, Walgreens, Pathmark, and Rite-Aid private label products with NEOSPORIN®. The survey results again showed no statistically reliable evidence of a likelihood of confusion.").   It is unclear, then, how Reynolds can argue to this Court with a straight face that Dr. Kivetz's method is a "Frankenstein" creation that was "manufactured for the sole purpose of this litigation" when Reynolds' counsel was presented with the same methodology years ago from another expert, especially when the court **relied** on that survey as showing no likelihood of confusion.

Instead of discussing *Johnson & Johnson* or even mentioning that case, Reynolds focuses on *Safe Auto Insurance v. State Automobile Mutual Insurance*.   (Reynolds' Brief at 13-14.) Unlike what Reynolds argues, the court in *Safe Auto* spent significant time going through all different factors that make a survey reliable such as the approach used, the sampling of the universe, leading questions, and replicating the marketplace.  *Safe Auto*, 2009 WL 3150328, at *3-4.  In the end, the court **considered** the survey that used a mixed methodology format, noting that "Plaintiff has not shown the Simonson Survey's methodology to be so unreliable that it should be excluded."  *Id.* at *3.   As in *Safe Auto*, Reynolds has not shown that Dr. Kivetz's methodology is so unreliable that it should be excluded.   Moreover, Reynolds mixed up the

experts in *Safe Auto*.  The survey at issue in the *Daubert* briefing in *Safe Auto* was performed by a Dr. **Alexander** Simonson; Dr. **Itamar** Simonson, with whom Dr. Kivetz co-wrote his chapter, was a rebuttal witness and not the subject of *Daubert*.  (*Id.* at *1.)  Thus, the survey at issue was performed by a *third-party* independent expert—not Dr. Kivetz or Dr. **Itamar** Simonson in a "self-serving" manner as Reynolds argues—and, again, the court expressly considered that survey.[8]  *Id.* ; *see also* Reynolds' Brief at 14.

   ***Third***, in a last-ditch effort to support its argument that only two types of surveys are acceptable, Reynolds pulls an incomplete quote from an article written by Jerre Swann, who Reynolds admits is "a leading trademark practitioner."  (Reynolds' Brief at 14.)  In fact, that expert stated in full:

> Given the level of judicial suspicion generated by variants of traditional designs [Eveready and Squirt], and the often high level of hostility to the Squirt format, I doubt that going both ways will come into vogue.  ***A dual approach, however, could afford benefits where*** the researcher does not know whether the senior brand is sufficiently available in consciousness so that the junior use will trigger pattern matching, or in the Circuits, like the Third, that emphasize mark similarity above other confusion factors.

Ex. 8, Swann, 98 TRADEMARK REP. 755 (emphasis added).[9]  Mr. Swann makes this same point again in a 2012 publication, actually advocating for combining the *Eveready* and *Squirt*

---

[8]  While Dr. Itamar Simonson criticized Dr. Alexander Simonson's survey (arguing that it used leading questions, wrong universe, biased methodology because of the company name used in the questions, and improper control), his criticisms did not address the combination of the *Eveready* and *Squirt* formats.  (Ex. 15, Oct. 27, 2008 Expert Report of Dr. Itamar Simonson in *Safe Auto Inc. Co. v. Safe Auto Mut. Ins. Co.*, Case No. 2:07-cv-01121 (S.D. Ohio Sept. 30, 2009), at ¶¶ 49-51.)  On the contrary, Dr. Itamar Simonson noted that "there are different survey methods for assessing likelihood of confusion."  (*Id.* at ¶ 16.)

[9]  The only case Reynolds cites about courts being "suspicious of methodologies created for the purpose of litigation" (Reynolds' Brief at 14) is inapplicable.  The survey at issue was whether or not a model train car design was copied and the plaintiffs, who retained the expert at issue, ***admitted*** that the expert's report was created solely for the litigation at issue in that case.  *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006).

methodologies. *See* Ex. 13, S. Diamond and J. Swann, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN, *Likelihood of Confusion* (J. Swann) (2012) at 72 ("The benefits of both [the E*veready* and *Squirt* design] . . . can be achieved by 'going both ways'"). Moreover, that same leading trademark practitioner reviewed and edited (thus approving) Dr. Kivetz's chapter in which Dr. Kivetz advocated for the side-by-side *Eveready* he used here.   Indeed, several experts—including Dr. Shari Diamond, Dr. Gerald Ford, Dr. AnnaBelle Sartore and Jerre Swann—reviewed and commented on Dr. Kivetz's chapter prior to publication in 2012.  *See* Ex. 14, at 243.  Thus, other experts in the field—including the author of the Reference Manual on Scientific Evidence relied on by courts nationwide—have published this methodology for consideration.

## V.       CONCLUSION

For the foregoing reasons, Reynolds' motion to exclude the expert report of Dr. Ran Kivetz should be denied.

Dated: December 31, 2013

Respectfully Submitted,

By: */s/ Brian N. Gross*
    D. Sean Trainor (Va. Bar No. 43260)
    dtrainor@kirkland.com
    Brian N. Gross (Va. Bar No. 76795)
    brian.gross@kirkland.com
    KIRKLAND & ELLIS LLP
    655 Fifteenth Street, N.W.
    Washington, D.C. 20005
    Telephone: (202) 879-5000
    Facsimile: (202) 879-5200

    David K. Callahan, P.C. (admitted *pro hac vice*)
    dcallahan@kirkland.com
    Robin A. McCue (admitted *pro hac vice*)
    rmccue@kirkland.com
    Jordan M. Heinz (admitted *pro hac vice*)
    jordan.heinz@kirkland.com
    Ian J. Block (admitted *pro hac vice*)
    ian.block@kirkland.com
    KIRKLAND & ELLIS LLP
    300 North LaSalle
    Chicago, Illinois 60654
    Telephone: (312) 862-2000
    Facsimile: (312) 862-2200

    *Counsel for Defendant*
    *Handi-Foil Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of December, 2013, pursuant to the Court's Order

(Dkt. No. 87) and the parties' agreement, a copy of the foregoing document was served via

electronic mail to the following:

Britt Cass Steckman (Va. Bar No. 80966)
britt.steckman@bgllp.com
BRACEWELL & GIULIANI LLP
2000 K Street, N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 828-5831

Mark N. Mutterperl
mark.mutterperl@bgllp.com
Jessica S. Parise
jessica.parise@bgllp.com
BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020
Telephone: (212) 638-6468

*/s/ Ian J. Block*
Ian J. Block (admitted *pro hac vice*)
ian.block@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200