UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

REYNOLDS CONSUMER PRODUCTS INC.,

  Plaintiff,

v.

HANDI-FOIL CORPORATION,

  Defendant.

Case No.: 1:13-cv-214 LO/TRJ

## OPPOSITION TO HANDI-FOIL CORPORATION'S MOTION TO EXCLUDE ANY TESTIMONY, ARGUMENT, OR EVIDENCE REGARDING THE SURVEY, EXPERT REPORT, AND OPINIONS OF SARAH BUTLER

BRACEWELL & GIULIANI LLP

Britt Steckman
britt.steckman@bgllp.com
2000 K Street NW, Suite 500
Washington, D.C. 20006-1809
Telephone: 202.828.5800
Facsimile: 800.404.3970

OF COUNSEL:

Mark N. Mutterperl (*pro hac vice*)
mark.mutterperl@bgllp.com
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
Telephone: 212.508.6100
Facsimile: 800.404.3970

*Attorneys for Plaintiff Reynolds Consumer Products Inc.*

Dated:  December 31, 2013

# TABLE OF CONTENTS

PAGE(S)

I.      LEGAL STANDARD ........................................................................................................3

II.     MS. BUTLER IS A WELL RECOGNIZED, HIGHLY REGARDED, AND
        CAPABLE EXPERT ........................................................................................................4

III.    MS. BUTLER'S SURVEY METHODOLOGY IS SOUND AND HANDI-FOIL'S
        TECHNICAL CRITIQUES ARE MERITLESS .................................................................6

        A.      Ms. Butler Surveyed An Appropriate Universe Of Potential Consumers. ..............6

        B.      Ms. Butler's Survey Properly Reflects Market Conditions. ...................................11

        C.      Ms. Butler's Survey Followed The Long-Accepted *Squirt* Format And Did
                Not Ask Improper Leading Questions. .................................................................13

        D.      Ms. Butler's Survey Used An Appropriate Control ...............................................14

        E.      Ms. Butler's Survey Appropriately Considers The Representative Trade
                Dress At Issue In This Case. ................................................................................17

IV.     CONCLUSION ..............................................................................................................18

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*24 Hour Fitness USA, Inc., v. 24/7 Tribeca Fitness,*
 447 F. Supp. 2d 266 (S.D.N.Y. 2006)....................................................................................14

*Adidas-Salomon AG v. Target Corp.,*
 228 F. Supp. 2d 1192 (D. Or. 2002) ........................................................................................9

*Belk, Inc. v. Meyer Corp., U.S.,*
 679 F.3d 146 (4th Cir. 2012) ............................................................................................2, 4

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank,*
 383 F.3d 110 (3d Cir. 2004).................................................................................................4, 6

*Daubert v. Merrell Dow Pharmaceuticals,*
 509 U.S. 579 (1993)......................................................................................................3, 4, 15

*Harolds Stores v. Dillard Dep't Stores,*
 82 F.3d 1533 (10th Cir. 1996) .................................................................................................6

*Palmlab, L.L.C. and Metabolite Labs., Inc. v. Brookstone Pharmas, L.L.C.,*
 Case No. 2:09-cv-07434 (E.D. La. 2010) ..............................................................................17

*PBM Prods., LLC v. Mead Johnson & Co.,*
 639 F.3d 111 (4th Cir. 2011) ...........................................................................1, 4, 6, 9, 10, 15

*Scott Fetzer Co. v. House of Vacuums, Inc.,*
 381 F.3d 477 (5th Cir. 2004) ...................................................................................................6

*Simon & Schuster v. Dove Audio, Inc.,*
 970 F. Supp. 279 (S.D.N.Y. 1997) ........................................................................................13

*Squirtco v. Seven-Up Co.,*
 628 F.2d 1086 (8th Cir. 1980) ...............................................................................................13

*Urban Outfitters, Inc. v. BCBG Max Azria Grp., Inc.,*
 511 F.Supp.2d. 482, 499-500 (E.D. Pa. 2007).......................................................................14

RULES

FED. R. EVID. 401 .................................................................................................................3

FED. R. EVID. 402.................................................................................................................3

FED. R. EVID. 702.................................................................................................................3

OTHER AUTHORITIES

6 J. THOMAS MCCARTHY, *McCarthy on Trademarks and Unfair Competition* (2013).....................
.........................................................................................................................1, 4, 12, 13

Plaintiff Reynolds Consumer Products, Inc. ("Reynolds") opposes Handi-Foil Corporation's ("Handi-Foil") Motion to Exclude Any Testimony, Argument, or Evidence Regarding the Survey, Expert Report, and Opinions of Sarah Butler ("Handi-Foil's Motion") and respectfully shows as follows:

## SUMMARY

There is no merit to Handi-Foil's *ad hominem* attack on Sarah Butler or its criticisms of her expert survey and report.  Contrary to Handi-Foil's charges, Ms. Butler is a highly regarded, experienced professional who, in contrast to Handi-Foil's own expert witness, conducted a conventional survey following well established and generally accepted principles.  When one cuts through Handi-Foil's rhetoric, there is nothing left but the types of technical criticisms the Fourth Circuit and other courts have repeatedly held go to the weight of testimony, not its admissibility.

Handi-Foil's motion is a scattershot attack that throws the proverbial "kitchen sink" at Ms. Butler's survey and report, attacking every minute, technical issue around which it can muster an argument.  However, courts generally and especially the Fourth Circuit, which Handi-Foil largely ignores, have made abundantly clear that "once a survey has passed the threshold criteria of having a proper foundation, being relevant, and having been conducted according to accepted principles" it can be admitted into evidence and any follow-on technical critiques are left for the trier of fact to weigh when considering the survey's impact on the ultimate question of likelihood of confusion. 6 J. THOMAS MCCARTHY, *McCarthy on Trademarks and Unfair Competition* (2013) ("MCCARTHY") §32:170 (citing cases); *PBM Prods., LLC v. Mead Johnson*

1

& *Co.*, 639 F.3d 111, 123 (4th Cir. 2011) (reiterating the majority rule that "while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence"); *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 163 (4th Cir. 2012).

Unlike Handi-Foil's survey expert, Dr. Ran Kivetz, Ms. Butler used a well-accepted survey format (*i.e.*, the *Squirt* format) according to accepted survey principles when designing and conducting her survey. The arguments in Handi-Foil's Motion *certainly* do not rise to the level of the extremely unusual, major methodological flaw in Dr. Kivetz's survey (*i.e.*, that Dr. Kivetz's methodology is essentially unrecognized by any court of law or reliable peer reviewed publication). It appears that the purpose of Handi-Foil's scattershot, largely technical motion is to distract from the obvious flaws in Handi-Foil's own expert survey and report.

It is easy to highlight the unmeritorious nature of Handi-Foil's arguments by simply applying them to Handi-Foil's own survey: many of Handi-Foil's technical critiques apply with equal, if not greater, force to Dr. Kivetz's survey. For example, one of Handi-Foil's primary criticisms of Ms. Butler's survey is that Ms. Butler only tested one of the five different accused Handi-Foil packages and thereby sampled the wrong universe of potential customers and limited the usefulness and applicability of her findings. However, Dr. Kivetz did the same thing. Similarly, Handi-Foil attacks Ms. Butler's survey for using what it claims are "leading questions." However, Ms. Butler's survey uses the well-accepted questions normally associated with a standard *Squirt* survey. In contrast, Dr. Kivetz used questions from an *Eveready* survey format after displaying products to survey respondents according to a *Squirt* methodology, thereby leading respondents to respond to the products in ways in which they would not in the marketplace. Thus, if any expert deserves criticism based on the questions posed to respondents, it is Dr. Kivetz.

2

In short, Handi-Foil's smattering of hyper-technical arguments should be rejected because they are wrong and, importantly for the current motion, solely address the evidentiary weight of the Butler Report, not its admissibility. To the extent any of Handi-Foil's arguments are given any credence—which they should not—such arguments apply equally to Dr. Kivetz's survey and report and weigh in favor of their exclusion.

ARGUMENT

I.    LEGAL STANDARD

As a threshold matter, "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" is relevant. FED. R. EVID. 401. Generally, "[a]ll relevant evidence is admissible . . . [and e]vidence which is not relevant is not admissible." FED. R. EVID. 402.

The Federal Rules of Evidence set forth the guidelines by which the admissibility of expert testimony should be analyzed as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Essentially, Rule 702 establishes a two part test for admitting expert testimony: (1) whether the expert is qualified and the testimony reliable; and (2) whether the evidence is relevant and helpful to the trier of fact. *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 597 (1993).

3

Because any trademark confusion surveys are necessarily "an imperfect mirror of actual customer behavior," courts generally hold that—unless extreme—questions about survey methodology go to the evidentiary weight of the survey rather than its admissibility. 6 MCCARTHY §32:178; *PBM Prods.*, 639 F.3d at 123; *Belk*, 679 F.3d at 163; *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 121 (3d Cir. 2004). As Professor McCarthy has observed:

> It is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another . . . One must keep in mind that there is no such thing as a 'perfect' survey. The nature of the beast is that it is a sample, albeit a scientifically constructed one . . . Like any scientific method related to statistics in the social sciences, every survey, no matter how carefully constructed and conducted, has some potential flaws somewhere. *The proper approach is to view evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.*

6 MCCARTHY §32:178 (emphasis added).

Handi-Foil ignores this jurisdiction's policy of admissibility and full consideration of survey evidence (and that of virtually every jurisdiction that has considered this type of evidence in a case involving consumer confusion) and, accordingly, fails to meet the justifiably high burden for exclusion of the Butler Report. *See PBM Prods.*, 639 F.3d at 123; *Belk*, 679 F.3d at 163.

## II.     MS. BUTLER IS A WELL RECOGNIZED, HIGHLY REGARDED, AND CAPABLE EXPERT

The most important place to begin any *Daubert* analysis is with the credentials and experience of the scientist whose work is under scrutiny. Although Handi-Foil never directly seeks to exclude Ms. Butler based on her qualifications, Handi-Foil often mischaracterizes her level of experience in matters similar to that before the Court and otherwise seeks to disparage

her throughout its motion.  Handi-Foil would have the Court believe Ms. Butler is a careless, bumbling rookie who ignored accepted procedures and failed to spend adequate time doing her job.  This mean spirited portrayal is false and is a transparent attempt to distract from Dr. Kivetz's own fundamentally flawed methodology.

To set the record straight, and as set forth in her CV, Ms. Butler is Vice President at NERA Economic Consulting, which exists specifically to provide expert statistical, survey, and financial research analysis. *See* **Ex. 1**, Expert Report of S. Butler ("Butler Report) at Ex. A (S. Butler CV). During her career, Ms. Butler has conducted survey research, market analysis, and sampling analysis on a wide range of topics regarding business and consumer decision making, consumer choice, and consumer behavior. *Id.* Indeed, her work has been included in numerous lawsuits involving issues of trademark and trade dress, false advertising and secondary meaning, as well as in antitrust and employment related litigation, a multi-page list of which is provided in her CV. *Id.* Ms. Butler has prepared approximately ten surveys for *trade dress cases alone*, to say nothing of her work with trademark, false advertising, and other intellectual property cases and topics.  *Id.*; *see also* **Ex. 2**, Dep. of S. Butler at 27:9-12.  Further bolstering her credentials to design and administer surveys in the context of trademark litigation, Ms. Butler is a member of the American Association of Public Opinion Research, the American Statistical Society, the Intellectual Property Section of the American Bar Association, and the International Trademark Association. *See* **Ex. 1**, Ex. A to Butler Report (S. Butler CV).  Ms. Butler has, of course, been accepted as an expert witness in a number of matters and has authored and co-authored numerous articles for industry publications concerning survey and marketing research principles and techniques, including several publications specifically devoted to survey evidence used in intellectual property litigation, case law trends, and updates concerning the same. *Id.* Thus, there

is simply no question that Ms. Butler is more than qualified to perform the survey at issue here, which is undoubtedly why Handi-Foil declines to explicitly argue otherwise.

III.   MS. BUTLER'S SURVEY METHODOLOGY IS SOUND AND HANDI-FOIL'S
TECHNICAL CRITIQUES ARE MERITLESS

Handi-Foil's charges of hyper-technical deficiencies, which often apply with equal force to Handi-Foil's own expert survey, fail to alter the undeniable reality that Ms. Butler's survey followed accepted principles for survey design. Accordingly, her survey and testimony should be considered by the trier of fact.

A.   Ms. Butler Surveyed An Appropriate Universe Of Potential Consumers.

As an initial matter, it is well-established that arguments that an expert "surveyed the wrong universe *bear[] directly on the weight accorded to the survey, not to its admissibility*." *PBM Prods.*, 639 F. 3d at 124 (emphasis added); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 120 (3d Cir. Pa. 2004) ("selection of an inappropriate universe generally affects the weight of survey and not its admissibility"); *Harolds Stores v. Dillard Dep't Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996) (accord). The proper universe in a forward-confusion case "should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 487-8 (5th Cir. 2004). The Butler Survey defined the universe as:

> men and women across the United States, over the age of 18, who are considering purchasing aluminum foil in the next six months. It is my understanding from discussions with counsel that purchasers of aluminum foil are largely women and tend to be between the ages of 35 and 54.

**Ex. 1**, Butler Report at 9. Ms. Butler, therefore, set quotas such that the age and gender of her survey sample generally reflect this population distribution. *Id.* In other words, the Butler Survey

6

included a fair sampling of the purchasers likely to purchase Handi-Foil's aluminum foil products because it tested only those respondents considering purchasing aluminum foil in the next six months. *Id.* at 9-10. This was proper and all that was required. Accordingly, the Court's inquiry can end here. However, Handi-Foil argues the universe was not properly defined and was over-inclusive because the specific Handi-Foil product surveyed is only available at Dollar Tree stores and the universe *might* include potential purchasers who will not shop for aluminum foil at Dollar Tree specifically.

Handi-Foil's myopic focus on the Dollar Tree packaging ignores Reynolds' claims in this litigation. Reynolds has not and does not limit its claims of trade dress infringement to Handi-Foil's Dollar Tree packaging alone, but also to Handi-Foil's nearly identical packaging promoted to and offered for sale in grocery stores, discount stores, and other general dollar-type stores. As shown below, the trade dress used on the Handi-Foil product sold at Dollar Tree stores is remarkably similar to the trade dress used on those Handi-Foil products that have been and/or continue to be offered for sale in grocery stores, discount stores, and general dollar-type stores, including the so-called Blue Box 2 Package, and Grocery Box:



Handi Foil's "Dollar Tree Package," which is sold in Dollar Tree stores. *See* **Ex. 3**, *Stipulated Facts* (Dkt. No. 62) ¶¶13-17.

7



Handi-Foil's "Blue Box 2 Package," which was sold at grocery stores, discount stores, and general dollar-type stores. *Id.* ¶¶18-20.



Handi-Foil's "Grocery Box," which is sold at grocery stores, discount stores, and general dollar-type stores. *Id.* ¶¶21-23.

All of these Handi-Foil products are also strikingly similar to the iconic, senior Reynolds trade dress, exemplified below.



Representative Reynolds aluminum foil packaging. *Id.* ¶3.

Ms. Butler appropriately used the Handi-Foil Dollar Tree Package as representative of Handi-Foil's infringing trade dress used through the grocery store, discount store, and general

dollar-type store market channels. Therefore, Handi-Foil's focus on only the Dollar Tree Package and supposed focus on only Dollar Tree Handi-Foil aluminum foil purchasers (which as discussed below, its own expert fails to incorporate into his survey) misses the mark. *See Adidas-Salomon AG v. Target Corp.*, 228 F. Supp. 2d 1192, 1212 (D. Or. 2002) ("Defendants challenge adidas' survey evidence on the grounds that it does not address children's model shoes, which are the only models that carry the B.U.M. name. However, they have submitted no evidence from which the court may conclude that adult shoes differ so significantly from children's shoes that the survey must be disregarded.").

Indeed, if Handi-Foil were to consider its criticism in the context of its own expert's report, it would find its argument equally applicable. Specifically, Dr. Kivetz asked whether potential survey respondents (a) had shopped at Dollar Tree and would shop at Dollar Tree in the next six months and (b) had purchased aluminum foil products and would purchase such products in the next six months. However, Dr. Kivetz refused or otherwise failed to determine whether the survey participants actually purchased aluminum foil at Dollar Tree at any time or indicated that they would likely do so in the future. *See* **Ex. 4**, Kivetz Report at 19-21. If it truly were so imperative that survey respondents had purchased and/or were going to purchase aluminum foil at Dollar Tree—as Handi-Foil claims in its motion—then both parties' surveys suffer from the same flaw.[1]

Handi-Foil ignores recent, controlling Fourth Circuit precedent contrary to its position. Specifically, in *PBM Products, LLC v. Mead Johnson & Company*, the Fourth Circuit found that,

---

[1] Dr. Kivetz's universe is *under inclusive* based on its focus merely on Dollar Tree stimuli and shoppers. However, as discussed above, in the Fourth Circuit, such challenges are not the grounds for a motion to strike. Thus, Handi-Foil's "over inclusive argument" aimed at the Butler Report and Reynolds' "under inclusive argument" aimed at the Kivetz Report are issues that should be left to the trier of fact. *PBM Prods.*, 639 F.3d at 123.

in a false advertising case concerning allegedly false claims as to baby formula, a survey of a universe of simply new and expecting parents was sufficiently close to an ideal universe that the finder of fact could properly rely on it when determining whether the message conveyed by the challenged advertising was unlawful. 639 F.3d at 123-24 ("while the survey sample may not exactly match the audience that received the advertisement, it is a sufficiently close approximation of the recipient pool to be admissible"). The court in *PBM Products* stated that "the wrong universe bears directly on the weight accorded to the survey, not to its admissibility." *Id.* Here, as in *PBM Products*, the survey universe not only correct, but at a minimum is close enough to render the survey and report admissible.

Finally, Handi-Foil argues that the universe is improper because the male/female breakdown in Ms. Butler's survey universe differs slightly from the actual male/female breakdown of Dollar Tree shoppers, who may or may not purchase aluminum foil at Dollar Tree. *See* Handi-Foil's Motion at 12 (Ms. Butler's universe was 80% female, 20% male; Dollar Tree shoppers are 66% female and 34% male). This minor statistical divergence typifies the level of technical argument Handi-Foil improperly raises throughout its motion. As an initial matter, Ms. Butler's universe was proper and, therefore, Handi-Foil's argument that the gender breakdown in the Dollar Tree specific universe is different is irrelevant. Additionally, Handi-Foil's own survey does not establish that this supposed demographic difference applies to actual purchasers of aluminum foil at Dollar Tree (as opposed to Handi-Foil shoppers more generally) nor does Handi-Foil even proffer an opinion as to what impact a change in the gender demographic of Ms. Butler's universe might have. Indeed, in Ms. Butler's survey, men were revealed to have a

*higher* level of confusion than women.[2] Therefore, if the universe were altered to more closely mirror the alleged general Dollar Tree shopping demographics, there would very likely be a *higher* net level of confusion.  In any event, such hyper-technical arguments provide no basis for excluding Ms. Butler's survey and report, and Handi-Foil's assertions concerning the allegedly improper universe used, in addition to being wrong, go merely to the weight accorded the survey, not its admissibility.

        B.    <u>Ms. Butler's Survey Properly Reflects Market Conditions.</u>

Handi-Foil next criticizes the Butler Survey for supposedly violating market conditions. The bulk of Handi-Foil's marketplace condition arguments hinge on Handi-Foil's improper focus on Handi-Foil packaging displayed exclusively in Dollar Tree stores. As set forth above, Handi-Foil's Dollar Tree packing was appropriately used by Ms. Butler as a representative example of Handi-Foil's infringing trade dress sold across various market segments at various retails outlets. Thus, the fact that the representative Dollar Tree Handi-Foil product might differ in a non-material way from the Handi-Foil products displayed next to Reynolds products at other, non-Dollar Tree stores has absolutely no impact on the admissibility of the Butler Survey.

To follow Handi-Foil's argument to its logical conclusion, Handi-Foil would effectively require that the Butler Survey (and any survey for this case, for that matter) have composed a different test for every single Handi-Foil product and every single Reynolds product, each survey differing depending on the specific grocery, discount, or dollar-type store in which the products appear and further differing for each otherwise nearly identical infringing trade dress displayed therein.  Such an argument is not only wholly unsupported by legal authority, but is unreasonable

---

[2] Fifty-one percent of males in the test group revealed confusion, whereas 29% of males in the control group revealed confusion, resulting in a net 22% male confusion. On the other hand, 46% of females in the test group revealed confusion, whereas 28% of females in the control group revealed confusion, resulting in a net 18% female confusion. **Ex. 5**, Decl. of S. Butler.

and unobtainable in practice. The conditions pursuant to which Handi-Foil would have a survey performed would effectively amount to a rejection of all surveys, since no survey can perfectly reproduce the actual market in which the customer puts his or her money behind a purchasing decision. 6 MCCARTHY, § 32:163.

As explained in Reynolds' Motion To Exclude The Expert Report Of Dr. Ran Kivetz, a survey designer should try "to *approximate* marketplace conditions." *See* **Ex. 6,** Reynolds' Motion To Exclude The Expert Report Of Dr. Ran Kivetz at 16 (citing *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, Case No. 06 Civ. 550, 2007 U.S. Dist. LEXIS 57320, \*20 (S.D.N.Y. Aug. 6, 2007)) (emphasis added). Here, Ms. Butler used an appropriate array of products that are seen by customers together in the aluminum foil marketplace—which is comprised of more than merely Dollar Tree stores. To wit, Ultra Foil brand aluminum foil is sold alongside Handi-Foil and Reynolds products in Dollar Tree stores; Shopper's Value brand aluminum foil is sold alongside Handi-Foil and Reynolds products in Albertsons grocery stores; and Total Home brand (Ms. Butler's control product) aluminum foil is sold alongside Reynolds products at CVS (whereas Dr. Kivetz's control does not appear in the marketplace at any place or any time). *See* **Ex. 2,** Dep. of S. Butler at 80:25-88:13. Thus, there can be no dispute that Ms. Butler's survey appropriately approximates marketplace conditions as required.

Indeed, it was Dr. Kivetz's survey (not Ms. Butler's) that failed to approximate marketplace conditions. As noted in Reynolds' Motion To Exclude The Expert Report Of Dr. Ran Kivetz, Dr. Kivetz did not show the products as they would be seen by consumers in the marketplace, but rather blatantly and artificially highlighted an accused Handi-Foil product by specifically separating it from the product array, placing it before the respondents during the interview, and further highlighting the representative Handi-Foil product by pointing to it during

12

the interview. **Ex. 6,** Reynolds' Motion To Exclude The Expert Report Of Dr. Ran Kivetz at 16-17. This is particularly offensive given the low cost and low investment nature of purchasing aluminum foil. *Id.* Frankly put, one simply does not repeatedly remove and isolate for inspection a particular aluminum foil package from its competitive offerings when walking down the store aisle. Such decisions are far more likely to be relatively quick, "first impression" purchases. Further, Dr. Kivetz used for his survey several of the same products Ms. Butler used for hers (*i.e.*, the Handi-Foil, Reynolds, and Ultra Foil products). Thus, Handi-Foil's arguments as they relate to marketplace conditions are misleading and actually undercut its own expert such that if the Butler Survey is excluded, the Kivetz Survey must be excluded as well.

      C.    Ms. Butler's Survey Followed The Long-Accepted *Squirt* Format And Did Not Ask Improper Leading Questions.

By definition, in a *Squirt* survey design, respondents are shown marketing materials bearing both the junior and senior user's marks, and are then asked whether the products or services are put out by the same company. *Simon & Schuster v. Dove Audio, Inc.*, 970 F. Supp. 279, 289 (S.D.N.Y. 1997); *Squirtco v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980); *see also* **Ex. 6,** Reynolds' Motion To Exclude The Expert Report Of Dr. Ran Kivetz at 2-4 and 9-13 (discussing the *Squirt* test); 6 MCCARTHY at §32:177 (same). Despite the existence of this long-accepted method of estimating market confusion, Handi-Foil refuses to recognize that Ms. Butler employed a generally accepted survey method, and instead attempts to attack the *Squirt* survey format generally. Such a survey is regularly "used to test for likelihood of confusion, especially in trade dress cases," and Handi-Foil's argument on this issue is wrong. 6 MCCARTHY § 32:177. Moreover, Dr. Kivetz himself uses at least some portions of the *Squirt* survey method and acknowledges that this format is appropriate when products are seen side by side in the marketplace.

Further, Handi-Foil's contention concerning Ms. Butler's instruction that the survey administrators not read the "don't know" option out loud to respondents has no merit and fails to impact the survey's admissibility in any way. First, the general instructions provided during the introduction portion of the survey include the following language: "*If you do not know or do not have an opinion about any of the questions I ask, please say so, do not guess*." **Ex. 1**, Butler Report, Ex. D, at 2. Thus, the respondents were explicitly instructed that "don't know" was an option to every question in both the test and control groups. Additionally, if the instruction not to read the "don't know" option out loud during specific questions had any impact whatsoever, as Ms. Butler noted in her deposition, it simply would have enabled people to think through their answer further and avoid the easier "don't know" option. If anything, this results in more reliable, thoughtful data. **Ex. 2**, Dep. of S. Butler at 110:5-112:9; **Ex. 7**, M. GILLJAM & D. GRANBERG, Should We Take Don't Know for an Answer, THE PUBLIC OPINION QUARTERLY (Univ. of Chicago Press 2004) at p. 355.

D.    Ms. Butler's Survey Used An Appropriate Control.

Due to the unlimited number of potential stimuli from which to choose, experts often and predictably disagree on the appropriateness of a control stimulus and such common disagreements only go to issues of weight and not admissibility. *See 24 Hour Fitness USA, Inc., v. 24/7 Tribeca Fitness*, 447 F. Supp. 2d 266, 280-282 (S.D.N.Y. 2006) (court criticized control, but did not exclude survey); *Urban Outfitters, Inc. v. BCBG Max Azria Grp.*, Inc. 511 F.Supp.2d. 482, 499-500 (E.D. Pa. 2007) (same).

Of course, and as noted by Handi-Foil in its motion, Ms. Butler also criticizes Dr. Kivetz's control. Experts frequently criticize the control of their opposition. This should come as no surprise. What is surprising is that Handi-Foil's counsel would—yet again—attempt to

14

elevate a technical issue by including it in a *Daubert* motion. But, *Daubert* challenges to confusion surveys are limited to the rare situations in which the "proffered survey is so flawed as to be completely unhelpful to the trier of fact." *PBM Prods.*, 639 F.3d at 123. Such a common and hyper-technical critique relating to an opposing expert's control comes nowhere close to approaching an appropriate *Daubert* challenge.

Additionally, Handi-Foil misleadingly argues that Ms. Butler admitted using alleged elements of the trade dress in her control. *See* Handi-Foil's Motion at 17-18. This is not the case. The Total Home packaging retains certain trade dress elements and is an appropriate control precisely because it allows Ms. Butler to measure the extent to which such elements— *used in a non-infringing manner*—might cause respondents to guess that the Reynolds and Total Home products are related. This allowed Ms. Butler to subtract such results from those concerning the Reynolds and Handi-Foil packaging to account for survey "noise," which is precisely what a proper control is designed to do. The representative Reynolds packaging, the Total Home packaging used as a control in Ms. Butler's survey, and the fabricated Handi-Foil packaging used as a control in Dr. Kivetz's survey are depicted below.





Further, and despite Handi-Foil's confusing arguments (*see* Handi-Foil's Motion at 19-20), the name "Handi-Foil" is not one of the accused trade dress elements in this case. Accordingly, whether "Handi-Foil" or "Total Home" was used on the control product is not relevant, nor is there any basis to conclude the use of the "Handi-Foil" trade name on the control product would have had any impact on the confusion level found in the control test. Handi-Foil's mere disagreement as to the effectiveness of Ms. Butler's control is not grounds for dismissing her survey or her conclusions arising therefrom. Indeed, despite the fact that Reynolds disagrees with the control used by Handi-Foil—including the fact that it does not even exist in the marketplace and was purposefully fabricated for the purposes of litigation—it did not believe it appropriate to waste the Court's or parties' resources arguing over such technical, non-*Daubert* issues. Once again, Handi-Foil's technical critique is incorrect and, at most, goes to the weight the trier of fact should afford Ms. Butler's survey.[3]

---

[3] Handi-Foil also argues via footnote that Ms. Butler failed to manipulate her survey response metrics based on the "reasons" given by the respondents, as Dr. Kivetz did. *See* Motion at 20-21, n.5. First, such data manipulation is inappropriate. The respondents answers and responses speak for themselves, and an expert should merely record and interpret the data, not manipulate it to better serve his or her client's litigation interests. Dr. Kivetz and Handi-Foil's decision to do otherwise is improper. Second, any responses in Ms. Butler's survey that might be "re-interpreted" to alter the confusion in the test group are mirrored by similar countervailing responses in the control group and, therefore, would provide no meaningful change in results. *See* **Ex. 1**, Butler Report at Ex. F.

E.   Ms. Butler's Survey Appropriately Considers The Representative Trade Dress At Issue In This Case.

As discussed above, Ms. Butler appropriately used the Handi-Foil Dollar Tree Package as representative of Handi-Foil's infringing trade dress sold through the grocery store, discount store, and general dollar-type store market channels. The Dollar Tree Package is strikingly similar to, and representative of, Handi-Foil's trade dress used throughout its aluminum foil retail channels and Handi-Foil's focus on merely the Dollar Tree market channel is under-inclusive and improper. Handi-Foil's speculation that the small print disclaimer on one of the Handi-Foil non-Dollar Tree store products would materially impact either expert's survey results is mere speculation that should be considered by the trier of fact.

Further, Handi Foil's attempt to use one of Ms. Butler's prior expert reports—submitted in conjunction with *Palmlab, L.L.C. and Metabolite Labs., Inc. v. Brookstone Pharmas, L.L.C.*, Case No. 2:09-cv-07434 (E.D. La. 2010)—against her survey and report in this case is unavailing. Among other differences, Ms. Butler's report in *Palmlab* addressed survey deficiencies based on extrapolating survey responses *from pharmacists to physicians*, individuals with substantially (and obviously) different professional perspectives on medical package information inserts far different from the supposed market channel divides here. Moreover, such argument represents standard cross-examination technique that highlights precisely why Handi-Foil's arguments merely go to weight, not admissibility.

To the extent Ms. Butler's survey is limited to a particular package, a result which would be improper, obviously so should Dr. Kivetz's.

17

IV.    CONCLUSION

For the foregoing reasons, Handi-Foil's Motion should be denied and Reynolds respectfully requests any such other relief the Court deems just.


December 31, 2013                                Respectfully submitted,


                                                 Britt Steckman
                                                 britt.steckman@bgllp.com
                                                 BRACEWELL & GIULIANI LLP
                                                 2000 K Street NW, Suite 500
                                                 Washington, D.C. 20006-1809
                                                 Telephone: 202.828.5800
                                                 Facsimile: 800.404.3970

                                                 OF COUNSEL:

                                                 Mark N. Mutterperl (*pro hac vice*)
                                                 mark.mutterperl@bgllp.com
                                                 BRACEWELL & GIULIANI LLP
                                                 1251 Avenue of the Americas, 49th Floor
                                                 New York, New York 10020-1104
                                                 Telephone: 212.508.6100
                                                 Facsimile: 800.404.3970

                                                 *Attorneys for Plaintiff Reynolds Consumer Products Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2013, the foregoing document was served

via electronic mail to the following per the parties' agreement:

>
> Brian N. Gross
> D. Sean Trainor
> Kirkland & Ellis L.L.P.
> 655 15th Street, NW
> Suite 12
> Washington, D.C. 20005
> brian.gross@kirkland.com
> dtrainor@kirkland.com
>
> David Callahan
> Ian J. Block
> Robin A. McCue
> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> dcallahan@kirkland.com
> ian.block@kirkland.com
> rmccue@kirkland.com

Mark N. Mutterperl