# EXHIBIT 1

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


```
--------------------------------:
                                :
REYNOLDS CONSUMER PRODUCTS INC., :
              Plaintiff,        :
                                :
     -vs-                       :    Case No. 1:13-cv-214
                                :
                                :
HANDI-FOIL CORPORATION,         :
              Defendant.        :
                                :
--------------------------------:
```

V O L U M E   1   (a.m.)


TRIAL PROCEEDINGS

March 24, 2014

Before:  Liam O'Grady, USDC Judge

And a Jury


APPEARANCES:

John G. Froemming, Jessica D. Bradley, and Daniel H. Shulman,
Counsel for the Plaintiff

David K. Callahan and Robin A. McCue,
Counsel for the Defendant

<u>INDEX</u>

<u>OPENING STATEMENTS BY:</u>

  MR. FROEMMING                                              56


<u>WITNESS</u>                          <u>EXAMINATION</u>       <u>PAGE</u>




<u>CLOSING ARGUMENTS BY:</u>




<u>COURT'S JURY INSTRUCTIONS</u>

P R O C E E D I N G S

1

2          THE CLERK:  Civil Action 1:13cv214, Reynolds Consumer

3   Products Inc. v. Handi-Foil Corporation.  Will counsel please

4   identify themselves for the record.

5          MR. FROEMMING:  Good morning, Your Honor.  John

6   Froemming and Jessica Bradley, Jones Day, counsel for the

7   plaintiff.

8          THE COURT:  All right, good morning.  Good morning.

9          MR. CALLAHAN:  Good morning, Your Honor.  David

10  Callahan and Robin McCue from Kirkland & Ellis for the

11  defendant, Handi-Foil.  With us at counsel table, Mr. Peter

12  Perkins.  He's Handi-Foil's CFO.

13         THE COURT:  All right, good morning to you, sir.

14  Good morning to each of you.

15         All right, so I take it we don't need the services of

16  Judge Jones this morning?

17         MR. CALLAHAN:  We did talk, Mr. Froemming and I did

18  talk over the weekend.  I think not today, Your Honor.  Thanks.

19         THE COURT:  All right, we'll let him know that he's

20  not needed right now, and I'm not sure what his availability is

21  afterwards, but if need be, we'll check.

22         There's a number of corporations that you asked that

23  I identify in voir dire, including, you know, several Reynolds

24  groups, but also Beverage Packaging Holdings, Columbia

25  University, Davis & Hosfield Consulting, NERA -- I guess these

J.D. Mickle - Cross                                                   173

1   whatever it is and say, we've got exactly Reynolds blue, right?

2   A.   Right.

3   Q.   Okay.  And similarly, you've got this Reynolds pink?

4   A.   Yes.

5   Q.   And you use that always, all the time, consistently the

6   same way, it looks like that has gone back 50 years, right?

7   A.   Yes.  That's a PMS 486, it's slightly darker than PMS 486.

8   Q.   Okay.  So, you take PMS 486 which is something I could

9   look up in a color guide, you make that just a little bit

10  darker, and you use it that way every single time, right?

11  A.   Right.

12  Q.   When you originally started, you had three straight lines,

13  then you went to these curved silver lines to separate the

14  reflex blue from the pink, correct?

15  A.   Yes, sir.

16  Q.   And you always do that exactly the same way, correct?

17  A.   Yes.

18  Q.   Because you want consumers to know that when they see

19  Reynolds, reflex blue, three curved silver stripes, and pink,

20  this is Reynolds, right?

21  A.   All together it works as the carton trade dress.

22  Q.   All of those elements together?

23  A.   Right.

24  Q.   The Reynolds name, the particular shade of reflex blue,

25  the particular shade of PMS pink, and the three silver stripes,

J.D. Mickle - Cross                                                    174

1   right?

2   A.   That's right.

3   Q.   That's Reynolds' brand equity, correct?

4   A.   This is Reynolds trade dress, yes.

5   Q.   Right.  So, can we agree -- I am going to show you -- let

6   me just -- I am going to ask that you get exhibits, Defendant's

7   Exhibit 248, 256 and 252.  Thank you very much.

8         Those are the Handi-Foil boxes, three of the

9   Handi-Foil boxes that are at issue in this case.

10        Now, do you know -- well, let's start with the easy

11  one.  You said one of the four parts of Reynolds brand equity

12  is the Reynolds name or the Reynolds Wrap name, right?

13  A.   Right.

14  Q.   You would agree with me that none of the three Handi-Foil

15  boxes that you have got in front of you have got the Reynolds

16  name on them, right?

17  A.   That's right.

18  Q.   Do you know whether the three Handi-Foil boxes use that

19  particular shade of reflex blue that Reynolds uses?

20  A.   I don't know that for sure.

21  Q.   You can't tell?

22  A.   It's very similar.

23  Q.   But you don't know if it's that particular shade of reflex

24  blue?

25  A.   No, no, but it is very similar.

J.D. Mickle - Cross                                                      175

1  Q.   You would agree with me that none of the three Handi-Foil

2  boxes that are at issue in this case in front of you have got

3  three silver stripes on them, correct?

4  A.   That's correct.

5  Q.   In fact, they don't have three stripes of any color on

6  them, right?

7  A.   This one has a stripe.

8  Q.   That's got a one single white stripe, right?

9  A.   Right, but you said none of them have, and it does have a

10 stripe.

11 Q.   And let me just make sure my question was clear, I'm

12 sorry.

13           None of the boxes have three stripes?

14 A.   No.

15 Q.   Whether they are silver or any other color, right?

16 A.   No.

17 Q.   And you would agree with me that none of the Handi-Foil

18 boxes that you've got up on the stand use the color pink, is

19 that right?

20 A.   No, that's not pink.

21 Q.   Okay.  So, of the four things that you said -- I just want

22 to see if we've got the list right.  Of the four things that

23 you said constitute the Reynolds brand equity, you agree with

24 me, don't you, that the three boxes that you've got on the

25 stand up in front of you, don't have three of them and you are

J.D. Mickle - Cross                                                    176

1    not sure about the fourth, right?

2    A.   Not literally, no.

3    Q.   Pardon me?

4    A.   They do not literally have those on there.

5    Q.   So, the Handi-Foil boxes do not literally have three of

6    the four elements that you described as being the Reynolds

7    brand equity, and you're not sure about the fourth, right?

8    A.   Yes.

9    Q.   Okay.  Let's go back and talk about those trademarks

10   because I may have misspoken in my opening statement, I am not

11   sure if I did or not.

12          But it is accurate that the color reflex blue is not

13   listed in the trademark, right?

14   A.   No.

15   Q.   The trademark registrations?

16   A.   No, it's not.

17   Q.   One of those track registrations has the Reynolds name on

18   it, right?

19   A.   Yes.

20   Q.   Both of the trademark registrations call for the color

21   pink, correct?

22   A.   What it says -- what it says in that, the line drawings

23   indicate the color placement by horizontal, diagonal, and

24   vertical lines, and call out the colors.

25   Q.   And the color that they call out for this, as you look it,

J.D. Mickle - Cross                                                    177

1    the right-hand section of the box, is pink, right?

2    A.   Yes, it's called pink.

3    Q.   And it calls out three actually straight stripes, right,

4    in the trademark registration?

5    A.   It shows three stripes, right.

6    Q.   And they call those out as being silver?

7    A.   Yes.

8    Q.   Okay.  So, for the trademark, the two trademarks at issue,

9    you would agree with me that none of the Handi-Foil boxes in

10   front of you have the name Reynolds on them, right, as one of

11   the trademarks does?

12   A.   None of them have the word "Reynolds" on them, except --

13   Q.   None of them --

14   A.   Except under your Handi-Foil logo it says:  Compare to

15   Reynolds Wrap.

16   Q.   Now, you are aware, aren't that you, that Mr. Bryla has

17   testified in this case, he gave a deposition in this case, he

18   testified that that is actually a thing that distinguishes

19   Handi-Foil from Reynolds Wrap, right?

20   A.   I haven't heard Mr. Bryla's testimony.

21   Q.   Well, you would agree with that, wouldn't you?  That is a

22   distinction?

23   A.   Say that again.

24   Q.   So, in other words, you would never put "compare to

25   Reynolds Wrap" on a box of Reynolds Wrap, right?

1   A.   No.

2   Q.   That would be silly?

3   A.   No.

4   Q.   You would put "compare to Reynolds Wrap" on something that

5   isn't Reynolds Wrap, right?

6   A.   Not necessarily.

7   Q.   Okay.  Well, there's only -- I think there's only two

8   different ways to do this.  Either you would or wouldn't put --

9   A.   I'm sorry, say this again.  Ask the question again.

10  Q.   Yeah.  So, you agree with me that you would never put

11  "compare to Reynolds Wrap" on something that was Reynolds Wrap,

12  right?

13  A.   No.

14  Q.   That would be silly?  It just wouldn't make sense, right?

15  A.   No.

16  Q.   So, the only thing that it makes sense to put "compare to

17  Reynolds Wrap" on is something that isn't Reynolds Wrap, right?

18  A.   Yes.

19  Q.   Yes?

20  A.   And why would they do that?

21  Q.   Well, because it's not Reynolds Wrap, right?

22  A.   I guess what -- I guess what I'm confused about is that a

23  carton that looks so much like the Reynolds Wrap product that

24  has the word "Reynolds Wrap" on it, seems very, very -- it

25  seems likely that there could be some confusion in terms of

J.D. Mickle - Cross                                                    179

1   what the consumer is really reading there.

2   Q.   Okay.  So, in your opinion, Mr. Mickle, a carton that

3   doesn't have three of the four elements of what you described

4   as Reynolds' trade dress, you are not sure about the fourth,

5   and says something on it that would never be on a Reynolds Wrap

6   box, might still cause some likelihood of confusion, is that

7   your position?

8   A.   Well, there is one point I think that we need to make, is

9   that when you're saying --

10  Q.   Well, again I --

11  A.   When you're saying --

12          THE COURT:  Hold, hold.  Whoa, you can't both talk at

13  one time or we can't get the record correct.

14          THE WITNESS:  I'm sorry.

15          THE COURT:  So, you listen to the question.

16          THE WITNESS:  Okay.

17          THE COURT:  And you answer the question that you're

18  asked.

19          THE WITNESS:  Okay.

20          THE COURT:  And if your counsel wants to try and

21  bring something back up, he'll have the opportunity to do that.

22          THE WITNESS:  I'm sorry.  I'm sorry.

23  BY MR. CALLAHAN: (Continuing)

24  Q.   So the question is, the three boxes up there that you

25  admit don't have three of the four elements of the Reynolds

J.D. Mickle - Cross                                                    180

1  brand equity, you're not sure about the fourth, and two of the

2  boxes say something -- or all the boxes say something that

3  you'd never put on a package of Reynolds Wrap, you still think,

4  is it correct, that those boxes might cause some likelihood of

5  confusion?

6  A.   I do.

7  Q.   With real consumers?

8  A.   I do.

9  Q.   But you haven't seen any actual consumer who was in fact

10 confused, have you?

11 A.   No, I have not.

12 Q.   Okay.  Now, the bars, these three stripes, these three

13 curved stripes --

14 A.   Yes, sir.

15 Q.   -- are a pretty important sort of individual part of

16 Reynolds' brand equity, aren't they?

17 A.   Pretty important may be an overstatement.

18 Q.   Okay.  Are they important enough that Reynolds has given

19 these three curved lines their own name?

20 A.   Well, for defining the carton that was being tested, the

21 label of arc was put on that one.  And then there was another

22 one tested that had its own label.  It was so that we could

23 identify them.  And it's just stayed.

24 Q.   So, these three lines are at least important enough that

25 Reynolds has given them their own name, and it calls it the

S. Butler - Cross                                                    443

1   Q.   Now, in designing your protocol in the case, you did rely

2   on Reynolds' lawyers to provide you with certain information,

3   right?

4   A.   That's correct.

5   Q.   You discussed the proper population of people to survey

6   with Reynolds' lawyers, right?

7   A.   Yes.

8   Q.   And Reynolds' lawyers gave you information about who the

9   purchasers of Reynolds' products might be, correct?

10  A.   Of Reynolds' products and of aluminum foil more generally,

11  yes.

12  Q.   Reynolds' counsel gave you information about the markets

13  in which Handi-Foil was being sold, right?

14  A.   Yes.

15  Q.   And they provided you with samples of the boxes that are

16  at issue in this case so you could look at them, right?

17  A.   I believe I had samples, yes.

18  Q.   Well, you must have had at least pictures?

19  A.   I certainly had pictures.  I'm trying to remember at what

20  point I actually had the real boxes.

21  Q.   But it was always the lawyers that were the

22  intermediaries, right?  You never spoke directly to anyone at

23  Reynolds about this, is that right?

24  A.   That's correct.

25  Q.   Now, let's take a look again at Exhibit 40, Defendant's

S. Butler - Cross                                                    444

1    Exhibit 40.  This is what we call the Dollar Tree box, right?

2    Is that right?

3    A.   Yes.  Sorry.  Yes.

4    Q.   And you understand that Exhibit 40, the Dollar Tree box,

5    was only ever sold in Dollar Tree stores, right?

6    A.   That's my understanding, yes.

7    Q.   Dollar Tree is the only place consumers could ever come

8    across the Dollar Tree box, right?

9    A.   Yes.

10   Q.   But at the time you did this survey, you were not aware

11   that Exhibit 40, the Dollar Tree box, wasn't also -- or wasn't

12   available in grocery stores?  You weren't aware of that, right?

13   A.   At the time that I did the survey it was my belief that

14   that box was in other locations beyond the Dollar Tree, yeah.

15   Q.   So from your conversations with Reynolds' lawyers, you

16   came to conclude that the Dollar Tree box, which we know is

17   only ever available in Dollar Tree, was actually available in

18   Dollar Tree and other grocery and retail outlets, right?

19   A.   That's correct.

20   Q.   And is it accurate that -- I think while you said you did

21   look at pictures of the boxes that are at issue in this case,

22   is it accurate that you had not looked at the actual packages

23   themselves, physical samples, during the development of your

24   survey or in preparing your report?

25   A.   I guess you have to be more specific about which packages.

1    I looked at a number of packages --

2    Q.   Let's talk about the two that are available in grocery,

3    and those would be Defendant's Exhibits 256 and 250.

4    A.   That's correct.  I did not have those packages at the

5    time, the actual packages at the time I designed the survey.

6    Q.   In fact, refresh my recollection if I'm wrong, but my

7    recollection is I was the first person ever to show you actual

8    samples of the two products that Reynolds sells -- or that

9    Handi-Foil sells in grocery stores, right?

10   A.   In my deposition, that's correct, yes.

11   Q.   Okay.  Now one of the things -- and maybe -- well, I think

12   you've seen these before, but if you need to look at them, just

13   let them know and I'll ask them to be got to you.

14        One of the things you weren't aware when you designed

15   your survey is that both of the grocery packages have got

16   disclaimers on the box itself, right?

17   A.   That's correct.

18   Q.   So, you were not aware when you designed your survey,

19   Reynolds didn't tell you that both of the grocery store

20   packages say Reynolds Wrap is the registered trademark of

21   Reynolds Consumer Products Company.  This product is neither

22   manufactured nor made under the authorization of Reynolds

23   Consumer Products Company.

24        You didn't know these two boxes said that, did you?

25   A.   I was not aware of that when I designed my survey, that's

S. Butler - Cross                                              446

1    correct.

2    Q.   And that is not information that Reynolds' lawyers

3    provided to you, right?

4    A.   Not at the time I designed the survey, that's correct.

5    Q.   Okay.  Let's talk about the Reynolds package that you

6    surveyed.  It is Defendant's Exhibit 41, is that correct?

7    A.   Yes.

8    Q.   And the Reynolds Wrap package that you surveyed is, as

9    this is, 30 square feet, correct?

10   A.   That's correct.

11   Q.   And you are aware now that the Reynolds product that was

12   sold at Dollar Tree in -- where Handi-Foil's Dollar Tree

13   package is sold, was not a 30-foot, 30-square foot product,

14   right?

15   A.   Yes.  It's my understanding now that the Reynolds package

16   is no longer sold at Dollar Tree at all.

17   Q.   Okay.  When you did your survey, it was being sold at

18   Dollar Tree?

19   A.   That's correct.

20   Q.   But what was being sold at Dollar Tree when you did your

21   survey was not the 30-square foot box, it was a different size

22   box, right?

23   A.   Right.  But I was aware at the time that I did my survey

24   that that Reynolds package was going to be phased out of Dollar

25   Tree.

1   Q.   And you were also -- but you weren't aware that what was

2   actually being sold was like an 18.75-square foot roll?  Or do

3   you still not know that?

4   A.   No, I am aware of that now.  I may have been aware of that

5   at the time and understood that that package was no longer

6   going to exist in Dollar Tree.

7   Q.   Okay.  Now, Ms. Butler, you talked about some of the work

8   you did in the Apple case where it sounds like you sort of were

9   helping people sift through all this expert stuff that other

10  people were doing, is that right?

11  A.   I was helping Apple's counsel, yes, review all of the

12  surveys that were submitted, including helping them design

13  their own, and also evaluate the other surveys turned in by the

14  other side.

15  Q.   And about how long did that take you?  Months and months?

16  A.   I believe so.  Yeah, it certainly was like three months

17  probably.

18  Q.   Three months or so to sort of get yourself the

19  understanding that you need to be able to look at all the

20  different stuff and help them create a survey that was

21  appropriate?

22  A.   Well, again, there were multiple surveys, both from

23  Apple's side that were designed and from the other side.  So --

24  and things came in at staggered times.

25  Q.   Okay.  In this case, Reynolds' attorneys got ahold of

S. Butler - Cross                                                      448

1    June 26 of last year, right?

2    A.    That sounds about right, yes.

3    Q.    And I'll include the 4th of July weekend.  But in about 16

4    days later you had issued an expert witness report, is that

5    right?

6    A.    That's correct.

7    Q.    Every single thing that you did that went into your expert

8    report, all the research, all the talking to Reynolds' lawyers,

9    all the designing the survey, and getting it out to the field,

10   and all of that other stuff took place in 16 days?

11   A.    That's correct.

12   Q.    You would agree with me that that is on the shorter end of

13   time that you normally have to do the work that is required to

14   do an appropriate and well-put-together survey, right?

15   A.    Right.  And I think as you and I probably discussed in my

16   deposition, you know, if I have more time, I would always love

17   to have more time.  But that was the time I had.

18   Q.    Now, it's compounded to some extent by the fact that is

19   the first time that you have ever served as a testifying expert

20   in a trade dress survey case, correct?

21   A.    Well, the testifying part really comes after the design

22   and after the report.  So, certainly I have designed surveys

23   like this before.  I have certainly helped put them into the

24   field.  Certainly analyzed data from them.  I have been hired

25   as a testifying expert before in matters very similar to this

1   one in the sense that it involved trade dress packaging.

2           It's just, I think as I articulated this morning, not

3   all of them turn out to the client's liking.

4   Q.   So, let me just ask that question again.

5   A.   Sure.

6   Q.   I would just like you to focus on what my question is.

7   Which is, isn't this the first time -- wasn't today the first

8   time you've taken the stand as the person who designed a trade

9   dress survey and served as a testifying expert?

10  A.   This is the first time I have testified to a trade dress

11  survey, yes.

12  Q.   You've worked for other people at NERA before and sort of

13  been the number two or something like that, but this is the

14  first time where it's your survey, you designed it in 16 days

15  and put it together and got it all done, and you are actually

16  the one testifying about it?

17  A.   I am -- this is the first time I am testifying to a trade

18  dress survey, yes.

19  Q.   Now, let's go back to how we put this survey together.

20  One of the first and most important things you do in putting a

21  survey together is defining the relevant population, right?

22  A.   That's correct.

23  Q.   Give us the easiest possible example.  If we are doing a

24  survey that has to do with aluminum foil, we wouldn't survey

25  people who never buy aluminum foil?

S. Butler - Cross                                                      450

1    A.    That's correct.

2    Q.    That's the easiest example of a place where, whoops,

3    picked the wrong group of people.  I want know about aluminum

4    foil, but none of or some of the people that I surveyed don't

5    know anything about aluminum foil and don't buy it themselves?

6    A.    That's right.

7    Q.    So, you would agree with me that in your field -- and when

8    people are doing surveys like this that sit around and talk

9    about what's important, one of the things that they think is

10   very important, some people call it a key element, is

11   identification of the proper universe to survey?

12   A.    The population of the universe, yes.

13   Q.    And that's because if you get the wrong population, then

14   you might be surveying people whose opinions just aren't

15   relevant, right?

16   A.    That's correct.

17   Q.    Again now, the box that you surveyed, the Dollar Tree box,

18   the only -- the universe of people who would only ever see this

19   is somebody who went into a Dollar Tree, right?

20   A.    Unless they saw it at somebody else's house.  But, yes, I

21   mean, where they would purchase it is a Dollar Tree, that's

22   correct.

23   Q.    So, if the person that we're looking at hasn't ever been

24   into a Dollar Tree, or we don't know they have been into a

25   Dollar Tree, they never could have come across the product that

S. Butler - Cross                                                        451

1    you're doing the survey on, right?

2    A.   For that exact specific product, that's correct.

3    Q.   Okay.  And you would agree with me that there might be a

4    difference in a consumer's understanding between somebody who

5    sees a package when they go to the Dollar Tree store and

6    somebody who has never seen it, right?

7    A.   It's possible.  It's also likely that there are no

8    differences.

9    Q.   But you don't know that, do you?

10   A.   No, I don't know.

11   Q.   In fact, you don't have any evidence of whether or to what

12   extent the people that you surveyed, these 400 folks that you

13   surveyed, ever shopped at a Dollar Tree?

14   A.   No, that's not correct.

15   Q.   Do you have any evidence of whether, and if so, the extent

16   to which the people you surveyed shop in Dollar Tree?  Do you

17   have any information about that at all?

18   A.   Well, certainly there are a number of respondents in my

19   survey, at least one or two, that indicate they have seen the

20   packages before in a Dollar Tree.

21   Q.   Let me ask you to take a look at your deposition, Ms.

22   Butler.  You recall being deposed in this case?

23   A.   Yes.

24   Q.   It's in your binder.  What's that?  Oh, it's not.  I'm

25   sorry.

1           Could you hand Ms. Butler a copy of her deposition.

2    There you go.

3    A.    Thank you.

4    Q.    We will be at 78, lines 15 through 19.

5           If you would take a look at page 78, Ms. Butler,

6    lines 15 through 19.  You recall giving a deposition in this

7    case, right?

8    A.    That's correct.

9    Q.    And you were placed under oath just as you are here in

10   court?

11   A.    That's correct.

12   Q.    And affirmed that you would tell the truth at your

13   deposition?

14   A.    Yes.

15   Q.    I asked you a bunch of questions, you gave a bunch of

16   answers, right?

17   A.    Yes.

18   Q.    And isn't it true that you said -- I asked you the

19   following question at your deposition, page 78, lines 15

20   through 19.  And you gave the following answer.

21          Question:  Do you have any evidence that -- do you

22   have any evidence of whether, and if so, the extent to which

23   the people you surveyed shop in Dollar Tree?  Do you have any

24   information about that at all?  Answer:  No.

25          Was that the question I asked and was that the answer

S. Butler - Cross                                                    453

1    you gave under oath?

2    A.   Yes.

3    Q.   Now, you would agree with me -- now let's just move on.

4    Okay.  All right.

5          Let's talk about whether the people who participated

6    in your survey, which was designed to figure out what people

7    encountering the Handi-Foil product in a Dollar Tree store, how

8    they would react to it, right?

9    A.   Well, the survey was designed to evaluate whether

10   Handi-Foil's use of the trade dress elements at issue would

11   cause confusion.  That box is one example of the way in which

12   Handi-Foil uses the trade dress elements.

13   Q.   And it's the only -- it's the only box you surveyed?  It's

14   the only Handi-Foil box you surveyed?

15   A.   That's correct.

16   Q.   So your survey was focussed on a box only available at

17   Dollar Tree, right?

18   A.   That's the box that was used, yes.

19   Q.   And we know that the Reynolds box that you used was never

20   sold at Dollar Tree, right?

21   A.   Again, it was my understanding at the time I did the

22   survey that Reynolds was no longer going to be sold in Dollar

23   Tree, so --

24   Q.   But Reynolds had been in Dollar Tree?

25   A.   Yes.

S. Butler - Cross                                                      454

1   Q.   And when you did your survey, they were in Dollar Tree?

2   A.   I believe so, yes.

3   Q.   And my point is just, you chose a box that at no time ever

4   was ever sold by Reynolds in Dollar Tree, right?

5   A.   That's correct.

6   Q.   So, no consumer ever walking into Dollar Tree would ever

7   have seen the Reynolds and the Handi-Foil packages side to

8   side, is that right?

9   A.   They weren't shown in the survey side to side like that

10  either.  But, yes, that's correct.

11  Q.   Nobody would ever first see the Reynolds 30 foot in the

12  Dollar Tree and then later see the Handi-Foil product in the

13  Dollar Tree, would they?

14  A.   That's correct.

15  Q.   And there were some other boxes that you used -- Kentaro,

16  if you could pull up 271, please.  This is demonstrative

17  Exhibit 271.  Can you pull up the first product there.

18        So, the first one is Handi-Foil 25 foot.  And that is

19  sold at Dollar Tree, right?

20  A.   Yes.

21  Q.   The second product is the Reynolds 30 square foot, and we

22  just determined that's not sold at Dollar Tree, right?

23  A.   That's correct.

24  Q.   Okay.  The third product is the CVS Total Home.  CVS is

25  not available at Dollar Tree, correct?

S. Butler - Cross                                                        455

1    A.    That's correct.

2    Q.    The next product is the Shopper's Value 25-square foot

3    product.   Is that sold in Dollar Tree?

4    A.    No.

5    Q.    All right.  And then the last product you showed people is

6    the Ultra Foil 40-square foot package.  That actually is sold

7    in Dollar Tree, right?

8    A.    That's correct.

9    Q.    So of the packages that you showed consumers in your

10   survey, three of the five were never available in Dollar Tree

11   stores?

12   A.    That's correct.

13   Q.    All right.  Another -- you can take that down, Kentaro.

14   Thank you.

15            Another key area of survey design that requires very

16   careful attention by you is the control, right?

17   A.    That's correct.

18   Q.    This is how you get to what you call net confusion, right?

19   A.    That's correct.

20   Q.    You take the number of people that you say were confused

21   by the box that's at issue, in this case the Handi-Foil box,

22   you see how many people are confused by the other box, and you

23   subtract the control box from the Handi-Foil box, right?

24   A.    That's correct.

25   Q.    So you've got to do the control correctly or you're going

S. Butler - Cross                                                    472

1  overanalysis to say this person thinks that all aluminum foil

2  has got a similar origin?

3  A.   Well, they are naming the two packages.  But, yes, they

4  seem to say that every -- or they are all foil, yes.

5  Q.   And you counted them as being confused as well, right?

6  A.   That's correct.

7  Q.   Let's set that aside.  Now let's talk about the two

8  grocery boxes that you did not survey.  Right?

9  A.   Yes.

10 Q.   These are two not available in Dollar Tree, never

11 available in Dollar Tree.  Your understanding now is that these

12 were or are sold in grocery outlets, right?

13 A.   That's my understanding, yes.

14 Q.   You didn't survey either of the two grocery boxes,

15 correct?

16 A.   That's correct.

17 Q.   But nonetheless, I believe it is your opinion that the

18 survey results that you did do, the box you did use would not

19 be any different -- they would apply with equal force to the

20 two grocery boxes, right?

21 A.   I think, as I have testified, that the boxes are

22 substantially similar.  And I would expect the results to be

23 substantially similar.

24 Q.   And that's not just sort of gut feel on your part?  I

25 mean, you told me that you feel you've a scientific basis for

S. Butler - Cross                                                        473

1  saying the results wouldn't be any different?  That consumers

2  would be similarly confused by any of the grocery packages,

3  isn't that right?

4  A.    I think I indicated that I thought that was likely, yes.

5  Q.    And your scientific basis for concluding that the results

6  wouldn't be any different is because the boxes share, in your

7  view, a lot of the same elements that Reynolds claims are

8  infringing?

9  A.    They share many of the similar elements to the box I

10 tested, yes.

11 Q.    And remember, both of these grocery boxes have that

12 disclaimer on them.  Both of these grocery boxes expressly

13 state that they don't come from Reynolds, right?

14 A.    That's correct.

15 Q.    And you didn't know that when you did your survey?

16 A.    That's correct.

17 Q.    Because I think nobody actually gave you the boxes, at

18 least the grocery boxes with the disclaimers on them before you

19 did your survey, right?

20 A.    That's correct.

21 Q.    And you agree with me, Ms. Butler, that knowing whether

22 the grocery boxes had disclaimers on them would have been a

23 useful piece of information for you to know, right?

24 A.    It would have been useful, yes.

25 Q.    Because you would want to understand how consumers --

S. Butler - Cross                                                        474

1    whether and the extent to which consumers reacted to that

2    disclaimer, right?

3    A.    Yes.

4    Q.    And you didn't do that survey, and so you don't have any

5    idea how consumers would react to that disclaimer, right?

6    A.    I did not do a survey with a box with the disclaimer,

7    that's correct.

8    Q.    And the last box you looked at that we talked about is

9    this red box, red and blue box, right?  This is what I think we

10   have called the trade show box.  It is Defendant's Exhibit 257.

11          Now, you also, did you not, in your deposition tell

12   me that the results you got on the Dollar Tree box would not be

13   any different or wouldn't be materially different than what you

14   would expect consumers to say about the trade show box,

15   correct?

16   A.    I said it was possible that the trade show box would get

17   similar results, yes.

18   Q.    You actually again believe there is a scientific basis for

19   you to conclude based on the survey that you did that the trade

20   show box would result in as much confusion or comparable

21   confusion to what the Dollar Tree box did, correct?

22   A.    I said it's possible that that box would get similar

23   results, yes.

24   Q.    And again, you believe that there is a scientific basis

25   for you to say that?

1    A.    Yes.

2    Q.    Based on the -- based on your view that your survey did

3    all the appropriate stuff and did it in the right way, correct?

4    A.    That's correct.

5    Q.    Now, are you aware that in the last two-and-a-half weeks

6    even Reynolds has said that Exhibit 257, the trade show box,

7    even Reynolds has said that this box is okay for Handi-Foil to

8    use?  Do you know that?

9    A.    Yes.

10   Q.    Okay.  You are aware, aren't you, that a couple weeks

11   ago -- if you turn in your binder to Exhibit 264 -- Kentaro, if

12   you would put 264 up.

13         You are aware that on March 11 of this year, just two

14   weeks before we began this trial -- well, let me take a step

15   back.

16         You are aware that throughout the entirety of this

17   case Reynolds has taken the position, similar to you, that this

18   red box infringes Reynolds' trade dress rights, correct?

19   A.    That was my understanding, yes.

20   Q.    And you are also aware that now, if we can go to page 2 of

21   Exhibit 264, that Reynolds has said they will never sue

22   Handi-Foil, its subsidiaries, or affiliate companies over this

23   trade show box, correct?

24   A.    Yes.

25   Q.    And you are aware that Mr. Shulman, who is sitting here in

S. Butler - Redirect                                                  476

1   the courtroom today, signed that and submitted it to this Court

2   promising they would never sue on this box again, right?

3   A.   Yes.

4   Q.   Notwithstanding the fact that you believe it is every bit

5   as infringing as the other three Handi-Foil boxes that are at

6   issue in this case, correct?

7   A.   Well, I think infringement is a legal issue.

8   Q.   It's every bit as confusing --

9             THE COURT:  Don't ask those questions.

10            MR. CALLAHAN:  Okay.

11            THE COURT:  You have got the facts out.  Let's move

12   on.

13            MR. CALLAHAN:  Right.

14   BY MR. CALLAHAN: (Continuing)

15   Q.   You're aware that this box is okay now, right?

16   A.   Yes.

17            MR. CALLAHAN:  Nothing further, Your Honor.

18        REDIRECT EXAMINATION

19   BY MR. FROEMMING:

20   Q.   Ms. Butler, at about 2:55, about a half hour ago, before

21   he picked up the Ultra Foil box, Mr. -- counsel had a

22   Handi-Foil box along side a Reynolds box and some of the

23   Handi-Foil boxes.

24            Did you see how long it took even counsel to pick out

25   the Handi-Foil box from this array of boxes on the table?

D. Bryla - Direct                                                        540

1   sales have you lost to Handi-Foil since they introduced this

2   new packaging beyond Dollar Tree?

3   A.    Beyond Dollar Tree?  We've lost about a share point of

4   business so far.

5   Q.    What do you mean by a share point of business?

6   A.    So the entire -- in the retailers where Handi-Foil has

7   gained distribution, our share has gone down about a point, so

8   a share represents 1 percent of the total market, and so if you

9   take a look at it from a, what our sales were doing versus what

10  they are doing after Handi-Foil gained distribution, we've lost

11  about a share point.

12  Q.    What -- in terms of the overall size of the market, what

13  does one lost share point represent?

14  A.    The total market is about $800 million in sales, and one

15  share point is worth $8 million.

16  Q.    And what is the profit, what is the profit of Reynolds on

17  $8 million of business?

18  A.    It's $3 million.

19  Q.    Where -- at what retailers have, to your knowledge, has,

20  if any, has Handi-Foil's new package taken away sales?

21  A.    We know at, at Buy Low, at Winn Dixie, Jewel, Hy-Vee, and

22  Albertsons in Phoenix.

23  Q.    All right.  And are these small, medium, or large

24  retailers?

25  A.    They're, I'd call them between medium and large.  They

D. Bryla - Cross                                                565

1    Q.   Okay.  What were Reynolds' sales in 2013 of Reynolds Wrap?

2    A.   Oh, Reynolds Wrap?

3    Q.   If we were to, if we were to just fill in the last full

4    year that wasn't on what you put in front of the jury, what

5    would that be?

6    A.   About $435 million.

7    Q.   Okay.  Now, you were here -- you've been here throughout

8    the entirety of the trial; is that correct?

9    A.   Correct.

10   Q.   So you heard Mr. Mickle testify?

11   A.   Yes.

12   Q.   Twenty-some years running the Reynolds brand, right?

13   A.   Yes.

14   Q.   And he was your immediate predecessor?

15   A.   No.

16   Q.   Was there somebody in between him and you?

17   A.   Doug was responsible for product services, advertising,

18   which reported up in to my predecessor at Reynolds, who

19   ultimately wound up reporting to me, if that helps.

20   Q.   So Ken Lane, whose testimony we're going to hear next in

21   this case by videotape, Ken Lane succeeded Mr. Mickle in the

22   responsibility of -- that he had; is that right?

23   A.   No, not really.  So there's the line functions, which are

24   the general management roles, which Ken Lane has right now, and

25   the guy before him was Jeff Johansen, and Doug Mickle has a

D. Bryla - Cross                                                    566

1    marketing services role, which is a staff function which

2    supports the general management function.

3           So right now in my organization, I have a head of

4    integrated marketing communications which reports to me, which

5    would have been the Doug Mickle job back in the day.

6    Q.   Okay.  So you heard Mr. Mickle's testimony about the sort

7    of history of the Reynolds brand and how Reynolds always uses

8    the same design the same way and all that kind of stuff, right?

9    A.   Correct.

10   Q.   You heard him talk about the Reynolds, the brand and the

11   image being the, the pink, the three silver sort of curved

12   stripes, the reflex blue, and the Reynolds name, right?

13   A.   Yes.

14   Q.   And you'd agree with, with all the stuff that Mr. Mickle

15   said in that regard.  We don't have to cover that again, right?

16   A.   Correct.

17   Q.   Was there anything Mr. Mickle said that you thought was

18   wrong or that you disagreed with?

19   A.   No.

20   Q.   Okay.  So we don't have to cover the things we went over

21   with Mr. Mickle because you were here, you heard them, you

22   agree with them all.

23   A.   He did mention it was blue, not reflex blue, but besides

24   that, yeah.

25   Q.   Well, when you use it on the box, it's always reflex blue,

D. Bryla - Cross                                                    567

1  right?

2  A.   Yes, but the trademark is not for reflex blue.  Yes.

3  Q.   The trademark is just blue, but when you use it on the

4  box, it's always reflex blue?

5  A.   Yes.

6  Q.   Okay.  All right.  So we're not going to go into those

7  things since it sounds like you and Mr. Mickle are in accord

8  with everything he said originally.

9         Now, isn't it the case that Reynolds sometimes

10 purchases aluminum foil from a company called Novelis?

11 A.   Correct.

12 Q.   So it's not, it's not accurate that Reynolds makes all of

13 its own aluminum foil, right?

14 A.   For the foil that's in the consumer boxes, it's all made

15 internally.

16 Q.   Okay.  But Reynolds does purchase foil from Novelis?

17 A.   Yes, to use for private label or other non-Reynolds Wrap

18 uses, yeah.

19 Q.   Okay.  So we'll talk about private label in a minute.

20        Now, you indicated that -- I think this was the last

21 question, and Mr. Froemming said he would have one question,

22 and he only had one question, which he should be complimented.

23 In that last question, you said one of your big concerns was

24 that consumers would have negative experiences with Handi-Foil

25 and that would come back on Reynolds Wrap; is that right?

D. Bryla - Cross                                                      568

1    A.   Negative experiences with substandard foil, yes.

2    Q.   Okay.  But you didn't talk to the jury about any actual

3    evidence of anybody having a negative experience, right?

4    A.   No.

5    Q.   Because you're not aware of any?

6    A.   None.  I wouldn't imagine if someone had a negative

7    experience with someone else's product, they would call

8    Reynolds Wrap and tell them about it.

9    Q.   Okay.  You haven't seen any evidence in this courtroom

10   during Reynolds' time to put on its case that any of the 30 to

11   31 million people that purchased Handi-Foil over the last two

12   years had a negative experience with that?

13   A.   Not that I'm aware of.

14   Q.   And no information like that filtered up through Reynolds,

15   you know, all the friends that you've got on Facebook or any of

16   the other sophisticated marketing tools that you guys have got

17   at Reynolds for staying in touch with your consumers, right?

18   A.   Actually, I did see some posts on social media.

19   Q.   None of those are coming into evidence in this case, are

20   they?

21   A.   Not that I'm aware of.

22   Q.   And you said you wouldn't expect somebody who had a

23   problem with, let's use the Handi-Foil Dollar Tree box as a

24   example, you wouldn't expect somebody who had a problem with

25   the Handi-Foil box to call Reynolds, would you?

D. Bryla - Cross                                                          569

1   A.   No, I would not.

2   Q.   Because they'd know to call Handi-Foil, right?

3   A.   Correct.

4   Q.   Because they would look at the box, even a two- to

5   three-second look at the box tells you who makes it, right?

6   A.   Correct.

7   Q.   Now, Mr. Bryla, I got the impression from your testimony,

8   I just want to make it clear, is it your testimony that

9   Reynolds sells in the stores for the same amount as, let's say,

10  store brands or as it does for Handi-Foil?

11  A.   Do you mean retail price?

12  Q.   Yeah.  So when I, the customer, walk into -- where I'm

13  from, I go into Jewel.  That's one of the places that you guys

14  sell?

15  A.   Correct.

16  Q.   Right across the street from us.  I go into Jewel, and

17  there's a number of different aluminum foil products.  Is it

18  your testimony that when I, the consumer, walk in there, all

19  those things are priced about the same?

20  A.   I didn't say that.  What I said was --

21  Q.   So I just want to make clear, when I, the consumer, walk

22  in, Reynolds is the most expensive, store brand less expensive,

23  and sometimes there's a discount brand that's even less

24  expensive than that?

25  A.   For some days of the year, yes.

D. Bryla - Cross                                                    605

1   A.   It did not.

2   Q.   Another thing that happens -- and we saw evidence of some

3   of these and, I think, even in your own testimony -- is people

4   will enter into what's called a consent judgment, right?

5   A.   I'm sorry, I don't know what that is.

6   Q.   So somebody says:  You've taken me to court.  I'll now

7   agree to stop.

8   A.   Okay.

9   Q.   And there's a variety of reasons people can do that,

10  right?

11  A.   Tell me.

12          THE COURT:  He said he's not familiar with the words.

13          MR. CALLAHAN:  Okay.

14          THE COURT:  And then -- let's move on to something

15  else.

16          MR. CALLAHAN:  Fair enough.

17  Q.   Again, I'd just like to close, I think, on sort of where

18  we started, Mr. Bryla.  As you sit here today, Reynolds' last

19  witness, and having heard that there's 30 million, almost 31

20  million boxes of the products that are at issue in this case

21  out there in the marketplace, you folks still aren't aware and

22  the jury is not going to hear any evidence of any real consumer

23  in a store being actually confused into thinking that those

24  Handi-Foil products came from Reynolds, correct?

25  A.   We have not done store intercepts to ask consumers on the

D. Bryla - Cross                                              606

1    spot if they're confused, but we do know in stores where

2    Handi-Foil and Reynolds are sitting side by side, we've lost

3    some market share.  So, you know, we'll find out over time.

4    You know, we get what's called panel data, and we'll see if

5    consumers have switched from -- because Handi-Foil clearly

6    picked up some business.  The business didn't come out of thin

7    air, right?

8    Q.   That's right.

9    A.   And so the question is did it come from private label or

10   did it come from Reynolds, and then we'll be able to find out

11   what was the rationale of why they bought it, but those types

12   of -- that type of market research takes some time to, you

13   know, to analyze, and we don't have that admissible today.

14   Q.   More than two years?

15   A.   No, not more than two years, but we don't even have our

16   first round of panel data yet as a result of this.  The sample

17   size is not big enough.

18   Q.   If when you brought this case you thought that was a

19   question that was important enough to find out the answer to,

20   you could have done these panel things in the preceding year,

21   correct?

22   A.   There wouldn't be a large enough sample size.  There

23   weren't enough boxes sold to make an impact on that.

24   Q.   And in your opinion, the only thing we care about in this

25   case -- we don't care, it's perfectly okay if consumers are

622

1              THE COURT:  All right.

2              MS. BRADLEY:  -- all four pages -- three pages.

3              Reynolds would also like to put into the record some

4    of the stipulated facts that the parties have agreed to in this

5    case.

6              THE COURT:  Go ahead, please.

7              MS. BRADLEY:  Stipulated Fact No. 3:  "Reynolds'

8    Reynolds Wrap brand aluminum foil roll products are currently

9    sold in the boxes depicted below, possibly among others:"

10             "The blue color on the Reynolds roll foil packaging

11   is called reflex blue."  That was No. 4.

12             "12.  Handi-Foil has manufactured, offered for sale

13   and sold consumer aluminum roll foil products since

14   approximately 2001 or 2002.

15             "13.  Handi-Foil manufactures, offers for sale, sells

16   and has sold aluminum roll foil in the 'Dollar Tree Package'

17   depicted below:

18             "14.  Handi-Foil has sold and continues to sell

19   aluminum foil in the Dollar Tree Package to Dollar Tree Stores,

20   Inc., ('Dollar Tree') in the United States, which resells the

21   product to consumers.

22             "15.  Dollar Tree began selling aluminum foil in the

23   Dollar Tree Package in March 2012.

24             "16.  Dollar Tree has approximately 4,600 stores

25   located in all 48 contiguous states and the District of

1 Columbia.

2          "17.  The Dollar Tree Package contains the

3 statement, 'Compare to Reynolds Wrap Foil.'

4          "18.  Handi-Foil has manufactured, offered for sale

5 and sold consumer aluminum roll foil in the package designed as

6 depicted below.

7          "20.  Handi-Foil has offered for sale or sold

8 aluminum roll foil in the Blue Box 2 Package in the following

9 sizes:

10          "21.  Handi-Foil manufactures and sells consumer

11 aluminum roll foil in the package designed as depicted below

12 (the 'Grocery Box'):

13          "22.  Handi-Foil has offered for sale or sold

14 consumer aluminum foil roll products in the Grocery Package to

15 grocery stores, discount stores and dollar-type stores

16 nationwide."

17          Let's go to No. 24.  "Handi-Foil has offered aluminum

18 foil roll for sale in the Grocery Box in the following sizes:

19          "25.  Handi-Foil has sold and continues to sell

20 aluminum foil roll products in the Grocery Box in the following

21 sizes:

22          "29.  Defendant has been selling Handi-Foil brand

23 consumer aluminum roll foil to Dollar Tree in the Dollar Tree

24 Box continuously since March 2012."

25          Let's go to No. 31.  "From March 2012 to August 5,

1    we don't have a problem with that, Your Honor.

2              THE COURT:  All right.

3              MS. BRADLEY:  We can limit it to the ones I read in.

4              THE COURT:  All right, good.  Thank you.

5              MS. BRADLEY:  Plaintiff rests.

6              THE COURT:  All right.  Then we're going to have a

7    conversation for a few minutes, and then we'll, we'll get you

8    back in, but we'll at least take 15 minutes for our mid-morning

9    break.  So you're excused at this time.  Thank you.

10                        (Jury out.)

11             MR. CALLAHAN:  Your Honor, one housekeeping thing for

12   Mr. Bryla.  We move to admit Defendant's Trial Exhibit 37.

13             THE COURT:  All right, any objection?

14             MR. FROEMMING:  What is 37?

15             MR. CALLAHAN:  37 is the e-mail chain.

16             MR. FROEMMING:  No objection.

17             THE COURT:  That you used in cross?

18             MR. CALLAHAN:  Yes, sir.

19             THE COURT:  All right, it's received.

20             All right, Mr. Callahan?

21             MR. CALLAHAN:  Yes, sir.  Your Honor, we would move

22   for judgment as a matter of law on all counts:  trademark

23   infringement, Count 1; false designation of origin, Count 2;

24   trade dress infringement, Count 3; Virginia state trade law

25   trademark infringement, Count 5; and Virginia state law unfair

1    competition, Count 6.  These all in our view, Your Honor, rise

2    and fall together.

3           The elements are Reynolds has got a mark, Handi-Foil

4    uses it, Handi-Foil's use occurred in commerce in connection

5    with the sale, offering for sale, distribution, or advertising

6    of goods and services, and that Handi-Foil used the mark in a

7    manner likely to confuse consumers.

8           As to trade dress infringement, the elements are that

9    the trade dress is primarily nonfunctional, the infringement

10   creates a likelihood of confusion, and the trade dress is

11   inherently distinctive or has created -- has acquired secondary

12   meaning.

13          State law trademark infringement also looks to

14   likelihood of confusion.  State law unfair competition requires

15   the same proof, including likelihood of confusion, as the

16   Lanham Act defenses.  I'm not going to read all nine of the

17   Fourth Circuit's likelihood of confusion factors into the

18   record.  The Fourth Circuit said these serve as a guide rather

19   than a formula, not all equal.  Obviously, they get weighed

20   separately.

21          With respect to the similarity of the marks, start

22   with the trademark.  That's also lined for blue, silver bands,

23   pink.  The other mark has got the Reynolds name.  Reynolds' own

24   witness testified that three of those four things are missing

25   and he wasn't sure about the fourth.

1          And again, the most important thing there is that the

2     Handi-Foil products all say "Handi-Foil," Reynolds Wrap

3     products all say "Reynolds Wrap," and there's been not an

4     instance of actual confusion, notwithstanding the fact that for

5     two years, 30 million of these -- 31 million almost of these

6     products have been sold.

7          Reynolds has also not shown in its case-in-chief any

8     intent to infringe with respect to the products at issue.

9     Ms. Butler's survey, as you heard her admit, tested -- did not

10    test the trademark issues at all, did not test dilution at all,

11    tested only the Dollar Tree box.  There's no even evidence of

12    likelihood of confusion with respect to either of the two

13    grocery boxes or any of the nonstick boxes, and again, there's

14    no evidence of actual confusion.

15         One, Your Honor, I would ask Your Honor to give

16    serious consideration to is Count 4.  Count 4 is dilution.  The

17    elements of dilution are that Reynolds own a protectible mark,

18    it's famous and became famous before 2012, it's distinctive,

19    that Handi-Foil used in commerce a mark different than

20    Reynolds, and that Handi-Foil's use of the mark is likely to

21    cause dilution of Reynolds' mark by blurring or tarnishment.

22    Now I think they've taken out the tarnishment.  It doesn't

23    appear in their jury instructions anymore.

24         The elements of dilution or blurring are the degree

25    of similarity, inherent or required distinctiveness, the extent

1    to which the owner is engaged in substantially exclusive use of

2    the mark, degree of recognition of the famous mark, whether the

3    user intended to create an association with the famous mark,

4    and any actual association between the mark and the famous

5    mark.

6              We haven't heard a single word from anyone, their

7    survey expert didn't say anything -- she didn't survey the

8    issue of dilution; she conceded that.  No witness for Reynolds

9    has said anything and no witness for Handi-Foil or any of those

10   things that they read in, no one has even mentioned to this

11   jury dilution or blurring, and so there really isn't any

12   evidence at all as to which the jury could reach a verdict in

13   favor of Reynolds on that point.

14             Count 8 is the false advertising case.  There is no

15   evidence of any literal falsity.  The testing evidence that is

16   in the record says the products are comparable.  Reynolds

17   admitted that they have testing of both their products and

18   Handi-Foil's products; we just heard that.  They didn't put

19   that into evidence, so all we have is the test evidence that

20   says comparable, comparable, comparable.

21             THE COURT:  You didn't put it into evidence either,

22   right?

23             MR. CALLAHAN:  All those things are in evidence, Your

24   Honor.

25             THE COURT:  You did not put -- I assume that you

1     sought any testing that Reynolds had done in your discovery,

2     and you didn't put in any evidence of their testing as well,

3     right?

4              MR. CALLAHAN:  No, we didn't, Your Honor, and the

5     reason we didn't is because false advertising came in at the

6     close of discovery.

7              THE COURT:  Ah, all right.

8              MR. CALLAHAN:  We didn't -- and Reynolds didn't say

9     in their, in their response to Judge Jones' order:  And here's

10    all the testing we're relying on.  So we had no opportunity to

11    even get that testing from them, and they chose not to rely on

12    it.  All we have is the STR testing, and that shows

13    conclusively that it's comparable.

14             THE COURT:  What about the 2002-2003 testing and

15    Mr. Bryla's testimony about the equivalent 10 percent rule?

16    Isn't that evidence that the jury has to consider?

17             MR. CALLAHAN:  That is evidence that the jury can

18    consider.  Mr. Bryla, though, admitted he's not the testing

19    expert.  The testing experts are the STR people.

20             THE COURT:  For the tests but not the criteria for

21    the tests.

22             MR. CALLAHAN:  Well, STR did the tests according to

23    their criteria.  Mr. Bryla said and he testified at some length

24    Reynolds has different criteria.  They try to tell people who

25    care you should use the Reynolds criteria.  But there's no

1  dispute that the STR people faithfully followed their own

2  criteria in determining that these are all comparable.

3          THE COURT:  All right, go ahead.

4          MR. CALLAHAN:  Thanks, Judge.

5          THE COURT:  Mr. Froemming?

6          MR. FROEMMING:  Your Honor, I didn't hear any zingers

7  there.

8          THE COURT:  No, no zingers.

9          MR. FROEMMING:  In terms of likelihood of confusion,

10  the test is total image and appearance.  That phrase is right

11  out of the Supreme Court case.  There's evidence galore of a

12  likelihood of confusion between the total look and appearance

13  of the challenged Handi-Foil packages and the registered and

14  incontestably so Reynolds Wrap packaging design.

15          We have a survey in evidence from Ms. Butler showing

16  significant likelihood of confusion.  We also have evidence of

17  reckless disregard of -- by Handi-Foil of Reynolds' claimed

18  trademark rights.

19          As to dilution, Your Honor, the same goes.  We have

20  ample evidence that the packaging design, the incontestably

21  registered packaging design is famous, in fact, according to

22  the EquiTrend and Harris interactive polls, more famous than

23  any other -- others that are commonly thought of.  If this

24  packaging design is not famous, Your Honor, nothing is.  The

25  same goes with distinctiveness.

636

1           As to the dilution factors as well, the very factors

2   that counsel rattled off support a judgment for likelihood of

3   dilution.  He mentioned degree of similarity.  He mentioned

4   inherent or, I think, acquired distinctiveness.  Again, an

5   incontestable -- an incontestable registration, Your Honor, is

6   irrebuttably presumed to have secondary meaning.

7           Substantially exclusive use, we put in evidence of

8   numerous enforcement efforts against third parties by Reynolds

9   over the years.  There is nothing in the record to my knowledge

10  of any packaging design other than the challenged designs of

11  Handi-Foil that come close to the look and feel of the

12  incontestably registered Reynolds Wrap trade dress.

13          The last factor he mentioned was intent to create

14  association.  We believe there's ample evidence of that,

15  including but not limited to the e-mails reflecting the

16  conscious attempt to match the color, match the laminate, copy

17  the yellow color of the nonstick box.  That goes for all the

18  products.

19          As to literal falsity, two points, one legal, one

20  factual, Your Honor.  The -- I don't have our proposed Fourth

21  Circuit jury instructions that quote Fourth Circuit law, but it

22  is generally law across this land that whereas here the

23  defendant makes in the nature of a tests show or a tests prove

24  advertising claim, that one way that that can be proven to be

25  false advertising is by putting in evidence that the purported

1  tests do not reliably support the proposition that is being

2  advertised.

3          That is the case here.  It's the case here with

4  respect to the tests, the 2011 preferred tests by Handi-Foil

5  that they paraded around the country themselves and through

6  their sales reps, which based upon the tensile strength,

7  demonstrably the most important criterion of aluminum foil, the

8  most important property that Reynolds has, in fact, featured in

9  its advertising for over 55 years, is significantly lower, in

10  fact, more than 10 percent lower for its most popular selling

11  stock-keeping unit, or SKU, and also for the other size of

12  product that was reflected in the other test that Handi-Foil

13  likes from recent times.  That's even before we get to the 2002

14  and 2003 tests, which they submitted product for, which they

15  paid for, and which say on their face the product is not

16  comparable.

17          We have admissions in the record that Handi-Foil is

18  the same old foil, just in a new package.  We have testimony

19  and evidence that the, that the Reynolds Wrap branded foil is

20  the same as it's been, and as you pointed out, Your Honor,

21  Mr. Bryla testified both as to the 10 percent rule and as to

22  the criteria as they relate in the real world to evaluating

23  equivalence with respect to the most important aspect of

24  aluminum foil.

25          THE COURT:  All right.  At this stage, with the legal

1   review that I must undertake at the end of the plaintiff's

2   case, they've made out a prima facie case for each of the

3   counts.  You know, these are uniquely, factually bound, and

4   there is evidence on both sides of the aisle for virtually

5   every one of the counts, but there's sufficient evidence of

6   each, including the dilution count.

7         You know, the jury has heard evidence of -- that can

8   be used for them to determine whether there's been blurring or

9   not and the other points that Mr. Froemming made with regard to

10  the famousness of the mark and the incontestability or weighty

11  considerations.  You know, I don't know whether the jury is

12  going to listen to any more of this false advertising evidence

13  given that they now understand that Reynolds did some testing

14  of Handi-Foil products and didn't enter it into evidence, but

15  that they at this stage have the 2002-2003 reports and the 2011

16  report and Mr. Bryla's testimony about the criteria used, and

17  so there's a factual dispute as well as to whether there was

18  intentional false advertising in it.

19        So your exception is noted, and let's take, you know,

20  15 minutes and come back and begin your case, all right?

21        MR. CALLAHAN:  Thanks, Your Honor.

22        THE COURT:  All right, thank you.  We're in recess.

23        (Recess from 11:01 a.m., until 11:17 a.m.)

24        NOTE:  The case continues in the absence of the jury

25  as follows:

K.E. Lane, III - By Deposition                                     659

1   lead you to believe that a consumer would have a negative

2   experience with Handi-Foil?

3   A.   I don't have any data or research.

4   Q.   You mentioned earlier that you were concerned --

5   A.   Yes.

6   Q.    -- about the package because of confusion at the shelf.

7   A.   Likely confusion at the shelf.

8   Q.   So what did you mean by that?

9   A.   That if this product was sold in distribution, which we

10  had found it at Dollar Tree, and if it had sold at other

11  locations as well, that a consumer would likely be confused.

12  Q.   Okay.  Are you aware of any instances where a consumer was

13  confused?

14  A.   Directly no.

15  Q.   Any indirect?

16  A.   Yeah.

17  Q.   How?

18  A.   Anecdotally a fellow employee of ours expressed to me that

19  he took the box home, handed it to his wife, and she expressed,

20  she said, why are you giving me this Reynolds Wrap box?  And he

21  said, that's what I thought, it's not Reynolds Wrap.

22  Q.   And who was that?

23  A.   That was our general counsel, Larry Tuskey.  Myself, I was

24  confused when I first received the samples.  They sat on my

25  desk probably for a week before I even examined them because I

K.E. Lane, III - By Deposition                                    660

1    didn't think to look at them because they looked -- I thought

2    they were just some other samples of Reynolds Wrap, to be

3    honest with you.

4           I get samples delivered to my office frequently from

5    trial runs or packaging runs.  I figured there would be an

6    e-mail somewhere in the pile about what this was for.

7    Q.   Okay.

8    A.   And then when I finally looked at it, I realized that it

9    was not in fact our product.

10   Q.   Ever have any retailer or person in the trade express any

11   confusion about the package?

12   A.   No.

13   Q.   Ever heard of an end user expressing any confusion as to

14   the package?

15   A.   Not to me.

16   Q.   To anyone?

17   A.   Not that's been played back.  But we don't monitor end

18   user sales at the shelf.

19   Q.   Was Reynolds Consumer Products concerned about the

20   placement of this package in the Dollar Tree stores, or are you

21   more concerned with grocery?

22   A.   I wasn't as concerned about placement in Dollar Tree

23   outside of the likely confusion I thought their consumers may

24   have when purchasing the product.

25   Q.   So is your concern that if someone sees the Handi-Foil

K.E. Lane, III - By Deposition                                    661

1  package sitting on the shelf, they're going to think that

2  that's a Reynolds package?

3  A.   I think that that is likely.

4  Q.   Why were you not as concerned about placement in Dollar

5  Tree as compared to grocery?

6  A.   Well, we had -- that was a class of trade that we couldn't

7  efficiently service anymore.  Dollar Tree is a retailer that

8  retails products at $1 and not above.  And that was a price

9  point that we could not efficiently hit, and we were going to

10 basically vacate that price point with Reynolds Wrap.

11         So I assumed Dollar Tree would continue to sell

12 aluminum foil.  So Handi-Foil gaining distribution there,

13 outside of what I thought was, you know, a confusing package,

14 was not surprising or the end of the world.

15 Q.   So, is it placement or distribution in the grocery

16 channels that's more concerning to Reynolds Consumer Products?

17 A.   What's concerning to me is twofold.  I'm more than willing

18 to compete with them in other classes of trade.  What's

19 concerning to me is their dilutive effect on the category and

20 likely confusion that consumers may see in their packaging.

21 Q.   This dilutive effect you're talking about, that's what we

22 were talking about earlier about the not bringing in new

23 consumers?

24 A.   Correct.

25 Q.   Okay.  Would that dilutive effect exist if Handi-Foil sold

K.E. Lane, III - By Deposition                                    662

1    its package in a green and yellow box?

2    A.   I suppose it depends on what their pricing in the

3    marketplace would be.

4    Q.   Does it have anything to do with the design of the

5    package?

6    A.   Once again, the only design of the package could produce

7    is in my opinion likely confusion from a consumer that may

8    purchase it.  And if they have a negative experience, since

9    it's a quality that I don't control, and they believe that they

10   purchased Reynolds Wrap, you know, and that they have negative

11   experience with the category and choose not to buy the category

12   anymore and move on to different solutions in their kitchen.

13   Q.   Is that separate from the dilutive effect you were talking

14   about earlier where --

15   A.   No.  That would be dilutive in terms of poor experiences

16   with products of a particular category, particularly if you're

17   confused and you thought you purchased the category leader

18   whose name and product is synonymous with that category,

19   meaning that you would then not purchase that category anymore

20   and the category would shrink in size.

21   Q.   Does Reynolds Consumer Products monitor customer

22   complaints?

23   A.   We do.

24   Q.   Are you aware of any complaints of someone complaining

25   about the quality of a product that you learned was Handi-Foil

K.E. Lane, III - By Deposition                                    663

1    and not Reynolds?

2    A.   Not -- no.

3    Q.   Does the Reynolds Consumer Products Web site have like a

4    place that consumers can post comments or questions about the

5    product?

6    A.   I think we have a submission form on our Web site, yes.

7    Q.   And are those monitored or reviewed?

8    A.   Oh, yes.

9    Q.   Were there any submissions that were given with someone

10   believing that they had purchased a Reynolds product that

11   turned out to be Handi-Foil?

12   A.   I'm not aware of any, but most people if they think they

13   purchased Reynolds Wrap wouldn't submit something that said I

14   bought Handi-Foil and it's not Reynolds Wrap.

15   Q.   Well, would you investigate if there was a quality issue

16   or a problem?

17   A.   We do investigate, yes.

18   Q.   Have you done any investigations where you determined that

19   quality issues were actually due to a Handi-Foil product?

20   A.   I'm not aware of any.

21   Q.   So you don't think the use of the Handi-Foil trade name

22   itself is a distinguishing element?

23   A.   Within the context of the whole trade dress, no.

24   Q.   Why not?

25   A.   Because our box has a distinct look and overall feel to

K.E. Lane, III - By Deposition                                    678

1  between Reynolds Wrap and the Handi-Foil accused packages?

2  A.   Not as of yet.

3  Q.   Is Reynolds aware of any instance of a consumer being

4  deceived about a relationship between Reynolds Wrap and the

5  Handi-Foil branded aluminum foil packages?

6  A.   Not as of yet.

7  Q.   Okay.  Now turn to topic 14, please.  Any facts that

8  support or refute Reynolds' contention that it is entitled to

9  any form of relief including, but not limited to, injunctive

10  and monetary relief.  Are you prepared to testify on behalf of

11  Reynolds on topic 14?

12  A.   Yeah, I guess to the best of my ability.

13  Q.   Is it Reynolds' contention that it's been harmed by the

14  Handi-Foil accused packages?

15  A.   I believe our contention is that consumer confusion is

16  likely.

17  Q.   Okay.  Does Reynolds contend it's been harmed?

18  A.   I believe that there would be and likely to be harm either

19  from a dilutive effect, as we talked about, or, you know, a

20  direct consumer confusion effect.

21  Q.   How would a direct consumer confusion effect harm

22  Reynolds?

23  A.   They chose to buy somebody else's product.

24  Q.   So a lost sale?

25  A.   Potentially.

K.E. Lane, III - By Deposition                                             679

1  Q.   So sitting here today, you're not aware of any lost sales,

2  is that correct?

3  A.   I'm not aware of any data around that, yes.

4  Q.   And how has this dilutive effect harmed Reynolds?

5  A.   The dilutive effect, I think, is likely as a spread in

6  distribution.

7  Q.   So sitting here today, you think there is a likelihood of

8  harm, but you're not aware of any actual harm at this point?

9  A.   I'm not aware of actual -- yeah, I think harm is likely.

10  Q.   Let's look at the complaint.  Reynolds has alleged in its

11  complaint that it has been harmed by these packages, and I'm

12  just trying to figure out how.

13  A.   Well, they currently are on shelf at certain retailers.

14  Q.   Okay.

15  A.   So in that regard I believe that we have been harmed.  The

16  extent of that harm I don't have data around.

17  Q.   Has the strength of Reynolds' brand been diminished by the

18  Handi-Foil branded accused products?

19  A.   It's a strong brand.  I believe that it could likely be

20  harmed if a consumer was confused, bought the product, had a

21  negative experience with a product they believe to be ours,

22  that we didn't control the quality.

23  Q.   All right.  Do you have any facts to support a contention

24  that the Reynolds Wrap brand has been diminished by the sale of

25  Handi-Foil and the accused packages?

K.E. Lane, III - By Deposition                                    680

1   A.   I don't have any, I have not seen any facts to that

2   regard.

3   Q.   Okay.  What facts does Reynolds Consumer Products have

4   with respect to the dilutive effect that you've referred to?

5   A.   The context which I've used it is a potential dilutive

6   effect as they grow distribution.  And the dilutive effect is

7   not only to our brand but also to the category, which we

8   covered.

9   Q.   Okay.  Does Reynolds Consumer Products have any facts to

10  support that it's actually had a dilutive effect on its brand?

11  A.   I don't have any surrounding that at this time.

12  Q.   Okay.  And does Reynolds believe that the likely confusion

13  is going to result in harm to the Reynolds brand?

14  A.   Yes.

15  Q.   How so?

16  A.   A confused consumer would pick up this package that I

17  can't guarantee the quality or the performance of the product

18  within that box and potentially have a negative experience

19  believing they have purchased Reynolds Wrap.

20  Q.   Are there any facts that Reynolds has that it would not be

21  able to be compensated monetarily for the sale of the accused

22  packages?

23  A.   I would say a 66-, soon to be 67-year-old brand's

24  reputation, if harmed, could not be compensated monetarily.

25  Q.   Okay.  Do you have any facts or data to support that the

K.E. Lane, III - By Deposition                              681

1    66-, soon to be 67-year-old brand's reputation has been harmed?

2    A.   Not as of yet.

3    Q.   Sitting here today, are you aware of any loss of market

4    share in the aluminum roll foil product that Reynolds Consumer

5    Products has experienced after the introduction of the

6    Handi-Foil accused packages?

7    A.   I don't have data around that.

8    Q.   Do you have any inclination, given your role at the

9    company?

10   A.   Yeah.  My inclination is that we have lost some potential

11   market share.

12   Q.   Okay.  So as part of your business, are you aware of any

13   surveys, polls, or any other research that Reynolds Consumer

14   Products has done with respect to the Handi-Foil accused

15   packages?

16   A.   We've not done any and we don't have any currently

17   planned.

18   Q.   I am going to hand you what's been marked as Exhibit 56,

19   which for the record is RHF 00020492 through 20532, which is

20   the specific document referenced in the topic.  This is labeled

21   2013 Foil Line-up Private Label.

22          Has Reynolds put together similar documents for

23   previous years?

24   A.   I'm not aware if we did or not.  We did this -- my team is

25   relatively new.  I believe we probably did one in 2012, but I

D. Sarnoff - Cross                                                        723

1    Q.   Okay.  Did it ever occur to you that by having a blue on

2    the left and red on the right new packaging design for your

3    product and putting Reynolds' trademark name on it, that people

4    might associate it with Reynolds?

5    A.   Absolutely no.  I did not think they would associate it

6    with Reynolds.  It says "Compare to Reynolds Wrap" on there.

7    People will know that it's not Reynolds, and it says

8    "Handi-Foil" on the box.

9    Q.   I don't want to inquire into any privileged communications

10   you've had with your counsel, but just as a non-lawyer, do you

11   understand that a likelihood of confusion that is trademark

12   infringement can be found either if there is a likelihood that

13   people would think that your designs were made or put out by

14   Reynolds or somehow affiliated or associated with Reynolds or,

15   or if people would think that you had obtained permission from

16   Reynolds to use this design?

17           Do you understand that?

18   A.   What was the question?

19   Q.   Did you understand that a, that there could be trademark

20   infringement, that trademark infringement arises if there's a

21   likelihood either that people would think that this, from this

22   overall look and feel, that this came from Reynolds Wrap, or if

23   it was affiliated or associated in some way with Reynolds Wrap,

24   or if people would think that, that the person putting out this

25   box had obtained the permission of Reynolds to use this overall

D. Sarnoff - Cross                                                    724

1    look and feel?

2    A.   It's a very long question.  We sold 31 million boxes of

3    retail roll foil.  We received no e-mails or any comments from

4    consumers or the retailers of anybody being confused, thinking

5    the product was from Reynolds.  The product says "Handi-Foil"

6    clearly, and it says "Compare to Reynolds" on the bottom.

7            THE COURT:  All right, so answer the question now if

8    you can --

9            THE WITNESS:  I'm not really sure what the question

10   is, to be honest.  I'm not trying to be difficult.  I don't

11   really understand.

12           THE COURT:  It's a legal standard that you're

13   unfamiliar with; is that fair to say?

14           THE WITNESS:  I'm not a lawyer.  I do sales and

15   marketing.

16           THE COURT:  All right, let's move on.

17           THE WITNESS:  I don't want to answer wrong.

18   BY MR. FROEMMING:

19   Q.   Well, you said at the top of your direct that if you saw

20   any evidence, that you would have made adjustments to the box.

21   You said that, right?

22   A.   I did say that.

23   Q.   And by "evidence," were you referring to evidence of

24   likelihood of confusion, which is the standard for trademark

25   infringement?

P. Perkins - Direct                                           840

1    specific sales for each of the accused packages for this year

2    to date, we would basically take the 75 pages of DTX 59 and add

3    up those individual item numbers?

4    A.   That's correct.  I think on page 2 I see one of the

5    numbers is 12200, that's one of the accused products.  I could

6    just total up the sales in year to date quantity 2013 or 2012,

7    I am not sure if we sold it in 2012, looks like a little bit,

8    we could total up that item number and get the total sales for

9    any one of those items.

10   Q.   You mentioned this came out of your computer system.  Is

11   Exhibit DTX 59 the type of information you keep in the ordinary

12   course of your business?

13   A.   It is.

14   Q.   To date, how many boxes of the accused products has

15   Handi-Foil sold?

16   A.   I believe we are at about 30.7 million boxes.

17   Q.   What have the revenues by for those packages to

18   Handi-Foil?

19   A.   The total revenue for the last two years, we just closed

20   the 2013 period, is just over 23 million of sales.

21   Q.   Okay.  And that's your revenue?

22   A.   That's our total revenue.

23   Q.   Are the sale of the accused products, the Dollar Tree

24   package and the grocery packages we've been looking at, are

25   those a profitable business for Handi-Foil?

R. Kivetz - Direct                                                    936

1    A.   Based on the different research that I conducted, that I

2    described earlier, reading the pleadings in the case, speaking

3    with the executives for Handi-Foil, importantly visiting stores

4    in the marketplace, what I determined is that typically in the

5    Dollar Tree stores consumers would face, would encounter three

6    aluminum foil products.  One is the allegedly infringing

7    aluminum foil by Handi-Foil, this package, the accused package.

8            Another product that they typically would encounter

9    would be the Reynolds Wrap 18-square foot package, which I also

10   used in my survey.

11           And the third product that they would typically see

12   in the Dollar Tree stores was an Ultra Foil, private label

13   product that had 40 square foot on it.

14   Q.   I am going to hand you what has been marked and previously

15   admitted as DTX 58, and then what has been marked for

16   identification purposes as DTX 286.

17           Can you describe for the jury what those packages

18   are.

19   A.   Sure.  So this, we have already discussed, this is the

20   allegedly infringing Handi-Foil product that was sold in the

21   Dollar Tree store and only in the Dollar Tree.

22           This is the Reynolds Wrap 18-square foot product that

23   typically was also sold in the Dollar Tree stores side by side

24   on the same shelves with the Handi-Foil product.

25           And this is the Ultra Foil aluminum foil product 40

R. Kivetz - Direct                                                937

1    square foot that also was typically sold side by side in the

2    same shelves with these two other products in the Dollar Tree

3    stores.

4    Q.   And how did you determine that these three products are

5    sold side by side in Dollar Tree stores?

6    A.   In a couple of ways.  One is I visited stores, Dollar Tree

7    stores.  I had an assistant of mine also visit multiple Dollar

8    Tree stores.  And I also spoke with the executives for

9    Handi-Foil, including Jim Oesterreicher, who is the account

10   manager into the Dollar Tree.

11   Q.   Okay.  Let's turn to the third principle we mentioned, the

12   proper control.  What was your goal for developing and

13   selecting a control in this case?

14   A.   My goal was to create a valid, reliable scientific

15   control, like a placebo for a drug, that would remove most or

16   all of the elements that the plaintiff, that Reynolds is

17   claiming are infringing on their product.

18           A control that would remove or change most of the

19   packaging elements on the Handi-Foil product that Reynolds is

20   saying are causing people to be confused.  That's what is at

21   stake in this case, that's what the likelihood of confusion

22   survey should test.

23           At the same time, my goal was to keep everything else

24   on the package the same.

25           So, for example, the name Handi-Foil, that name mark

1012

1  come back at 2:00, and have lunch, and then that appears to be

2  the end of the evidence in the case, and we'll -- if, if the

3  case is going to continue on, then we'll have closing arguments

4  and jury instructions at that time, all right?  So you're

5  excused at this time to come back at 2 p.m.

6                      (Jury out.)

7            THE COURT:  All right, have a seat.  Do you want to

8  renew your motion at this time?

9            MR. CALLAHAN:  Your Honor, we would at the close of

10 our evidence now renew our motion for judgment as a matter of

11 law for all the reasons that we stated in our initial motion

12 for judgment as a matter of law following the conclusion of

13 plaintiff's case.

14           THE COURT:  All right, thank you.  And I'm going to

15 deny it at this time.  I think that again, there's issues of

16 fact for each of the counts in the complaint that it's up to

17 the jury to resolve.

18           I've looked at the jury instructions, and I thank you

19 again for working through those, and as I understand it, we

20 only have a couple of instructions where Reynolds disagrees

21 with the proposed instruction of Handi-Foil:  33, 36, 40, and

22 43.

23           Mr. Froemming, is that your understanding?

24           MR. FROEMMING:  Just a second, Your Honor.  I'm just

25 checking the numbers.

1064

1   sales, four-and-a-half billion dollars over a period of time,

2   300 million in advertising.  And he wants people to believe,

3   and he testified under oath, that we, our presence caused them

4   to lose, Handi-Foil's presence caused them to lose a point in

5   market share, $8 million, $3 million in profit.

6          And I looked at this and I said, boy, there is a

7   line.  Can you highlight that gap in between 2012 and Total.

8   And I said, there is a line in between 2012 and the total.  I

9   don't know if that is just an extra line somebody put in there.

10  I said, wait a second, it's 2014.  That's 2013.  That's the

11  year in which Mr. Bryla says we took sales away from them.  We

12  caused their market share to shrink.

13         So, one of the very first questions I asked Mr. Bryla

14  on cross-examination, if we can go to trial transcript

15  page 565.  I said, let's fill that chart out.  Let's figure out

16  what belongs in that number because you didn't present that to

17  the jury, you just left it blank.

18         I said, okay, what were Reynolds' sale in 2013 of

19  Reynolds Wrap?  I was expecting he was going to say they went

20  down $8 million, that's the one point we lost to you guys in

21  market share.  Instead, I said if we were to -- if we were to

22  just fill in the last full year that wasn't on what you put in

23  front of the jury, what would that be.  About $435 million.

24         Let's go back to the chart.  $435 million, a little

25  quick math, their sales didn't go down 8 million.  Their sales

1   went up $52 million.  And at a 37-and-a-half percent profit, I

2   figure that's about an extra $15 million plus.

3          So, the testimony under oath was Reynolds lost market

4   share, down 8 million.  The truth is, they were up 52 million,

5   37-and-a-half percent of which was profit.

6          This goes exactly counter to what Mr. Lane tried to

7   testify to, which is that he said a second participant in this

8   market wrecks the market for everybody.  The sales will go down

9   in the overall market when Handi-Foil comes in.

10          That's not the case at all.  Handi-Foil had a good

11   sales year in 2013, they sold a lot of product.  Reynolds had a

12   fantastic sales year in 2013.  If you go back and you look at

13   this exhibit, you will see that's Reynolds' second best year of

14   aluminum foil sales ever.  Their next -- their best year was

15   the year just before the recession.

16          So, Reynolds decided to compete in court instead of

17   in the marketplace.  Why?  Because our sales have gone up.

18   Theirs have gone up too.

19          What do they know about Handi-Foil though?  They know

20   that Handi-Foil has nailed it in the pan business two different

21   times.  The company that David's father, Nort, started went

22   from 0 percent in the pan market to 70 percent.  They then sold

23   that business to Reynolds, which hasn't been able to run it as

24   well as Handi-Foil did.  Right.  They are back down to a very

25   minor player in that market again.  Nort came back into the

1100

1    instructions is about as painful as there is for a judge.

2                           (Jury present.)

3            THE COURT:  I apologize, I need you to go back into

4    the jury room for just one minute.

5                           (Jury out.)

6            THE COURT:  My fault.  I forgot to ask you about

7    alternate jurors.  We've got the two alternates.  As I said, if

8    you both agree, they can sit and deliberate.  If you would

9    prefer not -- if either party would prefer not, then I'll

10   excuse them after I read the instructions and ask them to, you

11   know, to not do anything which would disqualify them.

12           MR. FROEMMING:  The more the merrier.

13           MR. CALLAHAN:  Agreed.

14           THE COURT:  Okay.  All right, thanks.

15                           (Jury present.)

16           THE COURT:  I'm sorry, please be seated.  And as I

17   said, I'm going to read them, because when I try and

18   paraphrase, I mess them all up.

19           Now that you've heard all the evidence that's to be

20   received in the trial and each of the arguments of counsel,

21   it's my duty to give you the final instructions as to the law

22   that's applicable in the case.  These instructions should be

23   used to guide you in your decisions.

24           All the instructions of law given to you -- those

25   given in the beginning of the trial and those given to you

1    during the trial at different times and these final

2    instructions -- must guide you and govern your deliberations.

3    Actually, I don't remember giving you any instructions of the

4    law during the trial, but before we started and, and now.

5           It's your duty as jurors to follow the law as stated

6    in all the instructions and to apply these rules of law to the

7    facts as you find them to be from the evidence received during

8    the trial.

9           Counsel have quite properly referred to some of the

10   applicable rules of law in their closing arguments.  If,

11   however, any differences appear to you between the law as

12   stated by counsel and as stated by the Court in these

13   instructions, you are to be governed by the instructions that

14   I'm giving you now.

15          You're not to single out any one instruction alone as

16   stating the law but must consider the instructions as a whole

17   in reaching your decisions.

18          Neither are you to be concerned with the wisdom of

19   any rule of law as I state.  Regardless of any opinion you may

20   have as to what the law ought to be, it would be a violation of

21   your sworn duty to base any part of your verdict on any other

22   view or opinion on the law than that given in these

23   instructions, just as it would be a violation of your sworn

24   duty as judges to base your verdict upon anything but the

25   evidence that you received in the case.

1   manufactured or sold by others, and to indicate the source of

2   his product, even if that source is generally unknown.

3        A trade dress is a type of trademark used by a person

4   to identify his product, to distinguish his product from those

5   manufactured or sold by others, and to indicate the source of

6   his product.  The term "trade dress" refers to the total image

7   and overall appearance of a product, product packaging, product

8   label, product design, or a combination of these things.  It

9   includes features such as size, shape, color or color

10  combinations, texture, graphics, or particular sales

11  techniques.

12       The purpose of trademark law is to prevent confusion

13  among consumers about the source of products and to permit

14  trademark and trade dress owners to show ownership of their

15  products and control their products' reputation.

16       Reynolds claims that Handi-Foil infringed Reynolds'

17  trademarks and trade dress for the design of the Reynolds Wrap

18  package by adopting the package designs Handi-Foil has used on

19  its packages of Handi-Foil brand aluminum roll foil.

20  Handi-Foil denies that its use of its trade dress on Handi-Foil

21  brand packages either infringes or causes a likelihood of

22  confusion.

23       Reynolds claims that Handi-Foil infringed Reynolds'

24  trademarks and trade dress.  To succeed on these claims,

25  Reynolds must prove the following things by a preponderance of

the evidence:

      One, that Reynolds owns trademarks and trade dress in the Reynolds Wrap package as trademarks and trade dress;

      Two, that Reynolds' trademarks and trade dress are valid trademarks and trade dress;

      Three, that Handi-Foil used its trade dress for the Handi-Foil brand packages in interstate commerce in connection with the sale or offering for sale of goods;

      Handi-Foil used its trade dress for the Handi-Foil brand packages in a manner that is likely to cause confusion as to the source, origin, sponsorship, or approval of Handi-Foil's products;

      That Reynolds' claimed trade dress is not functional.

      And I'll explain what I mean by these terms.

      If you find that Reynolds has proved each of these things by a preponderance of the evidence, you must find for Reynolds.  If Reynolds did not prove each of these things by a preponderance of the evidence, you must find for Handi-Foil.

      One of the things Reynolds must prove is that Reynolds owns the Reynolds Wrap package design as trademarks and common law trade dress.

      Reynolds owns the Reynolds Wrap package design as trademarks and trade dress if Reynolds used the trademarks and trade dress in a manner that allowed consumers to identify the trademarks and trade dress with Reynolds or its product before

1113

1    Handi-Foil began to use the package designs for the Handi-Foil

2    brand packages on its aluminum roll foil boxes.

3           Among the factors you may consider are the volume of

4    sales of Reynolds' product, the nature of Reynolds' sales and

5    purchasers, and the amount of Reynolds' advertising promotion

6    and publicity relating to the product.

7           In this case, there's no dispute that Reynolds

8    received two registrations for the trademarks depicting certain

9    elements of the Reynolds Wrap package design, and these

10   registrations are now incontestable under the trademark laws.

11   This means that Reynolds' registrations of the trademarks are

12   conclusive evidence of Reynolds' ownership of these trademarks

13   and that the trademarks are valid and protectable.

14          A valid common law trade dress is a package design

15   that is distinctive, which means that the package design is

16   capable of distinguishing Reynolds' product from the products

17   of others.  A trade dress is valid if it is inherently

18   distinctive or if it has acquired distinctiveness, and it is

19   nonfunctional.

20          An inherently distinctive common law trade dress is

21   one that consumers would almost automatically recognize as

22   identifying a particular brand or source of the product.

23          To determine whether Reynolds' common law trade dress

24   is inherently distinctive, you must consider it as a whole.

25   Some of the factors you may consider are:

1    Nine, the sophistication of the consuming public.

2    The weight to be given each of these factors is up to

3    you to determine.  No particular factor or number of factors is

4    required to prove likelihood of confusion.

5    Virginia state requires -- state law requires a

6    finding of likelihood of confusion to prove trademark

7    infringement.

8    Virginia common law unfair competition claim requires

9    the same proof, including likelihood of confusion, as the

10   Lanham Act offenses.

11   Reynolds claims that Handi-Foil engaged in false

12   advertising.  To succeed on this claim, Reynolds must prove

13   five things by a preponderance of the evidence:

14   First, Handi-Foil made a false statement of fact in a

15   commercial advertisement about the nature, quality, or

16   characteristic of its own product;

17   Second, that the statement actually deceived or had

18   the tendency to deceive a substantial segment of Handi-Foil's

19   audience;

20   Third, the deception was likely to influence the

21   purchasing decisions of consumers;

22   Four, Handi-Foil caused the false statement to enter

23   interstate commerce.  A false statement enters interstate

24   commerce if Handi-Foil's products are advertised or sold across

25   state lines or if Reynolds' products as advertised or sold

1135

1        MR. CALLAHAN:  We agree with that, Your Honor.

2        THE COURT:  All right.  Then any reason why I should

3   not enter the verdict based on the judgment of the jury

4   pursuant to Rule 58 and then set some posttrial motions dates

5   and give you an opportunity to be heard posttrial?

6        I don't know if you want it.  I mean, we would need

7   to talk about an injunction, obviously, on the equity side.

8   But if you want an opportunity to review the record and see

9   whether you want to file posttrial motions, I am certainly

10  willing to give you that time.

11       MR. FROEMMING:  No reason, Your Honor.

12       THE COURT:  Okay.

13       MR. CALLAHAN:  That's fine with us, Your Honor.  I

14  would point out that the test as to which the jury answered yes

15  to question 2 is the same test in the instructions as to which

16  they answered no to questions -- at least question 5.

17       THE COURT:  Yeah.

18       MR. CALLAHAN:  So -- but I think that can probably

19  get hacked out post in trial briefing.

20       THE COURT:  Okay.  Then why don't you get together on

21  a posttrial briefing schedule and set it down for a Friday, and

22  also the issue of the injunction, and we will hear you down the

23  road.

24       Obviously, a good time to try and resolve it now that

25  the jury has heard it.  Very interesting from a judge's

1    would be terrific to give it a shot.

2            MR. FROEMMING:  Thanks, Your Honor.

3            THE COURT:  All right.  Thank you.  Thank you all.

4            MR. CALLAHAN:  Thanks, Judge.

5            THE COURT:  All right, we are in recess.

6    ------------------------------------------------
                        TRIAL CONCLUDED
7

8

9

10

11

12

13

14

15

16

17            I certify that the foregoing is a true and

18    accurate transcription of my stenographic notes.

19

20

21                     /s/ Norman B. Linnell
                     _____
22                   Norman B. Linnell, RPR, CM, VCE, FCRR

23

24

25